MORGAN & MORGAN
COMPLEX LITIGATION GROUP
John A. Yanchunis (Admitted *Pro Hac Vice*)
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Telephone: 813/223-5505
813/223-5402 (fax)
jyanchunis@ForThePeople.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
Stuart A. Davidson (Admitted *Pro Hac Vice*)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
sdavidson@rgrdlaw.com

MILBERG TADLER PHILLIPS
GROSSMAN LLP
Ariana J. Tadler (Admitted *Pro Hac Vice*)
One Pennsylvania Plaza, 19th Floor
New York, NY 10119
Telephone: 212/594-5300
212/868-1229 (fax)
atadler@milberg.com

CASEY GERRY SCHENK FRANCAVILLA
   BLATT & PENFIELD LLP
Gayle M. Blatt (122048)
110 Laurel Street
San Diego, CA 92101
Telephone: 619/238-1811
619/544-9232 (fax)
gmb@cglaw.com

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
Karen Hanson Riebel (Admitted *Pro Hac Vice*)
100 Washington Ave. South, Suite 2200
Minneapolis, MN 55401
Telephone: 612/339-6900
612/339-0981 (fax)
khriebel@locklaw.com

*Attorneys for Plaintiffs and Proposed Class Counsel*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA - SAN JOSE DIVISION

| | |
|---|---|
| IN RE: YAHOO! INC. CUSTOMER DATA SECURITY BREACH LITIGATION | No. 16-md-02752-LHK |

**PLAINTIFFS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Date:           November 1, 2018
Time:           1:30 p.m.
Courtroom:   8, 4th Floor
Judge:          Hon. Lucy H. Koh

PLEASE TAKE NOTICE THAT Plaintiffs will and hereby do respectfully move the Court, pursuant to Federal Rule of Civil Procedure 23, to grant Plaintiffs' Motion for Class Certification in connection with the classes specified below under the following causes of action alleged in their First Amended Consolidated Class Action Complaint: (i) the California Unfair Competition Law ("UCL") claims for unfair and unlawful business practices (First Claim for Relief and Second Claim for Relief); (ii) the breach of contract claim (Fifth Claim for Relief); (iii) the breach of implied contract claim (Sixth Claim for Relief); (iv) the breach of the implied covenant of good faith and fair dealing claim (Seventh Claim for Relief); (v) the negligence claim (Fourth Claim for Relief); (vi) the Consumers Legal Remedies Act ("CLRA") claim (Eleventh Claim for Relief); (vii) the UCL claim for fraudulent business practices (Ninth Claim for Relief); and (viii) the California Customer Records Act ("CRA") claim under Cal Civ. Code §1798.82 (Thirteenth Claim for Relief). Plaintiffs also seek appointment of the proposed Class Representatives and Class Counsel, as described below.

Hearing on this motion will be held on November 1, 2018, at 1:30 p.m. in the Courtroom of the Honorable Lucy H. Koh, located at the Robert F. Peckham Federal Building & United States Courthouse, 280 South First Street, Fourth Floor, San Jose, California.

## I.      Plaintiffs' Proposed Classes[1] and Class Representatives

### A.      Rule 23(b)(2): UCL Injunctive Relief Class

Plaintiffs move to certify, under Rule 23(b)(2), their claims for declaratory and injunctive relief under the UCL for unfair acts or practices on behalf of the following class:

> *UCL Injunctive Relief Class.*  All persons who registered for a free Yahoo account(s) in the United States whose PII was stolen from Yahoo in the 2013 Breach, the 2014 Breach, and/or the Forged Cookie Breach.

The proposed Class Representatives for the UCL Injunctive Relief Class are Plaintiffs Kimberly Heines, Hashmatullah Essar, Paul Dugas, Matthew Ridolfo, and Deana Ridolfo. Alternatively, Plaintiffs request that the Court certify the same claims on behalf of the following class, to be represented by Plaintiffs Heines and Dugas:

---

[1]   "Classes" collectively refers to the UCL Injunctive Relief Class and the Damages Class and Subclasses.

*CA UCL Injunctive Relief Class*.  All persons who registered for free Yahoo account(s) in California, or who are free Yahoo account users residing in California, whose PII was stolen from Yahoo through the 2013 Breach, the 2014 Breach, and/or the Forged Cookie Breach.

**B.     Rule 23(b)(3)**

**1.     The Damages Class and Subclasses**

Plaintiffs move to certify the following Class and subclasses under Rule 23(b)(3):

*Damages Class*.  All persons who registered for any Yahoo or Aabaco account(s) in the United States and Israel whose PII was stolen from Yahoo in the 2013 Breach, the 2014 Breach, and/or the Forged Cookie Breach.

a.     *Free Users Subclass*.  All persons who registered for free Yahoo account(s) in the United States or Israel whose PII was stolen from Yahoo in the 2013 Breach, the 2014 Breach, and/or the Forged Cookie Breach;

b.     *Paid Users Subclass*.  All persons who registered for paid Yahoo account(s), excluding Yahoo Small Business or Aabaco accounts, in the United States or Israel whose PII was stolen from Yahoo in the 2013 Breach, the 2014 Breach, and/or the Forged Cookie Breach;

c.     *Small Business Users Subclass*.  All persons who registered for Yahoo Small Business or Aabaco account(s) in the United States or Israel whose PII was stolen from Yahoo or Aabaco in the 2013 Breach, the 2014 Breach, and/or the Forged Cookie Breach; and

d.     *California Users Subclass*.  All persons who registered for any Yahoo or Aabaco account(s) in California, or who are Yahoo or Aabaco account users residing in California, whose PII was stolen from Yahoo in the 2014 Breach and/or the Forged Cookie Breach.

The proposed Class Representatives for the Damages Class are Plaintiffs Kimberly Heines, Hashmatullah Essar, Paul Dugas, Matthew and Deana Ridolfo, Mali Granot, Yaniv Rivlin, Andrew Mortensen, and Brian Neff.  The proposed Class Representatives for the Free Users Subclass are Plaintiffs Kimberly Heines, Hashmatullah Essar, Paul Dugas, Matthew Ridolfo, Deana Ridolfo, Mali Granot, and Yaniv Rivlin.  The proposed Class Representative for the Paid Users Subclass is Plaintiff Andrew Mortensen.  The proposed Class Representative for the Small Business Users Sublass is Plaintiff Brian Neff.  The proposed Class Representatives for the California Users Subclass are Plaintiffs Heines and Dugas.

1

### 2. The Claims

2      Through the above defined Classes, Plaintiffs seek to litigate the following claims on behalf

3  of Class members[2]:

4      On behalf of the Damages Class, with members who registered for free, paid, and small

5  business accounts being independently represented through their respective Subclasses, Plaintiffs

6  seek to litigate their claims for negligence, breach of express contract, breach of implied contract,

7  and breach of the implied covenant of good faith and fair dealing.

8      Plaintiff Mortensen further seeks to ligate his claim for unfair and deceptive business

9  practices in violation of the CLRA on behalf of the Paid Users Subclass.  Should the Court

10  determine that Plaintiff Mortensen may not litigate his CLRA claim on behalf of users who

11  registered their accounts in, or reside outside of, California, he requests that the Court certify the

12  following  alternative subclass:

13         *CA Paid Users Subclass*. All persons who registered paid Yahoo account(s),
        excluding Yahoo Small Business or Aabaco accounts, in California, or who are paid
14         Yahoo account users residing in California, whose PII was stolen from Yahoo
        through the 2013 Breach, the 2014 Breach, and/or the Forged Cookie Breach.
15

16      Plaintiff Neff further seeks to litigate his claim for fraudulent business practices in violation

17  of the UCL on behalf of the Small Business Users Subclass.  Should the Court determine that

18  Plaintiff Neff may not litigate his UCL claim on behalf of users who registered their accounts in, or

19  reside outside of, California, he requests that the Court certify the following alternative subclass:

20
        *CA Small Business Users Subclass*.  All persons who registered for Yahoo Small
21         Business or Aabaco account(s) in California, or who are Yahoo Small Business or
        Aabaco account users residing in California, whose PII was stolen from Yahoo or
22         Aabaco through the 2013 Breach, the 2014 Breach, and/or the Forged Cookie
        Breach.
23

24      Plaintiffs Heines and Dugas also seek to litigate their CRA claim on behalf of the California

25  Users Subclass.

26

27  [2]   "Class members" refers to members of either or both of the UCL Injunctive Relief Class and the
28  Damages Class.

C.     **Rule 23(c)(4): Issue Certification for the Damages Class**

Should the Court decline to certify the proposed Damages Class as a full class under Rule 23(b)(3), Plaintiffs request the Court certify the following issues for classwide determination under Rule 23(c)(4) to streamline the litigation for all Damages Class members seeking to recover for their contract and negligence claims:

- Whether Defendants had a contractual, legal, or statutory duty to safeguard users' PII;

- Whether Defendants failed to adequately safeguard users' PII;

- Whether affected users' PII was exfiltrated from Defendants' systems in the Breaches;

- Whether the PII exfiltrated by the Breaches from all affected users' accounts could have caused identity fraud;

- Whether Defendants' failure to adequately safeguard users' PII was a causal factor in the exfiltration of affected users' PII;

- Whether and when Defendants knew about their inadequate security and the Breaches and, if so, whether they failed to timely notify users;

- Whether the exfiltration of affected users' PII increased the risk that those users will suffer identity theft;

- Whether paid users and small business users lost the benefit of their bargain for secure services and, if so, the amount of that benefit to each group;

- The value of different categories of PII that was stolen by the Breaches; and

- Whether Defendants' conduct is such that the burden of proof for causation should shift to them to show that the Breaches were not the but for cause of affected users' injuries.

D.     **Exclusions**

Excluded from all Classes are Defendants, any entity in which Defendants or their successors have a controlling interest, and Defendants' officers, directors, legal representatives, successors, subsidiaries, and assigns.  Also excluded from all Classes are any judges, justices, or judicial officers

1  presiding over this matter, the members of their immediate families and judicial staff, and Plaintiffs'
2  counsel.

3  **II.    Plaintiffs' Proposed Class Counsel**

4        Plaintiffs also seek the appointment of John A. Yanchunis of Morgan & Morgan, Gayle M.
5  Blatt of Casey Gerry Schenk Francavilla Blatt & Penfield LLP, Karen Hanson Riebel of Lockridge
6  Grindal Nauen P.L.L.P., Ariana H. Tadler of Milberg Tadler Phillips Grossman LLP, and Stuart A.
7  Davidson of Robbins Geller Rudman & Dowd LLP as Class Counsel.

8        Plaintiffs base their Motion for Class Certification on: Plaintiffs' Notice of Motion and
9  Motion for Class Certification; Memorandum of Points and Authority in Support of Plaintiffs'
10 Motion for Class Certification; Declaration of John Yanchunis, including Record Evidence
11 Submitted in Support of Plaintiffs' Motion for Class Certification, Report of Mary Frantz, Report of
12 Jim Van Dyke, Declaration of Gary Parilis, and Declaration of Ian Ratner; First Amended
13 Consolidated Class Action Complaint; and all other records and papers on file in this action and all
14 other matters properly before the Court.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2
**Page**

3  I.   STATEMENT OF ISSUES TO BE DECIDED ............................................................... 1

4  II.  STATEMENT OF FACTS DEVELOPED THROUGH DISCOVERY ........................... 1

5       A.   Yahoo's Services and Representations Concerning Data Security ........................ 1

6       B.   The 2013 Breach, 2014 Breach, and Forged Cookie Breach ................................ 2

7       C.   Yahoo's Inadequate Information Security Was Ongoing and Pervasive and
            Negatively Impacted All Yahoo Users ................................................................. 3
8
9            1.   Yahoo's Information Security Was Woefully Inadequate ........................... 3

10           2.   Yahoo Failed to Meet Industry Standards and Federal Regulations ........... 5

11           3.   Yahoo Knew Its Data Security Measures Were Grossly Inadequate ......... 7

12      D.   Senior Executives Had Contemporaneous Knowledge of the 2014 Breach .......... 10

13      E.   Yahoo's Information Security Is Still Inadequate ................................................. 12

14 III. ARGUMENT .............................................................................................................. 13

15      A.   Rule 23 Was Designed to Aggregate Common Issues ......................................... 13

16      B.   The Proposed Classes Meet the Requirements of Rule 23(a) ............................... 13

17           1.   Numerosity ............................................................................................... 13

18           2.   Commonality ............................................................................................ 14

19           3.   Typicality ................................................................................................. 15

20                a.   UCL Injunctive Relief Class ........................................................ 15

21                b.   Damages Class and Subclasses ..................................................... 16

22           4.   Adequacy of Representation ...................................................................... 17

23                a.   Plaintiffs Are Adequate Class Representatives ............................. 18

24                b.   Plaintiffs Have Selected Adequate Class Counsel ........................ 19

25      C.   Rule 23(b)(2) Certification of the UCL Injunctive Relief Class Is
            Appropriate ........................................................................................................ 19

26      D.   Rule 23(b)(3) Certification of the Damages Class and Subclasses Is Proper ........ 21

27           1.   Common Questions of Law and Fact Predominate ..................................... 22

28                a.   Common Evidence Proves Plaintiffs' Claims ................................ 22

**CASES**                                                                                           **PAGE**

(1)    Plaintiffs' Contract Claims ...............................................22

(2)    Plaintiffs' Negligence Claim..............................................24

(3)    Plaintiffs' CRA Claim for Failure to Notify .....................24

(4)    Plaintiffs' UCL and CLRA Claims....................................25

b.    Damages Can Be Established with Common Proof and
Calculated with Common Methodologies ......................................26

(1)    Benefit of the Bargain and Restitution.............................27

(2)    Lost Value of PII.................................................................27

(3)    Identity Theft Losses..........................................................30

(4)    Punitive Damages ..............................................................32

2.    A Class Action Is Superior to Millions of Expensive Trials ...................32

E.    Certification of Issues Under Rule 23(c)(4) Is Also Appropriate.........................33

1.    The Court Has Broad Discretion to Certify Issues ......................................34

2.    Issue Certification Will Significantly Advance Resolution......................35

IV.    CONCLUSION..............................................................................................................35

# TABLE OF AUTHORITIES

**CASES** **PAGE**

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013).........................................................................................13, 26

*Backhaut v. Apple Inc.*,
    2015 U.S. Dist. LEXIS 107519 (N.D. Cal. Aug. 13, 2015)....................................35

*Bockrath v. Aldrich Chem. Co.*,
    21 Cal. 4th 71 (1999) ...........................................................................................28

*Brazil v. Dole Packaged Foods, LLC*,
    2014 WL 2466559 (N.D. Cal. May 30, 2014) ......................................................20

*Briseno v. ConAgra Foods, Inc.*,
    844 F.3d 1121 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 313 (2017)......................33

*Britz Fertilizers, Inc. v. Bayer Corp.*,
    665 F. Supp. 2d 1142 (E.D. Cal. 2009).................................................................27

*Butler v. Sears, Roebuck & Co.*,
    727 F.3d 796 (7th Cir. 2013) ...............................................................................34

*Careau & Co. v. Security Pac. Bus. Credit, Inc.*,
    222 Cal. App. 3d 1371 (1990) ..............................................................................24

*Daniel v. Ford Motor Co.*,
    806 F.3d 1217 (9th Cir. 2015) ..............................................................................26

*Davidson v. Apple*,
    2018 WL 2325426 (N.D. Cal. May 7, 2018) ...................................................22, 35

*Deane v. Fastenal Co.*,
    2012 WL 12552238 (N.D. Cal. Sept. 26, 2012) ...................................................34

*Ehret v. Uber Techs., Inc.*,
    148 F. Supp. 3d 884, 901-02 (N.D. Cal. 2015).....................................................25

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) ...........................................................................13, 14

*Ellsworth v. U.S. Bank, N.A.*,
    2014 WL 2734953 (N.D. Cal. June 13, 2014) ......................................................22

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*,
    2018 WL 3126385 (N.D. Cal. June 26, 2018).......................................................27

**CASES**                                                                     **PAGE**

*Friedman v. AARP*,
    855 F.3d 1047 (9th Cir. 2017) ...........................................................................25

*Giroux v. Essex Prop. Tr., Inc.*,
    2018 WL 2463107 (N.D. Cal. June 1, 2018) ......................................................24

*Haft v. Lone Palm Hotel*,
    3 Cal. 3d 756 (1970) ...........................................................................................31

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1101 (9th Cir. 1998) .....................................................................15, 17

*Huu Nguyen v. Nissan N. Am., Inc.*,
    2018 WL 1831857 (N.D. Cal. Apr. 9, 2018) ......................................................35

*Ileto v. Glock Inc.*,
    349 F.3d 1191 (9th Cir. 2003) ...........................................................................24

*In re Anthem, Inc. Data Breach Litig.*,
    2016 WL 3029783 (N.D. Cal. May 27, 2016) ....................................................30

*In re Deepwater Horizon*,
    739 F.3d 790 (5th Cir. 2014) ..............................................................................34

*In re Estate of Marcos Human Rights Litig.*,
    910 F. Supp. 1460 (D. Haw. 1995), *aff'd sub nom. Hilao v. Estate of Marcos*,
    103 F.3d 767 (9th Cir. 1996) ..............................................................................29

*In re LDK Solar Sec. Litig.*,
    255 F.R.D. 519 (N.D. Cal. 2009)........................................................................18

*In re Lenovo Adware Litig.*,
    2016 WL 6277245 (N.D. Cal. Oct. 27, 2016).....................................................21

*In re San Jose Airport Hotel, LLC*,
    2018 WL 1426702 (N.D. Cal. Mar. 22, 2018).....................................................27

*In re Target Corp. Customer Data Sec. Breach Litig.*,
    892 F.3d 968 (8th Cir. 2018) ..............................................................................18

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
    722 F.3d 838 (6th Cir. 2013) ..............................................................................34

*In re Yahoo Mail Litig.*,
    308 F.R.D. 577 (N.D. Cal. 2015)..........................................................13, 19, 20, 21

*In re Zappos.com, Inc.*,
    888 F.3d 1020 (9th Cir. 2018) ............................................................................30

**CASES**          **PAGE**

*Jimenez v. Allstate Ins. Co.*,
  2012 WL 1366052 (C.D. Cal. Apr. 18, 2012) ........................................................29

*Jimenez v. Allstate Ins. Co.*,
  765 F.3d 1161 (9th Cir. 2014) .................................................................33, 34

*Just Film, Inc. v. Buono*,
  847 F.3d 1108 (9th Cir. 2017) .................................................................22, 33

*Kamakahi v. Am. Soc'y for Reprod. Med.*,
  305 F.R.D. 164 (N.D. Cal. 2015).................................................................34

*Kumar v. Salov N. Am. Corp.*,
  2016 WL 3844334 (N.D. Cal. 2016) .........................................................25

*Lanovaz v. Twinings N. Am., Inc.*,
  2014 WL 1652338 (N.D. Cal. Apr. 24, 2014) .........................................26

*Liberty Surplus Ins. Corp. v. Ledesma & Meyer Constr. Co., Inc.*,
  5 Cal.5th 216, 418 P.3d 400 (Cal. 2018) .................................................28

*Lilly v. Jamba Juice Co.*,
  308 F.R.D. 231 (N.D. Cal. 2014).................................................................25

*Loritz v. Exide Techs., Inc.*,
  2015 WL 6790247 (N.D. Cal. July 21, 2015)...........................................35

*Marsh v. First Bank of Del.*,
  2014 WL 554553 (N.D. Cal. Feb. 7, 2014) ...............................................24

*Martinez v. Pacific Bell*,
  225 Cal. App. 3d 1557 (1990) .................................................................24

*McLeod v. Bank of America, N.A.*,
  2017 WL 6373020 (N.D. Cal. Dec. 13, 2017)...........................................29

*Mitchell v. Gonzales*,
  54 Cal. 3d 1041 (1991) ...............................................................................27

*Mullins v. Premier Nutrition Corp.*,
  2016 WL 1535057 (N.D. Cal. Apr. 15, 2016) ....................................15, 17, 25, 26

*Northstar Fin. Advisors Inc. v. Schwab Inv.*,
  779 F.3d 1036 (9th Cir. 2015) .................................................................23

*Opperman v. Path, Inc.*,
  2016 WL 3844326 (N.D. Cal. July 15, 2016)...........................................32

**CASES**                                                                          **PAGE**

*Parsons v. Bristol Dev. Co.*,
    62 Cal. 2d 861 (1965) ...........................................................................................23

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014) ...........................................................................21

*Pulaski & Middleman, LLC v. Google, Inc.*,
    802 F.3d 979 (9th Cir. 2015), *cert. denied*, 136 S. Ct. 2410 (2016)......................27

*Rannis v. Recchia*,
    380 F. App'x 646 (9th Cir. 2010) .....................................................................14

*Rutherford v. Owens-Illinois, Inc.*,
    16 Cal. 4th 953 (1997) ......................................................................................27

*Sali v. Corona Reg'l Med. Ctr.*,
    889 F.3d 623 (9th Cir. 2018) ............................................................................13

*Smith v. Triad of Alabama, LLC*,
    2017 WL 1044692 (M.D. Ala. Mar. 17, 2017), *aff'd on reconsideration*, 2017
    WL 3816722 (M.D. Ala. Aug. 31, 2017)........................................24, 31, 32

*Soares v. Flowers Foods, Inc.*,
    320 F.R.D. 464 (N.D. Cal. 2017)......................................................................32

*Stollenwerk v. Tri-West Health Care Alliance*,
    254 F. App'x 664 (9th Cir. 2007) .....................................................................30

*Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*,
    308 F.R.D. 630 (N.D. Cal. 2015)......................................................................34

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016)................................................................................29, 33

*Valentino v. Carter-Wallace, Inc.*,
    97 F.3d 1227 (9th Cir. 1996) ......................................................................13, 34

*Vaquero v. Ashley Furniture Indus., Inc.*,
    824 F.3d 1150 (9th Cir. 2016) ..........................................................................30

*Villalpando v. Exel Direct Inc.*,
    2016 WL 1598663 (N.D. Cal. Apr. 21, 2016) .................................................29

*Walters v. Reno*,
    145 F.3d 1032 (9th Cir. 1998) ..........................................................................19

*Werdebaugh v. Blue Diamond Growers*,
    2014 U.S. Dist. LEXIS 173789 (N.D. Cal. Dec. 15, 2014)..............................35

**CASES**                                                                                           **PAGE**

*Williams v. Gerber Prods. Co.*,
    552 F.3d 934 (9th Cir. 2008) ..................................................................................25

*Zinser v. Accufix Research Institute, Inc.*,
    253 F.3d 1180 (9th Cir. 2001) ................................................................................32

**STATUTES, RULES AND REGULATIONS**

California Business & Professions Code
    §17200............................................................................................................... *passim*
    §17203.........................................................................................................................19
    §17204.........................................................................................................................19

California Civil Code
    §1550............................................................................................................................22
    §1798.82.......................................................................................................................24
    §1750.................................................................................................................. *passim*

Federal Rule of Civil Procedure
    Rule 23 ............................................................................................................... *passim*

**SECONDARY AUTHORITIES**

Restatement (Second) of Torts §448...........................................................................28

1    Plaintiffs move this Honorable Court for an order certifying their claims[1] against

2 Defendants Yahoo! Inc. ("Yahoo") and Aabaco Small Business, LLC ("Aabaco") (collectively,

3 "Defendants")[2] under Rule 23 of the Federal Rules of Civil Procedure, and appointing

4 themselves and their counsel as Class Representatives and Class Counsel, respectively. The

5 common questions of law and fact raised by Defendants' inadequate data security practices

6 predominate, both in significance and in ability to move the case toward adjudication, over any

7 individual questions, making this action ideal for class treatment.

8 **I.    STATEMENT OF ISSUES TO BE DECIDED**

9    The issue to be decided is whether Plaintiffs' claims satisfy the requirements for class

10 certification under Federal Rule of Civil Procedure 23(b)(2), (b)(3), and (c)(4).

11 **II.   STATEMENT OF FACTS DEVELOPED THROUGH DISCOVERY**

12    **A.    Yahoo's Services and Representations Concerning Data Security**

13    Yahoo provides comprehensive internet services. Yahoo's core service is Yahoo Mail, a

14 free email service. ████████████████████████████████

15 ███████████████████████████████████████████

16 ████████████[3] Ex. 3 at 939-941. ████████████████████

17 ███████████████████████████████████████████

18 ██████████████ Ex. 3 at 941 ████████████████

19    Anyone creating a Yahoo account in the United States or Israel agrees to Yahoo's Terms

20 of Service ("Yahoo TOS"). Ex. 4. Each time the Yahoo TOS was revised, users were required to

21 [1] A chart of Plaintiffs' proposed classes and claims is attached as Ex. 1 to the Declaration of John
22 Yanchunis in Support of Plaintiffs' Motion for Class Certification ("Yanchunis Dec."). References to "Ex." or "Exs." shall reference those exhibits attached to the Yanchunis Dec.

23 [2] In June 2017, Yahoo's operating business and assets were acquired by Verizon
24 Communications, Inc. ("Verizon"), who, through its subsidiary Oath Holdings, Inc. ("Oath"), continues to operate all Yahoo services, while all remaining assets were renamed Altaba, Inc.
25 ("Altaba"). Ex. 2, ¶¶1-3; Ex. 5. Oath and Altaba have stipulated to the Court's jurisdiction, as if an order had been issued substituting them as real parties in interest under Rule 25(c). Ex. 2, ¶¶5-6.

26 [3] Yahoo Mail Pro is Yahoo's premium email service. From October 2013 to June 2017 it was
27 called Yahoo Ad-Free Mail, and prior to October 2013, it was called Yahoo Mail Plus.

[4] Since November 2015, Aabaco, a wholly owned and controlled subsidiary of Yahoo, has
28 provided services to Yahoo's small business owners.

1   accept its new terms. ECF No. 220 ¶39. The Yahoo TOS incorporated a "Privacy Policy," which

2   describes the types of personal information collected from users, and touted: "We have physical,

3   electronic, and procedural safeguards that comply with federal regulations to protect personal

4   information about you." Ex. 6. On the "Security at Yahoo" web page linked to the Privacy

5   Policy, Yahoo represented: "We deploy industry standard physical, technical, and procedural

6   safeguards that comply with relevant regulations to protect your personal information." Ex. 7.

7   Aabaco made similar, uniform representations in the Yahoo Small Business or Aabaco Terms of

8   Service ("Aabaco TOS") (Ex. 8)[5] and incorporated Privacy Policy (Ex. 9) throughout 2011-2016.

9       **B.    The 2013 Breach, 2014 Breach, and Forged Cookie Breach**

10          In 2016, Yahoo made repeated public confessions that its users' Personally Identifiable

11  Information ("PII") had been stolen in a series of massive data breaches – *i.e.*, the 2013 Breach,

12  2014 Breach, and Forged Cookie Breach (collectively, "Breaches"). First, in September 2016,

13  Yahoo revealed that PII "associated with at least 500 million user accounts was stolen" from its

14  user database ("UDB") in late 2014 ("2014 Breach"). Ex. 10. The stolen PII "included names,

15  email addresses, telephone numbers, dates of birth, hashed passwords (the vast majority with

16  bcrypt) and, in some cases, encrypted or unencrypted security questions and answers." *Id.*

17  ███████████████████████████ (Ex. 11 at 919),████████████████████████████

18  ████████████████████████████████████████████████████████████████████████

19  ███████████████████████████████████ Ex. 12 at 9.

20          A few months later, Yahoo revealed that "an unauthorized third party . . . stole PII

21  associated with more than one billion user accounts" in August 2013 ("2013 Breach"). Ex. 14.

22  Ten months later, Yahoo announced the 2013 Breach affected all three billion existing accounts.

23  Ex. 13. ██████████████████████████████ (Ex. 11 at 919),████████████████████

24  ████████████████████████████████████████████████████████████████████████

25  ██████████████████████████████████████████ Ex. 12 at 7.

26          Around the same time the 2013 Breach was announced, Yahoo confirmed that "an

27  ───────────────────

28  [5] The Yahoo TOS and Aabaco TOS are collectively referred to as the "TOS."

1   unauthorized third party accessed the company's proprietary code to learn how to forge cookies,"

2   and that ████████████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████ Ex. 14; Ex. 11 at 918.

4   ████████████████████████████████ (Ex. 11 at 919), ████████████████████

5   ████████████████████████████████████████████████████████████████████

6   ████████████████████████████████ Ex. 12 at 10.

7   **C.   Yahoo's Inadequate Information Security Was Ongoing and Pervasive and Negatively Impacted All Yahoo Users**

8   **1.   Yahoo's Information Security Was Woefully Inadequate**

9   Yahoo's story is one of flagrant inattention to data security, where upper management

10  continually starved for resources the "Paranoids," the group "primarily responsible for the

11  protection of Yahoo information and systems," including the safety of user data. Ex. 11 at 909.

12  Yahoo's first Chief Information Security Officer ("CISO"), Justin Somaini, was hired in

13  2011. Ex. 15 at 22:06-09.[6] The paltry budget Yahoo gave Somaini was far under what he asked

14  for (and felt was needed). *Id.* at 121:07-123:05, 125:11-126:04. ████████████████████

15  ████████████████████████████████████████████████████████████████████████.

16  Ex. 15 at 275:04-276:16; 280:10-281:16; Ex. 16. ███████████████████████████

17  ████████████████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████ Ex. 17.

20  ████████████████████████████████████████ . Ex. 16; Ex. 18. ████████████

21  ████████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████ Ex. 15 at 166:21-

25  174:07; 236:12-237:19, 288:10-290:19; Exs. 16-19; Ex. 20 at 991. Ramses Martinez, Senior

26  Director of Threat Response, aptly described information security as "***deplorable***" when he was

---

27  [6] Before then, "there were no functional roles and definitions" in the Paranoids "that you would

28  find in a typical security organization." *Id.* at 24:05-18, 29:10-23. ████████████████████
    ████████████████████████████ *Id.* at 29:24-30:09, 148:15-25.

1   hired in September 2011. Ex. 21 at 108:03-109:04. According to Martinez, the Paranoids

2   "needed more resources" and "had a lot of work to do." *Id.* at 134:13-136:21. ████████████

3   ███████████████████████████████████████████████████████████████████████████████████

4   ████████████████████████████████████████ *Id.* at 104:25-106:07.

5   ███████████████████████████████████████████████████████████████████████████████████

6   ███████████████████████████████████████████████████████████████████████████████████

7   ███████████████████████████████████████████████████████████████████████████████████

8   Ex. 22 at 428, 449. ████████████████████████████████████████████████████████████████

9   ██████████████████████████████████████████████████████████. Ex. 23 at 289.

10          From April 2011 to January 2013, Yahoo had *five* different CEOs. Ex. 15 at 50:05-14.

11   ███████████████████████████████████████████████████████████████████████████████████

12   ███████████████████████████████████████████████████████████████████████████████████

13   ████████████████████████████████████. Ex. 24 at 74:12-75:05. ████████████████████████

14   ███████████████████████████████████████████████████████████████████████████████████

15   ███████████████████████████████████████████████████████████████████████████████████

16   ████████████████████████ Ex. 25 at 635, 659. From January 2013 until March 2014 – while the 2013

17   Breach was happening (undetected) and the stage was being set for the 2014 Breach and Forged

18   Cookie Breach – Yahoo had no permanent, full-time CISO. Yahoo abruptly fired Somaini in

19   January 2013 without a succession plan, and did not have another permanent CISO until 14

20   months later when Stamos was hired. Ex. 15 at 60:12-64:11; Ex. 21 at 36:10-37:09.

21   Unsurprisingly, Martinez confirmed that "not having a CISO at the helm [during that period] was

22   extremely detrimental to the [Paranoids] team."[7] But a new CISO was no panacea.

23          In February 2015, Stamos told Yahoo's Executive Vice President Jay Rossiter: "*As a*

24   *result of [planned staffing] cuts we will be well below what I consider the minimum staffing*

25

26

27   ───────────────────────────

28   [7] Ex. 21 at 109:09-110:09 (many important projects initiated by Somaini stopped when he left, and many Paranoids team leaders left Yahoo at that same time).

1   *necessary to protect Yahoo in the current threat environment*."[8] [9] Ex. 26. Martinez confirmed

2   that "the security team was underfunded," and "[w]e never seemed to be able to get enough to

3   staff up, as I felt, and most of the folks I worked with felt was adequate. [W]e always had . . .

4   more work to do than . . . we really had the resources to handle." Ex. 21 at 135:16-136:21,

5   138:20-139:06, 153:21-154:11. ████████████████████████████████████████████

6   ██████████████████████████████████████ (Ex. 25 at 645, 659), ███

7   ████████████████████████████████████████████████████████████████████

8   ██████████████████████████████████████████████████ Ex. 28 at 758.

9   ████████████████████████████████████████████████████████████████████

10  ██████████████████████████████████████████████ . Ex. 17; Ex.

11  15 at 38:20-41:03, 110:06-14, 184:14-193:11. ██████████████████████████

12  ████████████████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████████████

14  ████   Ex. 17. When Martinez left in August 2015, the information security organization "was

15  nowhere near where [it] needed to be." Ex. 21 at 134:13-136:21; *see also* Ex. 93 at 4-8.

16                   **2.      Yahoo Failed to Meet Industry Standards and Federal Regulations**

17       Class members'[10] ████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████████████

19  ████████████████████████ Ex. 29 at 5971; Ex. 21 at 127:21-128:15. ██████████

20  ████████████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████████

22  ████████████████████ Ex. 30. █████████████████████████████████████

23  ████████████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████ Ex. 31 at 802,

25  ───────────────────

26  [8] *See also* Ex. 27 at 53:12-54:22, 64:04-20, 83:09-22 (staffing and funding was inadequate throughout his tenure as CISO).

27  [9] Emphasis is added, and citations are omitted throughout unless otherwise noted.

28  [10] "Class members" refers to members of either or both of the UCL Injunctive Relief Class and the Damages Class, which together with their Subclasses are referred to as the "Classes."

1   806 (emphasis in original).

2   ████████████████████████████████████████████

3   Ex. 29 at 973.████████████████████████████████

4   ████████████████████████████████████████████

5   ████████████████████████████████████████████

6   ████████████████████████████████████████████

7   ███████████████████. Ex. 29 at 973.

8          Since at least 2008, Yahoo's Privacy Policy represented that "[w]e limit access to

9   personal information about you to employees who we reasonably believe need to come into

10  contact with that information." Ex. 6. ████████████████████████████

11  Ex. 29 at 980; Ex. 33. ███████████████████████████████

12  ██████████████████████. Ex. 21 at 113:15-115:08, 171:10-173:06.

13  ████████████████████████████████████████████

14  ████████████████████████████████████████████

15  ████████████ (Ex. 27 at 111:16-113:09, 116:20-117:23) – ██████████

16  ██████████████████████████ (Ex. 34 at 271-77).

17         Until late 2013, Yahoo continued to "hash" user passwords using the outdated and

18  insecure MD5 algorithm. Research, well-known since early 2009, stated that MD5 was

19  "cryptographically broken and unsuitable for further use." Ex. 35. ████████████

20  ████████████████████████████████████████████

21  ██████████████████████████████ Ex. 21 at 610:16-612:11. Yahoo knew this, and by

22  2011, considered switching to a more secure mechanism called "bcrypt." Ex. 15 at 198:06-

23  204:19; Ex. 21 at 611:20-612:01. ██████████████████████████

24  ████████████████████████████████████████████

25  ███████████████████████ Ex. 32 at 341.

26  ██████████████████████████████████████[11] Ex. 11 at

27  ─────────────────────

28  [11] *See also* Ex. 21 at 229:05-24 ██████████████████████████
    ████████████████████

1   919. ████████████████████████████████████████████████

2   ███████████████████████████████████ Ex. 21 at 167:21-168:11. ████

3   ██████████████████████████████████████████████████ Ex. 11

4   at 919. ██████████████████████████████████████████████

5   ████████████████████████████████████████████████████

6   ████████████████████████████████████████████████ . *Id.*

7   █████████████████████████████████████████████████

8   ████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████

10   ███████████████████████████████ Ex. 36; Ex. 24 at 25:01-32:13, 77:17-81:11.

11   ████████████████████████████████████████████████████

12   ███████████████████████████ Ex. 24 at 77:17-81:11. █████████

13   ████████████████████████████████ Ex. 3 at 958.

14       **3.     Yahoo Knew Its Data Security Measures Were Grossly Inadequate**

15       Well before the Breaches, Yahoo knew about severe vulnerabilities in its networks and

16   deficiencies in its security capabilities. ██████████████████████████

17   ████████████████████████████████████████████████████

18   ███████████████████████████████████████████████ Ex. 37.

19   ████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████

21   ██████████████████ . Ex. 27 at 128:19-129:20; Ex. 38 at 588:15-593:09.

22   ████████████████████████████████████████████████████

23   ████████████████████████████████████████ Ex. 39. ████████

24   ████████████████████████████████████████████████████

25   ████████████████████████ (Ex. 40 at 060; Ex. 41 at 527-33) – ████████

26   ███████████████████████████████████████ Ex. 41 at 525. ████

27   ████████████████████████████████████████████████████

28   █████████████████████████████████ Ex. 40 at 061. ████████████

1  ████████████████████████████████████████████████████████

2  ████████████████████████████████████████████ Ex. 42 at 332.

3  ████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████ Ex. 43

6  at 166. ████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████

9  █████████████████████████████████ Ex. 24 at 74:12-75:05; Ex. 27 at

10  84:18-85:11. ██████████████

11  One glaring deficiency was the lack of an intrusion detection system ("IDS"). ██

12  ████████████████████████████████████████████████████████

13  ███████ Ex. 21 at 104:25-105:15, 150:05-15; *see also* Ex. 44; Ex. 30. ████

14  ████████████████████████████████████████████████████████

15  ████ Ex. 21 at 150:19-151:25; Ex. 45 at 171:23-176:07; Ex. 24 at 142:14-145:04. ████

16  ████████████████████████████████████████████████████████

17  ████████████████████████ Ex. 46 at 7-11. ████████████████

18  (Ex. 47 at 365; Ex. 29 at 6001) ████████████████████████████████

19  ████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████

21  Ex. 48. ████████████████████████████████ Ex. 49 at 677.

22  Inadequate logging was another pervasive problem. ██████████████

23  ████████████████████████████████████████████████████████

24  ███████████████████████████ Ex. 21 at 147:01-150:04. ████████

25  ████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████

27  ██████████████████████████████████████████ Ex. 50. ████████

28  ████████████████████████████████████████████████████████

. Ex. 51 at 587.

[12]

Ex. 38 at 533:14-534:06; Ex. 54 at 16:03-23, 29:03-30:12.

Ex. 55.

Ex. 56.

.[13] Ex. 52 at 176:16-180:09, 283:10-285:06, 367:15-25; Ex. 57.

Ex. 59 at 341.

Ex. 60 at 262; Ex. 21 at 209:10-25.

Ex. 21 at 206:22-207:25; *see also* Ex. 93 at 20-23.

[12] Ex. 52 at 100:05-101:22

Ex. 53

[13] *See also* Ex. 58 at 404

1        **D.     Senior Executives Had Contemporaneous Knowledge of the 2014 Breach**

2              In late 2014 or early 2015, Yahoo's CISO Stamos, EVP Rossiter, General Counsel Ron

3   Bell, CEO Mayer, and its Board were all informed that the attackers in the 2014 Breach had

4   exfiltrated PII for hundreds of millions of user accounts from Yahoo's UDB. ████████████

5   ████████████████████████████████████████████████████████████████████████████████

6   ██████████████████████████████████. Ex. 61 at 009; Ex. 62 at 407; Ex. 60 at 258; Ex. 46.█

7   ████████████████████████████████████████████████████████████████████████████████

8   ████████████████████████████████████████ Ex. 61 at 6008-09; Ex. 62 at 407.█

9   ████████████████████████████████████████████████████████████████████████████████

10  ██████████████████████████ Ex. 60 at 258; Ex. 63 at 131; Ex. 61 at 6008-09.

11       █████████████████████████████████████████████████████████████████████████

12  ██████████████████████ Ex. 63 at 131; Ex. 64. Martinez briefed Stamos daily throughout

13  late 2014, and Stamos informed Rossiter about the investigation and response. Ex. 45 at 87:10-

14  89:12, 117:14-121:09; Ex. 24 at 36:03-37:12, 44:11-45:01, 104:12-105:10. Stamos also met

15  regularly with Ron Bell. Ex. 24 at 50:04-52:25.██████████████████████████████

16  ██████████████████████████. Ex. 65; Ex. 66.█████████████████████████████████

17  ████████████████████████████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████████████████████████

19  ██████████████████████████ Ex. 60 at 257.████████████████████████████████████

20  ████████████████████████████████████████████████████████████████████████████████

21  ██████████████████████████████████████████ Ex. 67 at 425; Ex. 63 at 131; Ex. 61 at

22  010; Ex. 45 at 57:18-59:05.████████████████████████████████████████████████████

23  ██████████████████████ Ex. 67 at 425; Ex. 63 at 131; Ex. 61 at 010.

24       █████████████████████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████ Ex. 68 at 560; Ex. 63

26  at 131; Ex. 24 at 61:15-62:17.██████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████████████████████████

28  ████████████████████████████████████████ Ex. 63 at 131-32; Ex. 68 at 560; Ex. 69.█

1 ████████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████████

3 ██████████████ Ex. 63 at 136; Ex. 21 at 229:25-231:05. ███████

4 ████████████████████████████████████████████████████████████

5 ████████████████████████████████████████████████. [14]

6 █████████████████████████████████████████████████ Ex. 67 at 426;

7 Ex. 61 at 010; Ex. 45 at 57:05-59:05. ███████████████████████████

8 ████████████████████████████████████████████████████████████

9 ████████████. Ex. 68 at 560; Ex. 72; Ex. 38 at 482:03-20. ██████

10 ██████████████████████████████████████████████. Ex. 68 at

11 560; Ex. 73. But, Yahoo sent **no notifications** to the hundreds of millions of users whose PII was

12 stolen from the UDB, and it would not do so until September 22, 2016 – *almost two years later*.

13 ████████████████████████████████████████████████████████████

14 ████████████████ Ex. 74; Ex. 75; Ex. 24 at 139:06-155:25. ██████

15 ████████████████████████████████████████████████████████████

16 ████████████████████ Ex. 24 at 105:18-108:15, 150:12-152:14; Ex. 76; Ex. 21 at

17 256:14-257:21; Ex. 27 at 278:10-282:02 and its Exhibits 11 and 12.

18 ████████████████████████████████████████████████████████████

19 ████████████████████████████████████. Ex. 77; Ex. 68 at 553. In March 2017,

20 Yahoo disclosed the SCRC's findings, which conceded Yahoo's information security team's

21 contemporaneous understanding of the severity of the 2014 Breach, but questioned the extent to

22 which that understanding "was effectively communicated and understood outside the information

23 security team," and found that "the 2014 Security Incident was not properly investigated and

24 analyzed at the time, and the Company was not adequately advised with respect to the legal and

25 business risks associated with the 2014 Security Incident." Ex. 78.

26       Martinez strongly disagreed with any notion that the 2014 Breach was "not properly

27 _____

28 [14] Ex. 68 at 560; Ex. 70; Ex. 71; Ex. 27 at 171:07-179:11, 254:12-262:05, 266:23-267:16, 272:17-275:08, and its Exhibit 11.

1  investigated or analyzed," stating: "That's bullshit. Right. It was thoroughly investigated for

2  months. So that is false." Ex. 45 at 165:05-24. Martinez testified that the Paranoids also

3  effectively communicated all relevant facts to Yahoo senior management, including "wide

4  dissemination of the facts" about the user data exfiltration. Ex. 45 at 167:02-169:18, 171:14-19.

5  Stamos likewise testified that it was "definitely not true" that the Paranoids were the only ones

6  with contemporaneous knowledge of the UDB exfiltration; the data exfiltration "was understood

7  . . . by multiple people that we had briefed on it above me," including Rossiter, Mayer, Bell, the

8  Board Committee, and Filo. Ex. 24 at 82:17-83:12, 89:07-91:05; Ex. 27 at 446:10-452:11.

9  According to Stamos, his team "communicated everything we knew [about the 2014 Breach] to

10 upper management," and he had "no doubt" that the information was communicated to Mayer

11 and Filo in December 2014. Ex. 24 at 92:22-95:21.

12       **E.    Yahoo's Information Security Is Still Inadequate**

13              Yahoo's history of repeated, un-remedied security failures strongly suggests its systems

14 remain inadequate to secure users' PII. In responding to Plaintiffs' Interrogatory No. 3, regarding

15 "what, if any, security measures pertaining to Users' PII have been implemented at Oath

16 following Verizon's acquisition of Yahoo," Yahoo directed Plaintiffs to pages in its CID

17 Responses. Ex. 12 at 5-6. ███████████████████████████████████████████

18 ████████████████████████████████████████████████████████

19 ████████████████ Ex. 3 at 5957-960, 5962-965; Ex. 79 at 0590-593.████████

20 ████████████████████████████████████████████████████████

21 ███████████████████████████████████████. Ex. 93 at 6, 10, 25. Evidence

22 collected to date shows users' PII is still in Yahoo's possession and control. According to

23 Frantz's analysis of that evidence: ██████████████████████████████████

24 ████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████

26 ████████████████████████ *Id.* at 6. ██████████████████████████

27 ██████████████████████████████ Ex. 32 at 343. The risk to users of additional

28 intrusions and exfiltration continues unabated.

1    III.    ARGUMENT

2         A.    Rule 23 Was Designed to Aggregate Common Issues

3              The requirements of Federal Rule of Civil Procedure 23 are well known: numerosity,

4    commonality, typicality, and adequacy, and satisfaction of the requirements for one of the class

5    types defined in Rule 23(b). *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979-80 (9th Cir.

6    2011). To certify a Rule 23(b)(2) class, the plaintiff must show that "the party opposing the class

7    has acted or refused to act on grounds that apply generally to the class, so that final injunctive

8    relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R.

9    Civ. P. 23(b)(2). Certification under Rule 23(b)(3) requires that "'questions of law or fact

10   common to class members predominate over any questions affecting only individual members,

11   and that a class action is superior to other available methods for fairly and efficiently

12   adjudicating the controversy.'" *Sali v. Corona Reg'l Med. Ctr.*, 889 F.3d 623, 629 (9th Cir.

13   2018). Rule 23(c)(4) provides a court with discretion to certify a class to resolve particular

14   issues, such that "[e]ven if the common questions do not predominate over the individual

15   questions," a court may "isolate the common issues . . . and proceed with class treatment of these

16   particular issues." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).

17             While a "'rigorous analysis'" is required, *In re Yahoo Mail Litig.*, 308 F.R.D. 577, 586

18   (N.D. Cal. 2015), this does not equate to "a mini-trial." *Sali*, 889 F.3d at 631. A "district court is

19   not limited to considering only admissible evidence in evaluating whether Rule 23's

20   requirements are met." *Id.* at 632. Where the merits are probed, they may be so only to the extent

21   "that they are relevant to determining whether the Rule 23 prerequisites for class certification are

22   satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). Plaintiffs

23   meet their burden under Rule 23, such that certification of the proposed Classes is warranted.

24        B.    The Proposed Classes Meet the Requirements of Rule 23(a)

25             1.    Numerosity

26             The Classes number in the hundreds of thousands and, in some cases, the millions. The

27   Court "may consider reasonable inferences drawn from the facts before it" in determining

28   whether numerosity exists. *Yahoo Mail*, 308 F.R.D. at 589-90. Based on the number of user

1    accounts in the United States, Israel, and California impacted by the Breaches, including free,

2    paid, and small business accounts, and the number of accounts impacted worldwide, the

3    proposed Classes are sufficiently numerous. *Rannis v. Recchia*, 380 F. App'x 646, 651 (9th Cir.

4    2010) (noting numerosity usually met with at least 40 class members).

5              **2.      Commonality**

6              Rule 23(a)(2) requires "questions of law or fact common to the class." A single common

7    question is sufficient. *See Ellis*, 657 F.3d at 981. Here, each of the claims Plaintiffs seek to

8    advance turn on the question of whether Defendants' security protocols and policies were

9    adequate to protect Class members' PII. This involves examining related questions that are also

10   common across all Classes and Subclasses, including what steps Defendants took (or did not

11   take) to identify and respond to security threats, whether Defendants complied with industry

12   norms and applicable regulations, and whether and when Defendants knew or should have

13   known of the Breaches. Further, discovery reveals that the Breaches were part of a single course

14   of conduct that gives rise to the legal rights Plaintiffs seek to enforce under California law.

15             As set forth in the operative complaint and discussed herein, additional questions of law

16   and fact arise from Defendants' course of conduct that are common to Damages Class members,

17   such as: (1) whether Plaintiffs and Damages Class members' accounts were governed by valid

18   and binding contracts; (2) whether the TOS required Defendants to adequately safeguard

19   Plaintiffs and Damages Class members' PII; (3) whether Defendants breached the TOS by

20   failing to adequately safeguard PII; (4) whether Defendants owed a duty to exercise due care in

21   collecting, storing, and safeguarding PII; (5) whether Defendants breached that duty; (6) whether

22   Defendants knew about the Breaches and the state of their security (and when); (7) whether

23   Defendants failed to timely notify Plaintiffs and Damages Class members of the Breaches; and

24   (8) whether Plaintiffs and Damages Class members are entitled to punitive damages.

25             Questions common to the UCL Injunctive Relief Class include whether Yahoo's

26   provision of inadequate security was (1) an unfair business practice under either the tethering or

27   balancing tests, or (2) an unlawful business practice. Additional common questions for the Paid

28   Users Subclass and Small Business Users Subclass include: (1) whether Yahoo and/or Aabaco

1   had a duty to disclose the inadequacy of its security; and (2) whether Plaintiffs Mortensen and

2   Neff and Subclass members would have been aware and would have acted differently had

3   Defendants disclosed those facts (*i.e.*, whether they were material to a reasonable person).

4        Last, the inadequacy of Yahoo's security protocols and procedures also resulted in the

5   same fundamental injury to each Damages Class member – compromise of their PII – causing all

6   Damages Class members to lose value in their PII. Members of the Paid Users Subclass and

7   Small Business Users Subclass also suffered the lost benefit of their bargain. Moreover, the same

8   legal theories and facts giving rise to claims for lost value of PII and benefit of the bargain

9   damages give rise to Damages Class members' claims for losses related to identity fraud.

10                      **3.      Typicality**

11       Rule 23(a)(3)'s typicality standard is permissive. "[C]laims are 'typical' if they are

12   reasonably co-extensive with those of absent class members." *Hanlon v. Chrysler Corp.*, 150

13   F.3d 1101, 1020 (9th Cir. 1998). "[T]hey need not be substantially identical." *Id.*

14       Plaintiffs and Class members were injured through Defendants' pattern of misconduct.

15   Plaintiffs' claims and legal theories, both in their individual and representative capacities, arise

16   under this same factual predicate. *Mullins v. Premier Nutrition Corp.*, 2016 WL 1535057, at *4

17   (N.D. Cal. Apr. 15, 2016) ("Putative class members' claims are usually typical if their claims

18   arise[] from the same course of events, and each class member makes similar legal arguments to

19   prove the defendant's liability."). The elements Plaintiffs must prove for negligence, breach of

20   express or implied contract, and breach of the implied covenant of good faith and fair dealing,

21   and for their claims under California's Unfair Competition Law, Cal. Bus. & Prof. Code §17200,

22   *et seq.* ("UCL"), Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* ("CLRA"), and

23   Customer Records Act, Cal. Civ. Code §1798.80, *et seq.* ("CRA") are identical to what absent

24   Class members would need to prove, and there are no defenses unique to Plaintiffs.

25                      **a.      UCL Injunctive Relief Class**

26       Plaintiffs Heines, Essar, Dugas, and the Ridolfos are typical of the UCL Injunctive Relief

27   Class because each signed up for a free Yahoo account pursuant to the Yahoo TOS, and, as

28   required by Yahoo, each provided their PII. Yahoo maintained their PII in its UDB. Plaintiffs

1    suffered the access, compromise, or theft of their PII by the Breaches as a result of Yahoo's

2    unfair and unlawful practices of inadequately safeguarding that PII and failing to timely identify,

3    investigate, and remediate security threats or to notify users of the Breaches, and all suffered lost

4    money or property as a result. Indeed, all Class members suffered a loss in the value of their PII

5    maintained on the UDB when the intrusion occurred, and when that PII was used to access Class

6    members' accounts, the loss of value extended to their PII contained therein. Not only did each

7    Class member lose the value of their PII, each is also now at an increased risk of future harm.

8    That risk of future harm persists because their PII remains in Yahoo's possession and because

9    Yahoo has not yet adequately remediated its security policies and practices. Thus, their PII is not

10   adequately safeguarded from future unauthorized intrusions into the UDB.

11                    **b.      Damages Class and Subclasses**

12           Plaintiffs and Damages Class members' accounts were governed by nearly identical

13   contracts. Free Users Subclass members, including Plaintiffs Heines, Essar, Dugas, the Ridolfos,

14   Granot, and Rivlin,[15] and Paid Users Subclass members, including Plaintiff Mortensen, signed up

15   for accounts governed by the Yahoo TOS. Small Business Users Subclass members, including

16   Plaintiff Neff, similarly signed up for Yahoo small business or Aabaco accounts and agreed to

17   the Aabaco TOS. The TOS contain parallel terms regarding privacy protections, choice of law

18   and venue, and limitations on Defendants' liability, which have all remained materially

19   unchanged during the relevant time period. Each time Defendants updated the TOS, Plaintiffs

20   and Damages Class members were required to agree to their revised terms. Accordingly, the

21   same principles of contract formation, and the same material terms, apply across the Damages

22   Class. To the extent there is variation, either in the formation or interpretation of the governing

23   TOS, or in damages sought, those differences are universal across each Subclass. Either the

24   governing TOS are valid, or they are not. Either the TOS imposed an implied covenant of good

25   faith and fair dealing or they did not. If the TOS are not express contracts, then each Damages

26   Class member's creation of a user account either gave rise to an implied contract or did not.

27   _____

28   [15] Plaintiff Rivlin's deposition is being taken concurrent with the filing of Plaintiffs' Motion, on
     July 13, 2018, and so citation to his testimony is not possible.

1    Similarly, to the extent that Defendants owed Plaintiffs and members of the Damages

2    Class a legal duty to exercise due care in safeguarding their PII, that duty is identical across all

3    Damages Class members. Either Defendants owed a duty to Plaintiffs and members of the

4    Damages Class, or they did not. Either Defendants breached that legal duty, or they did not.

5    Plaintiffs and Damages Class members all suffered the access, compromise, and theft of their PII

6    by the Breaches, resulting from Yahoo's uniform failures to adequately safeguard their PII. Their

7    contract and negligence claims clearly arise from the same course of conduct.

8    Plaintiff Mortensen is also typical of Paid Users Subclass members because he was a

9    consumer who purchased Yahoo premium email services and whose PII was stolen in the

10   Breaches. The course of conduct underlying his claim and that of all Paid Users Subclass

11   members is the same: Yahoo's withholding of material information regarding the safeguarding of

12   their PII and the 2014 Breach and Forged Cookie Breach. Mortensen, like all Paid Users

13   Subclass members, has suffered a loss of value in his PII and is an increased risk of future harm.

14   Plaintiff Neff is typical of Small Business Users Subclass members because he was exposed to

15   the same small business advertising (and fraudulent omissions) to which all such members were

16   exposed when they created their accounts. Neff is also seeking the same relief to which all Small

17   Business Users Subclass members are entitled – restitution of the price paid minus the actual

18   value of the small business services for which he received. *Mullins*, 2016 WL 1535057, at *6.

19   Plaintiffs Heines and Dugas are typical of the California Users Subclass because they were both

20   residents of California when the 2014 and Forged Cookie Breaches occurred, both suffered the

21   exfiltration of their PII, and neither was notified until years after the fact.

22                        **4.      Adequacy of Representation**

23   Rule 23(a)(4) requires the representatives to "fairly and adequately protect the interests of

24   the class." Fed. R. Civ. P. 23(a)(4). Adequacy involves a two-part inquiry: "(1) do the named

25   plaintiffs and their counsel have any conflicts of interest with other class members and (2) will

26   the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"

27   *Hanlon*, 150 F.3d at 1020. Plaintiffs and proposed Class Counsel satisfy these requirements.

28

1          **a.          Plaintiffs Are Adequate Class Representatives**

2          Plaintiffs have no conflicts of interests with absent Class members, as they "'possess the

3     same interest and suffer[ed] the same injury as the class members.'" *In re LDK Solar Sec. Litig.*,

4     255 F.R.D. 519, 532 (N.D. Cal. 2009). Indeed, their claims flow from the same underlying

5     conduct, all suffered the compromise of their accounts and theft of their PII, and now suffer an

6     increased risk of harm. Plaintiffs' and Class members' interests are indisputably aligned.[16]

7          Second, Plaintiffs have each demonstrated their unwavering commitment to the Classes

8     they seek to represent in their vigorous prosecution of this case. Plaintiffs' sworn deposition

9     testimony and the actions they have undertaken in this litigation demonstrate that they

10    understand the role and obligations of class representatives.[17][18] The record shows that Plaintiffs

11    have actively participated in the prosecution of this action on behalf of the Classes and have

12    monitored their experienced counsel at every step. Plaintiffs have reviewed numerous documents

13    and pleadings in the case, and each has participated in in-person meetings with their attorneys

14    and regularly communicates with them regarding litigation strategy, the status of the litigation,

15    and major case developments.[19] Plaintiffs have responded to Defendants' discovery requests,

16    producing documents, including, for instance, through the imaging and examination of their

17    personal computers, responding to interrogatories, and giving informed testimony.[20]

18

19

---

20    [16] That only some Class members suffered identity theft does not create an "intraclass conflict."

21    *See In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968, 973 (8th Cir. 2018).

[17] Ex. 80 at 11:24-25, 21:2-9; Ex. 81 at 224:25-225:10; Ex. 82 at 257:23-258:13; Ex. 83 at 21:5-
22    12, 23:21-24:5, 119:21-23, 246:9-247:25; Ex. 84 at 250:14-252:5; Ex. 85 at 13:18-14:5, 18:18-
22:24; Ex. 86 at 94:8-95:7, 96:15-97:4; Ex. 87 at 143:21-145:25, 208:10-209:11.

23    [18] Plaintiff Rivlin's deposition is being taken concurrently with the filing of Plaintiffs' Motion,
and therefore, his testimony is not yet available for citation.
24
[19] Ex. 80 at 36:17-37:25, 186:4-9, 184:25-185:6, 191:19-192:2; Ex. 81 at 23:19-24:11, 25:15-17,
25    27:1-17, 138:7-20, 142:1-9; Ex. 82 at 23:1-17, 24:16-25:20, 57:10-60:6, 219:6-220:10; Ex. 83 at
27:3-28:5, 160:22-162:1, 169:7-171:9; Ex. 84 at 252:1-255:12; Ex. 85 at 283:8-284:2; Ex. 86 at
26    18:2-23, 106:11-25; Ex. 87 at 23:11–24:17, 153:5-155:3, 158:8-19, 216:13-217:22.

27    [20] Ex. 80 at 61:6-23, 119:14-23, 313:16-314:24, 318:8-17; Ex. 81 at 27:18-28:3, 142:24-145:2;
Ex. 82 at 57:10-60:6, 259:5-260:11; Ex. 83 at 80:18-81:6, 267:11-16; Ex. 84 at 22:12-23:12,
28    227:20-228:7; Ex. 85 at 283:8-284:2; Ex. 87 at 23:24-24:17, 153:5-155:3, 158:8-19, 216:13-
217:22.

1                  **b.**       **Plaintiffs Have Selected Adequate Class Counsel**

2        Plaintiffs have selected competent counsel with no conflicts of interest. Class Counsel are

3 experienced class action litigators that regularly prosecute and obtain significant victories for

4 injured consumers. *See* Exs. 88-92. This Court previously appointed this same slate of attorneys

5 as Lead Counsel and Plaintiffs' Executive Committee. ECF No. 58. Since their appointment,

6 Plaintiffs' proposed Class Counsel have litigated this action vigorously, including by: (1)

7 successfully opposing two motions to dismiss; (2) reviewing and analyzing over 9 million pages

8 of documents produced by Defendants; (3) uncovering key documents in discovery; (4)

9 reviewing and producing 13,856 pages of Plaintiff-related documents; (5) taking a lengthy, 2-day

10 30(b)(6) deposition, as well as the depositions of numerous persons with personal knowledge of

11 the facts alleged in the case; (6) propounding discovery requests on key non-parties; and (7)

12 working with experts to study and explain issues for the factfinders in this litigation. There is no

13 reason to doubt their adequacy.

14      **C.**       **Rule 23(b)(2) Certification of the UCL Injunctive Relief Class Is Appropriate**

15        As provided under the UCL,[21] Plaintiffs request certification of the UCL Injunctive

16 Relief Class for the specific declaratory and injunctive relief outlined in the report of Plaintiffs'

17 information security expert. Ex. 93 at 10-14. UCL Injunctive Relief Class members' claims arise

18 under two prongs of the UCL: (1) unlawful, for violating the CRA, §5(a) of the Federal Trade

19 Commission Act, 15 U.S.C. §45(a), Cal. Bus. & Prof. Code §22576 (as a result of Yahoo failing

20 to comply with its own posted privacy policies), and the CLRA; and (2) unfair, for failing to

21 employ adequate safeguards to protect users' PII.

22        Under Rule 23(b)(2), it is "sufficient if class members complain of a pattern or practice

23 that is generally applicable to the class as a whole." *Yahoo Mail*, 308 F.R.D. at 598 (citing

24 *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998)). "Even if some class members have not

25 been injured by the challenged practice, a class may nevertheless be appropriate." *Id.* "Unlike

26

27 [21] "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction." Cal. Bus. & Prof. Code §17203. Any person who has suffered injury in fact and lost money or property as a result of unfair competition "may pursue representative claims or relief on behalf of others." *Id.*; *see also id.* at §17204.

28

Rule 23(b)(3), a plaintiff does not need to show predominance of common issues or superiority of class adjudication to certify a Rule 23(b)(2) class." *Yahoo Mail*, 308 F.R.D. at 587; *see also Brazil v. Dole Packaged Foods, LLC*, 2014 WL 2466559, at *10 (N.D. Cal. May 30, 2014) ("Ordinarily, it follows that there is no need [in evaluating a Rule 23(b)(2) class] 'to undertake a case-specific inquiry into whether class issues must predominate or whether class action is the superior method of adjudicating the dispute . . . .'").

Plaintiffs challenge a pattern or practice that is generally applicable to all UCL Injunctive Relief Class members.[22] Plaintiffs contend all users provided PII to Yahoo when registering for accounts, and that PII, in turn, provided access to the additional PII found in their emails. As previously discussed, Yahoo failed to adequately safeguard that PII, and continues to do so.[23] Specifically, Yahoo maintains and stores U.S. users' PII in the UDB and has failed to take the steps necessary to prevent and stop unauthorized access to that UDB.

As the record evidence in this case makes clear, from at least 2011, Yahoo had a uniform practice of: (1) understaffing and underfunding its departments charged with securing user data; (2) failing to provide or pay for industry standard core competency training for its information security personnel; (3) failing to ensure that its security personnel consistently used Yahoo's tools for detecting and monitoring adverse security events; (4) failing to implement industry standard protocols or to employ best practices, thus failing to properly encrypt user data, harden Yahoo's internal network, and prevent unauthorized external access into the Yahoo environment; and (5) ignoring and blatantly erasing documentation of known and persistent security deficiencies. *See, e.g.*, Ex. 93 at 4-10, 14-15, 20-25. Discovery in this case shows these failings were uniform across the Class, persistent throughout the relevant time period, and directly impacted the security of all UCL Injunctive Relief Class members' PII, which was stored in the UDB. ██████████████████████████████████████████████

---

[22] Because the applicable TOS for all Class members includes a choice of law provision specifying California law shall apply regardless of California's conflict of law principles (ECF No. 196, ¶¶174, 177, 178), the application of the UCL to all Class members' claims is proper.

[23] As noted above, evidence thus far shows that Oath still has possession of all of the UCL Injunctive Relief Class members' PII, and Plaintiffs believe many of Yahoo's unsafe data security practices are being continued by Oath, making injunctive relief appropriate.

1  ███████████████████████████████████████████████████

2  ████████████.[24]

3          Because Yahoo's company-wide policies and failures were uniform and persistent

4  through the entire relevant time period, and continue to significantly increased the risk of harm to

5  all UCL Injunctive Relief Class members, Rule 23(b)(2) certification is particularly apt. *See*

6  *Parsons v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014) (affirming certification seeking injunction of

7  systemic deficiencies in policies and practices that put all plaintiffs at substantial risk of harm).

8  *Yahoo Mail* is instructive on this point. There, the plaintiffs asked this Court to certify a class of

9  non-Yahoo mail subscribers to enjoin Yahoo from intercepting and scanning non-Yahoo mail

10 subscribers' emails to Yahoo users. Though the same policy applied to all non-Yahoo mail

11 subscribers, Yahoo argued that the issue of whether individualized users consented to the

12 interception precluded Rule 23(b)(2) certification. This Court rejected Yahoo's argument, noting

13 the focus of a Rule 23(b)(2) analysis is "not on the claims of individual class members, but rather

14 whether [defendant] engaged in a 'common policy.'" *Yahoo Mail*, 308 F.R.D. at 599.

15         Likewise, Plaintiffs challenge Yahoo's practice of inadequately safeguarding UCL

16 Injunctive Relief Class members' PII and, therefore, "'seek uniform relief from a practice

17 applicable to' the entire class." *Id.* at 600. Rule 23(b)(2) certification is appropriate even if some

18 UCL Injunctive Relief Class members do not ultimately have viable UCL claims. *See id.* And, as

19 in *Yahoo Mail*, because the equitable relief Plaintiffs seek is identical across the UCL Injunctive

20 Relief Class, it may be properly sought through a Rule 23(b)(2) class. *Id*. at 600.

21         **D.        Rule 23(b)(3) Certification of the Damages Class and Subclasses Is Proper**

22         There is "'clear justification for handling the dispute on a representative . . . basis if

23 common questions present a significant aspect of the case and they can be resolved for all

24 members of the class in a single adjudication.'" *In re Lenovo Adware Litig.*, 2016 WL 6277245,

25 at *17 (N.D. Cal. Oct. 27, 2016).  They do so here, as demonstrated below.

26

27 ───────────────

[24] *See* Ex. 21 at 150:05-151:25; Ex. 45 at 171:23-176:07; Ex. 24 at 142:14-145:04; Ex. 44; Ex.
28 30; Ex. 46 at 7-11; Ex. 48.

### 1.    Common Questions of Law and Fact Predominate

"The predominance analysis under Rule 23(b)(3) focuses on 'the relationship between the common and individual issues' in the case, and 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120 (9th Cir. 2017); *see also Davidson v. Apple*, 2018 WL 2325426, at *14 (N.D. Cal. May 7, 2018) (articulating five-principle approach to predominance analysis).

### a.    Common Evidence Proves Plaintiffs' Claims

A predominance analysis generally begins with an examination of the elements underlying a plaintiff's causes of action. *Ellsworth v. U.S. Bank, N.A.*, 2014 WL 2734953, at *19 (N.D. Cal. June 13, 2014). "In determining whether common questions predominate, the Court identifies the substantive issues related to plaintiff's claims (both the causes of action and affirmative defenses); then considers the proof necessary to establish each element of the claim or defense; and considers how these issues would be tried." *Id.*

### (1)    Plaintiffs' Contract Claims

Plaintiffs will use common evidence to prove the elements of their breach of contract claim, applying California law: (1) formation; (2) Damages Class members' performance; (3) Defendants' breach; and (4) resulting appreciable and actual damages. ECF No. 132 at 75.

First, whether the TOS created express contracts will be determined on the face of the documents and on common facts. Elements "essential to the existence of a contract" are "[p]arties capable of contracting," "consent," a "lawful object," and "sufficient cause or consideration." Cal. Civ. Code §1550. When Damages Class members created their accounts, they were required to agree to the TOS in an identical manner, through an adhesion agreement presented at registration, and each time Defendants modified terms, Damages Class members were required to accept, as is, or lose access to their accounts. In consideration, Defendants agreed to provide members of the Free Users, Paid Users, and Small Business Users Subclasses with promised services. In exchange, members of those Subclasses provided their PII and agreed to either a payment for, *e.g.*, ad-free or small business services, and/or to the inclusion of advertisements and other communications from Defendants. The determination of whether these

1   facts establish the formation of an express contract do not vary among Damages Class members.

2   These same facts will also demonstrate the formation of implied contracts between Damages

3   Class members and Defendants, in the alternative to express contracts. *Northstar Fin. Advisors*

4   *Inc. v. Schwab Inv.*, 779 F.3d 1036, 1050-51 (9th Cir. 2015) ("An implied-in-fact contract

5   requires proof of the same elements necessary to evidence an express contract: mutual assent or

6   offer and acceptance, consideration, legal capacity and lawful subject matter.").

7        Second, common proof will demonstrate that Damages Class members performed under

8   the governing TOS. Defendants admit all Damages Class members "accepted Defendants' terms

9   of service when they registered to use Defendants' services." ECF No. 220, ¶¶173, 176, 178.

10  According to both the Yahoo TOS and Aabaco TOS, a user's breach or violation was cause for

11  termination of the account. By definition, all Damages Class members continued to maintain

12  accounts when one or more of the Breaches occurred and, thus, had not been terminated.

13       Third, whether Defendants breached their contracts with Damages Class members will be

14  judged by universal facts. Plaintiffs will prove that Defendants' Privacy Policies, including the

15  incorporated and hyperlinked "Security at Yahoo" page, is part of their contracts. Each TOS

16  version has language expressly incorporating the Privacy Policies, which are identical in their

17  promises to safeguard users PII consistent with industry standards and applicable regulations.

18  The interpretation of these provisions does not turn on extrinsic evidence; it is solely a judicial

19  function. *Parsons v. Bristol Dev. Co.*, 62 Cal. 2d 861, 865 (1965).

20       Common proof will also establish Defendants' breach of the TOS by failing to provide

21  "physical, electronic, and procedural safeguards that comply with federal regulations" and failing

22  to "deploy industry standard physical, technical, and procedural safeguards that comply with

23  relevant regulations" to protect Damages Class members' PII. This evidence will include

24  deposition testimony, Defendants' admissions and discovery responses, investigative reports of

25  government agencies and security consultants, and Defendants' own documents. Common

26  evidence will also demonstrate Defendants' breach of the implied covenant of good faith and fair

27  dealing, by showing Defendants deliberately ignored the warnings of their security personnel and

28  outside consultants to implement measures to safeguard Damages Class members' PII after the

1    2013 Breach (and earlier incidents) and the 2014 Breach, and that Defendants knowingly failed

2    to notify Damages Class members of the 2014 Breach. Thus, a jury will be able to answer, at

3    once, whether Defendants committed a conscious and deliberate act, unfairly frustrating the

4    agreed common purpose of the contract, as to all Damages Class members. *Careau & Co. v.*

5    *Security Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1394 (1990).

6                  **(2)**       **Plaintiffs' Negligence Claim**

7          Classwide application of California law moots many of the predominance concerns

8    nationwide negligence classes often raise. *See Marsh v. First Bank of Del.*, 2014 WL 554553, at

9    *16 (N.D. Cal. Feb. 7, 2014) (certifying negligence class under California law). All Damages

10    Class members must prove the same elements to prevail on their negligence claim: (1) a duty; (2)

11    breach of that duty; (3) causation; and (4) a cognizable injury. *Ileto v. Glock Inc.*, 349 F.3d 1191,

12    1203 (9th Cir. 2003) (citing *Martinez v. Pacific Bell*, 225 Cal. App. 3d 1557, 275 (1990)).

13          In a case such as this, where the operative conduct giving rise to both the duty and breach

14    is uniform, Plaintiffs' negligence claim is appropriate for classwide resolution. *See Giroux v.*

15    *Essex Prop. Tr., Inc.*, 2018 WL 2463107, at *4 (N.D. Cal. June 1, 2018). Each Damages Class

16    member was a Yahoo or Aabaco user, each alleges their PII was stolen, each alleges injury as a

17    result of that theft, and each suffered the same general type of damages – lost value of PII and

18    the foreseeable losses stemming from identity theft. Thus, questions of legal duty and

19    Defendants' breach of that duty – like the questions of the existence and breach of a contract –

20    are common issues susceptible to common proof. *See, e.g.*, *Smith v. Triad of Alabama, LLC*,

21    2017 WL 1044692, at *13 (M.D. Ala. Mar. 17, 2017) (certifying negligence class in data breach

22    suit against hospital where "each class member was a non-hospital patient at Flowers, each class

23    member alleges injury as a result of Millender's records heist, . . . each class member suffered

24    the same general type of damages," and class members' claims were subject to a single state's

25    law), *aff'd on reconsideration*, 2017 WL 3816722 (M.D. Ala. Aug. 31, 2017).

26                  **(3)**       **Plaintiffs' CRA Claim for Failure to Notify**

27          Cal. Civ. Code §1798.82 requires timely notice to Californians of a data breach. Using

28    Yahoo's own admissions, the September 2016 notice, and evidence already on record, Plaintiffs

1    Heines and Dugas will establish that Yahoo violated the CRA as to all members of the California

2    Users Subclass. Common evidence shows Yahoo knew about the 2014 Breach as it was

3    happening and failed to notify compromised users for two years.[25] The September 2016 notice

4    details the data points that were stolen – including, notably, PII specifically covered under the

5    CRA statute that was operative during and after the 2014 Breach. Ex. 10. This is the same

6    evidence every California Users Subclass member would use in proving liability.

7                          **(4)        Plaintiffs' UCL and CLRA Claims**

8            Plaintiff Neff asserts a claim for omissions in the small business advertisements, and

9    Plaintiff Mortensen asserts a CLRA claim based on Yahoo's material omissions of fact regarding

10   the true state of its security and the Breaches. Those Plaintiffs may seek to bring their claims on

11   behalf of the Small Business Users Subclass and Paid Users Subclass,[26] because their Subclass

12   members' reliance is established under an objective standard.

13           Though both the UCL and CLRA "require plaintiffs to prove members of the public are

14   likely to be deceived by the defendant's business practices," *Williams v. Gerber Prods. Co.*, 552

15   F.3d 934, 938 (9th Cir. 2008), the burden of proof is modest. *Friedman v. AARP*, 855 F.3d 1047,

16   1055 (9th Cir. 2017). It is subject only to an objective "reasonable consumer standard," *id.*, and

17   does not implicate individual issues specific to each consumer. *Lilly v. Jamba Juice Co.*, 308

18   F.R.D. 231, 242 (N.D. Cal. 2014); *see Kumar v. Salov N. Am. Corp.*, 2016 WL 3844334, at *7

19   n.9 (N.D. Cal. 2016) ("Claims under the UCL . . . do not require[] individualized proof of

20   reliance, deception, or causation."); *Ehret v. Uber Techs., Inc.*, 148 F. Supp. 3d 884, 901-02

21   (N.D. Cal. 2015) (reliance for CLRA "can be determined relative to the class as a whole").

22           "[A]n inference of common reliance arises if representations are material." *Lilly*, 308

23   F.R.D. at 242. The test for materiality is whether "'a reasonable man would attach importance to

24   its existence or nonexistence in determining his choice of action in the transaction.'" *Mullins*,

25   _____

26   [25] *See,* ECF No. 220, ¶8; Ex. 78 at p. 47; Ex. 11 at 923.

     [26] Plaintiffs Neff and Mortensen seek to bring their respective claims on behalf of nationwide

27   classes. Alternatively, Neff and Mortensen request the Court certify additional subclasses
     consisting of California users only, as defined in the Notice of Motion and Motion, and allow

28   Neff and Mortensen to proceed as Class Representatives on behalf of those subclasses.

1   2016 WL 1535057, at *5. "As materiality is an objective inquiry, no individualized examination

2   of materiality is necessary." *Lanovaz v. Twinings N. Am., Inc*., 2014 WL 1652338, at *4 (N.D.

3   Cal. Apr. 24, 2014). "As a general rule, materiality may be established by common proof."

4   *Mullins*, 2016 WL 1535057, at *5; *see also Amgen Inc*, 568 U.S. at 459 ("materiality of alleged

5   misrepresentations and omissions is a question common to all members of the class").

6           Plaintiffs are not required to "'produce a consumer survey or similar extrinsic evidence to

7   prevail on a claim that the public is likely to be misled by a representation.'" *Mullins*, 2016 WL

8   1535057, at *5. However, the report of Plaintiffs' expert Jim Van Dyke demonstrates that

9   reasonable consumers place and extremely high value on security. Ex. 94 at ¶¶79, 92. Thus,

10  Defendants' omissions regarding the true state of their security were material and caused

11  members of the Paid Users and Small Business Users Subclasses to pay more than they

12  otherwise would have. "'While a plaintiff must show that the misrepresentation was an

13  immediate cause of the injury-producing conduct, the plaintiff need not demonstrate it was the

14  only cause.'" *Mullins*, 2016 WL 1535057, at *5.

15          Last, the classwide exposure element of reliance under the UCL and CLRA is easily

16  established here, where all Small Business Users Subclass members were exposed to

17  Defendants' omissions in the small business advertisements they were required to view when

18  creating their accounts. *Mullins*, 2016 WL 1535057, at *2. Paid Users Subclass members'

19  exposure to Yahoo's omissions can be inferred from the scope and force of the public outcry

20  once Yahoo revealed the truth. *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1226 (9th Cir. 2015).

21
                        **b.      Damages Can Be Established with Common Proof and**
22                               **Calculated with Common Methodologies**

23          Plaintiffs' and Damages Class members' alleged losses are cognizable injuries in fact.

24  ECF No. 132 at 22-28. Plaintiffs will use common proof to establish that Damages Class

25  members suffered these injuries as a result of Defendants' conduct and common methodologies

26  to calculate the amount of those losses. Specifically, Plaintiffs will use expert testimony to

27  establish that: (1) all members of the Small Business Users Subclass and Paid Users Subclass

28  lost the benefit of their bargain and are entitled to restitution; (2) all members of the Damages

1    Class suffered the lost value of their PII and an increased risk of future harm; (3) many members

2    of the Damages Class suffered additional losses from identity theft; and (4) there is a logical and

3    foreseeable causal connection between Defendants' failures and these injuries. Any

4    individualized issues going to causation are minimal in comparison to the common questions that

5    stretch across the Damages Class. Further, that some or all of Damages Class members' damages

6    may ultimately require individual calculation, does not defeat class certification. *Pulaski &*

7    *Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015), *cert. denied*, 136 S. Ct. 2410

8    (2016) ("differences in damage calculations do not defeat class certification").

9                              **(1)    Benefit of the Bargain and Restitution**

10          Choice-based conjoint analysis has become a widely accepted tool for determining

11    benefit of the bargain damages. *See Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 2018

12    WL 3126385, at *17-*18 (N.D. Cal. June 26, 2018) (supporting predominance). Plaintiffs'

13    expert, Gary Parilis, proposes a conjoint analysis to determine the amount of money Damages

14    Class members overpaid for Defendants' services because of the concealed security

15    inadequacies. That analysis involves the surveying of consumers to determine how much value

16    they place on security when selecting an email service, and as Parilis demonstrates, that value

17    can be isolated and calculated through mathematical analyses of the survey results. *See* Ex. 95.

18                              **(2)    Lost Value of PII**

19          Plaintiffs may establish classwide causation for the lost value of Damages Class

20    members' PII by showing Defendants' conduct meets California's "substantial factor" test. *See*

21    *Mitchell v. Gonzales*, 54 Cal. 3d 1041, 1044 n.2, 1052 (1991) (negligence); *In re San Jose*

22    *Airport Hotel, LLC*, 2018 WL 1426702, at *5 (N.D. Cal. Mar. 22, 2018) (contract). "The

23    substantial factor standard . . . has been embraced as a clearer rule of causation – one which

24    subsumes the 'but for' test while reaching beyond it to satisfactorily address other situations,

25    such as those involving independent or concurrent causes in fact." *Rutherford v. Owens-Illinois,*

26    *Inc.*, 16 Cal. 4th 953, 968-69 (1997). Under this standard, a cause in fact is something that is a

27    substantial factor in bringing about the injury. *Mitchell*, 54 Cal. 3d at 1052-53; *see also Britz*

28    *Fertilizers, Inc. v. Bayer Corp.*, 665 F. Supp. 2d 1142, 1172 (E.D. Cal. 2009).

1    A defendant's conduct "must be more than a remote or trivial factor." Judicial Council Of

2    California Civil Jury Instruction ("CACI") 430 (2018). However, even "a very minor force that

3    [] cause[s] harm is a substantial factor." *Bockrath v. Aldrich Chem. Co.*, 21 Cal. 4th 71, 79

4    (1999). And, it "does not have to be the only cause of the harm." CACI 430. A defendant's

5    conduct can be a substantial factor even where harm is caused by a third party. *See Liberty*

6    *Surplus Ins. Corp. v. Ledesma & Meyer Constr. Co., Inc.*, 5 Cal.5th 216, 418 P.3d 400, 404-05

7    (Cal. 2018) (a company's negligent hiring could be a substantial factor in sexual molestation by

8    one of its employees). *See also* Restatement (Second) of Torts §448.

9         Plaintiffs will use the expert testimony of Mary Frantz and Jim Van Dyke, as well as the

10   evidence gathered to date, to show that Defendants' inadequate safeguarding of Plaintiffs' PII

11   was a substantial factor causing them to lose the value of their PII. Specifically, Plaintiffs will

12   show that Defendants' inadequate security compromised the entire UDB and was a substantial

13   factor in causing the Breaches. *See* Ex. 93 at 4-9. Plaintiffs will also use the notices sent by

14   Defendants, expert testimony, and common evidence to prove that their PII was exfiltrated

15   during the Breaches. Next, Plaintiffs will use expert testimony to prove that the data stolen in the

16   Breaches is different in breadth and value than that stolen in many other breaches. *See* Ex. 93 at

17   6,9; Ex. 94 at ¶¶ 19-35. ██████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████  Ex. 93 at 9; Ex. 94 at ¶¶19-

22   35. Thus, Damages Class members' PII is inherently more valuable than singular data points.

23        Plaintiffs will also show that Damages Class members' PII was stolen by "unauthorized

24   malicious actors" specifically seeking to use their PII to cause them harm. Ex. 93 at 9. Hackers

25   deliberately targeted, and exfiltrated, the ***entire*** UDB, and they were able to and did harvest

26   users' PII for years before Damages Class members were notified. The length of delayed notice

27   precluded Damages Class members from taking necessary remedial precautions in monitoring

28   credit and bank accounts, exposing even more valuable PII to would-be thieves.

1   Plaintiffs propose two models to calculate the aggregate lost value of PII through the use

2   of statistical sampling, an accepted method for determining aggregate damages on a classwide

3   basis. *See Villalpando v. Exel Direct Inc.*, 2016 WL 1598663, at \*14 (N.D. Cal. Apr. 21, 2016)

4   ("'[R]epresentative testimony, surveys, and statistical analysis all are available as tools to render

5   manageable determinations of the extent of liability.'"); *see also In re Estate of Marcos Human*

6   *Rights Litig.*, 910 F. Supp. 1460, 1464 (D. Haw. 1995) ("The use of aggregate procedures, with

7   the help of an expert in the field of inferential statistics, for the purpose of determining class

8   compensatory damages is proper."), *aff'd sub nom. Hilao v. Estate of Marcos*, 103 F.3d 767 (9th

9   Cir. 1996). Here, the methods of calculating damages are tied to Plaintiffs' theory of liability and

10  the representative evidence is "reliable and the inferences to be drawn . . . [are] just and

11  reasonable in light of the facts of this case." *McLeod v. Bank of America, N.A.*, 2017 WL

12  6373020, at \*17 n.24 (N.D. Cal. Dec. 13, 2017); *see also Tyson Foods, Inc. v. Bouaphakeo*, 136

13  S. Ct. 1036, 1047 (2016) (holding statistical evidence can be used to fill in evidentiary gaps

14  created by defendants' own misconduct). Statistical sampling techniques will allow Class

15  members to protect their rights while freeing the Court of the specter of unmanageability. And

16  while Plaintiffs, through their experts, have met their burden of demonstrating that statistical

17  sampling is appropriate here, any perceived shortcoming does not defeat certification. *See*

18  *Jimenez v. Allstate Ins. Co.*, 2012 WL 1366052, at \*15 (C.D. Cal. Apr. 18, 2012) ("*Jimenez I*").

19  Plaintiffs' identity theft expert, Jim Van Dyke, proposes to use statistical sampling to

20  determine the PII in an average users' account and the value of that PII in order to calculate

21  aggregate damages. The methodology consists of surveying consumers as to the type of PII they

22  have emailed and applying a pricing analysis for particular types of PII in order to determine an

23  aggregate lost value for the Damages Class. *See* Ex. 94 at ¶¶67-77. Plaintiffs' damages expert,

24  Ian Ratner, proposes a market-based approach to determine Class members' damages resulting

25  from the diminution of value of their PII as a result of the Data Breaches. Under this approach,

26  sources of market-based transactions are analyzed to value the PII based on comparable

27  transactions involving similar, or in some cases, the same PII. As detailed by Ratner, through

28  additional analysis of the Damages Class' composition and value Verizon allocated to the Yahoo

1    user base, the market-based approach can be used to calculate Class-wide damages. *See* Ex. 96.

2    Plaintiffs' proposed models afford Defendants an adequate opportunity to litigate their

3    affirmative defenses by attacking the representativeness and reliability of the statistical models,

4    rather than through cross-examining individual Class members. *Vaquero v. Ashley Furniture*

5    *Indus., Inc.*, 824 F.3d 1150, 1150 (9th Cir. 2016).

6                        **(3)    Identity Theft Losses**

7    It is undisputed that data breaches can cause identity theft. *See Stollenwerk v. Tri-West*

8    *Health Care Alliance*, 254 F. App'x 664, 668 (9th Cir. 2007) ("theft of a computer hard drive

9    [containing PII] certainly ***can*** result in an attempt by a thief to access the contents for purposes

10   of identity fraud") (emphasis in original). This Court also has concluded that it is plausible a data

11   breach is the casual factor in injuries related to identity theft. ECF No. 132 at 29-32; *In re*

12   *Anthem, Inc. Data Breach Litig.*, 2016 WL 3029783, at *16 (N.D. Cal. May 27, 2016); *see also*

13   *In re Zappos.com, Inc.*, 888 F.3d 1020, 1027 (9th Cir. 2018).

14   Plaintiffs can establish both a temporal and a logical connection between the Breaches

15   and Damages Class members' injuries. Temporally, the identity theft must follow the Breach in

16   which a Damages Class members' PII was taken. This point can be addressed through a basic

17   claims process. Whether the common PII stolen was the same kind needed to commit the identity

18   theft suffered by any Class member is "a matter of common knowledge from which a jury could

19   reasonably draw inferences regarding its probative value in establishing causation." *Stollenwerk*,

20   254 F. App'x at 667. Taken together with the facts that are common to all Damages Class

21   members, discussed here and above, these data points go well beyond loose, merely temporal

22   connections and establish a logical connection between the Breaches and Damages Class

23   members' harms. All Damages Class members' PII was actually stolen by thieves who

24   specifically targeted their PII, and who have sold and resold that PII on the dark web to other bad

25   actors, who bought it for the explicit purpose of causing the harm Damages Class members

26   suffered. In this context, and in the light of their significantly increased risk of future harm,

27   Damages Class members' purchases of credit mitigation services were the logical and

28   foreseeable results of the Breaches, as were their losses suffered through identity theft.

1    This case differs markedly from other data breach class actions where the individualized

2    nature of causation defeated predominance. Here, the PII taken was broader in scope, easier to

3    obtain, use, and re-use (for years), and unchangeable – giving thieves the simplest, most effective

4    way to commit fraud. As Plaintiffs' two experts explain, there is a very close connection between

5    the Breaches and Class Members' identity theft. *See* Ex. 93 at 9; Ex. 94 at ¶¶ 38-48. Also, the

6    length of time between the Breaches and their notice has eviscerated much, if not all, of the

7    evidence Defendants will claim is needed to show individual causation for every Damages Class

8    member. Thus, Plaintiffs offer the same causation proof that Damages Class members would

9    need to offer. To the extent more is needed, it is Defendants' burden to disprove causation, given

10   that their negligence precludes Plaintiffs' ability to offer additional proof. *See Haft v. Lone Palm*

11   *Hotel*, 3 Cal. 3d 756, 774 n.19 (1970). Defendants cannot meet this burden as to ***any*** Damages

12   Class member. It took Yahoo over three years to determine that PII from all users had been

13   exfiltrated in the 2013 Breach, and Defendants claim to still be unable to determine how the

14   exfiltration occurred. Notwithstanding, any attempt to disprove causation would not defeat

15   predominance because such an affirmative defense would be a common question.

16   Thus, the same evidence showing a causal connection between Defendants' conduct, the

17   Breaches, and Damages Class members' lost value of PII also establishes Defendants' conduct as

18   a substantial factor causing Damages Class members' other damages. While it is possible that a

19   particular Damages Class member's claim for losses stemming from identity theft will require

20   more individual determination, these instances are likely to be isolated and few and, therefore, do

21   not defeat predominance. *See Smith*, 2017 WL 1044692, at *13 (common issues of duty and

22   breach in data breach case were "pivotal to the resolution of the litigation, and therefore

23   predominate[d] despite individualized questions of causation and damages"). As with lost value

24   of PII, statistical evidence can be used to determine the aggregate damages relating to identity

25   theft by calculating the average user's out of pocket costs and required hours for identity fraud

26   resolution during the applicable risk period. Plaintiffs' expert, Jim Van Dyke, demonstrates how

27   data on costs and resolution for 2012 through 2016 can be obtained from industry leading Javelin

28   Strategy & Research, and then used to compute averages for those data points. Ex. 94 at ¶50.

1

### (4)     Punitive Damages

2      Plaintiffs' request for punitive damages under their negligence claim is appropriately

3   determined on a classwide basis. *Opperman v. Path, Inc.*, 2016 WL 3844326, at *16 (N.D. Cal.

4   July 15, 2016) ("'Because the purpose of punitive damages is not to compensate the victim, but

5   to punish and deter the defendant, any claim for such damages hinges, not on facts unique to

6   each class member, but on the defendant's conduct toward the class as a whole.'").

7

### 2.     A Class Action Is Superior to Millions of Expensive Trials

8      Certification of Plaintiffs' contract, negligence, and CLRA claims would be "superior to

9   other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P.

10  23(b)(3). Indeed, this is the kind of case for which the class action procedure was created. First,

11  any Class member's individual recovery, even in cases of actual identity fraud, would be

12  dwarfed by the cost of proving the predominating issues in this litigation. *Soares v. Flowers*

13  *Foods, Inc.*, 320 F.R.D. 464, 485 (N.D. Cal. 2017) (Rule 23(b)(3)(A) "only weighs against class

14  certification where individual damages 'run high' such that individual class members have a

15  strong interest 'in making individual decisions on whether and when to settle'"). Second,

16  because only one other case is currently pending in the United States, Rule 23(b)(3)(B) does not

17  weigh against certification. *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1191 (9th

18  Cir. 2001). Third, the TOS dictate all litigation must be in this forum or in California.

19      Fourth, the issues presented in this class litigation are manageable. *See* Fed. R. Civ. P.

20  23(b)(3)(D). Though individualized determinations of causation and damages may be necessary

21  in some limited circumstances, the class action device still presents far fewer management

22  difficulties than individually litigating the claims of millions of users. *Smith*, 2017 WL 1044692,

23  at *14 ("burden of corralling . . . run of mini-trials [on causation and damages linked to data

24  theft] shrinks in comparison to the burden of conducting a full-blown trial on every issue

25  contained in every cause of action, for every class member"). A class action provides the benefits

26  of single adjudication, economies of scale, and comprehensive supervision by a single court.

27  Individualized litigation would create a potential for inconsistent or contradictory judgments on

28  the issues Plaintiffs seek to certify here (including, most notably, whether Defendants' internal

1   policies and security protocols were adequate to safeguard its users' PII), and would increase the

2   delay and expense to all parties and the court system.

3          "Courts retain discretion to shape the proceedings and could ultimately choose an option

4   such as the use of individual claim forms or the appointment of a special master, which plainly

5   would allow [d]efendants to raise any defenses they may have to individual claims." *Jimenez v.*

6   *Allstate Ins. Co.*, 765 F.3d 1161, 1168-69 (9th Cir. 2014) ("*Jimenez II*") (finding "statistical

7   analysis [was] capable of leading to a fair determination of [defendant's] liability" and

8   individualized damages hearings "preserved the rights of [defendant] to present its damages

9   defenses on an individual basis"). Here, damages can be calculated through a simple claims

10  process whereby Class members submit receipts for identity theft related losses and testify as to

11  the PII stolen from their accounts. *See Just Film*, 847 F.3d at 1120-21. Even so, the common

12  liability questions are sufficient to support class certification. *Tyson Foods*, 136 S. Ct. at 1045.

13         Notice should not be cumbersome. Each Damages Class member can be contacted

14  directly by email using Defendants' records (in the same way notification of the Breaches was

15  eventually sent), or by publication for Damages Class members who no longer have their

16  accounts. Further, because the Breaches have been highly publicized around the world (they are

17  still the largest Breaches in history), a public notice in the U.S. and Israel would be effective.

18  Last, because Damages Class members can easily be verified using data maintained by

19  Defendants – who have already identified compromised user accounts and sent notices to the

20  Damages Class members who own them – the claims process will be straightforward. *Id.* Thus,

21  while ascertainability is not a requirement in the Ninth Circuit, *Briseno v. ConAgra Foods, Inc.*,

22  844 F.3d 1121, 1133 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 313 (2017), the manageability

23  problems that often plague certification do not exist here.

24         **E.      Certification of Issues Under Rule 23(c)(4) Is Also Appropriate**

25         Should the Court determine the individualized issues of causation or damages for certain

26  of Class members' injuries overwhelms common questions, Plaintiffs request that the Court

27  certify the issues listed in its Notice of Motion and Motion.

28

### 1.      The Court Has Broad Discretion to Certify Issues

"When appropriate," Rule 23(c)(4) allows a court great discretion to certify an action "as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). It does not prescribe elements that representatives must show in order to maintain an issue class, but courts recognize its value in resolving cases where, though common questions may not predominate, denying certification of common issues would all but strip class members of their right to seek relief.

The Ninth Circuit has endorsed the use of issue certification. *Valentino*, 97 F.3d at 1234. So have many other circuit courts. *See In re Deepwater Horizon*, 739 F.3d 790, 817 (5th Cir. 2014); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013); *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 860 (6th Cir. 2013); *see also Jimenez II*, 765 F.3d at 1168 (noting *Butler, Whirlpool*, and *Deepwater Horizon* "are compelling . . . [a]nd their reasoning is consistent with our circuit precedent").

As explained above, basic liability questions predominate for Plaintiffs' contract, negligence, consumer, and CRA claims. However, if the Court determines that Damages Class members' lost value of PII or losses from identity theft require a more specific showing of causation, and defeat predominance, it may still allow Plaintiffs to proceed under Rule 23(c)(4). *Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*, 308 F.R.D. 630, 633 (N.D. Cal. 2015) (Rule 23(c)(4) issues class "must still meet the requirements of Rule 23(a) and (b) (except for the predominance requirement of Rule 23(b)(3))"). The Court may certify issues under Rule 23(c)(4) if it materially advances the litigation as a whole, with the focus being "'judicial economy and efficiency.'" *Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 193 (N.D. Cal. 2015). Importantly, the analysis focuses only on the issues to be certified. *See Deane v. Fastenal Co.*, 2012 WL 12552238, at *7 (N.D. Cal. Sept. 26, 2012).

Here, the issues Plaintiffs propose to certify are key elements of their contract and negligence claims – claims that can be brought by all U.S. and Israeli users under a single state's law. They are costly and complicated issues to litigate, and the answers to the questions posed by those issues will be the same for every Class member. If the answer to one or more of the questions is "No," then the litigation ends. If the answers are "Yes," then all remaining issues are

1  capable of adjudication through a streamlined process that is far superior to requiring users to

2  independently establish what Defendants did (or did not) do to safeguard their PII and what

3  Defendants knew and when. Thus, their answers would help to efficiently resolve the litigation.

### 2. Issue Certification Will Significantly Advance Resolution

5  Plaintiffs acknowledge that this Court has recently denied several requests for Rule 23

6  (c)(4) issue certification.[27] This case differs significantly. In those cases, plaintiffs provided no

7  rationale for how the individualized issues that defeated predominance would otherwise be

8  resolved, once the certified issues had been decided, and in several instances more than one issue

9  remained to be addressed (*i.e.*, reliance and a workable damages methodology). Plaintiffs here

10  provide expert testimony showing how benefit of the bargain damages can be calculated and two

11  viable methods for determining lost value of PII, once liability is determined.

12  But, even if the Court ultimately finds fault with Plaintiffs' models on an aggregate level,

13  expert testimony demonstrates that users' damages for lost value of their PII and identity theft

14  losses costs can still be calculated individually, which "at this time is sufficient to allow the

15  Court to conclude that resolution of the common issues would materially advance this case's

16  disposition as a whole." *Loritz v. Exide Techs., Inc.*, 2015 WL 6790247, at *24 (N.D. Cal. July

17  21, 2015). Plaintiffs' expert's declarations show that individual pieces of PII, including the

18  common PII taken from all Damages Class members, have value. Ex. 94 at ¶¶67-77; Ex. 96 at

19  ¶¶17-33. Thus a claims process can be used to calculate lost value of non-common PII, as well as

20  identity theft losses. The only substantive issue to be resolved after the certified issues are

21  answered would be causation, and more specifically, whether the PII necessary to cause a user's

22  injuries may have come from a source other than the Breaches.

### IV. CONCLUSION

24  For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs'

25  Motion for Class Certification.

---

26  [27] *See Davidson*, 2018 WL 2325426, at *26; *Huu Nguyen v. Nissan N. Am., Inc.*, 2018 WL

27  1831857, at *8 (N.D. Cal. Apr. 9, 2018); *Backhaut v. Apple Inc.*, 2015 U.S. Dist. LEXIS 107519, at *9-*11 n.3 (N.D. Cal. Aug. 13, 2015); *Werdebaugh v. Blue Diamond Growers*, 2014 U.S.

28  Dist. LEXIS 173789, at *49 n.9 (N.D. Cal. Dec. 15, 2014).

DATED:  July 13, 2018

MORGAN & MORGAN
COMPLEX LITIGATION GROUP
John A. Yanchunis

*s/John A. Yanchunis*
John A. Yanchunis

201 N. Franklin Street, 7th Floor
Tampa, FL  33602
Telephone:  813/223-5505
813/223-5402 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
Stuart A. Davidson

*s/Stuart A. Davidson*
Stuart A. Davidson

120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)

CASEY GERRY SCHENK FRANCAVILLA
  BLATT & PENFIELD LLP
Gayle M. Blatt
110 Laurel Street
San Diego, CA  92101
Telephone:  619/238-1811
619/544-9232 (fax)

MILBERG TADLER PHILLIPS
GROSSMAN LLP
Ariana J. Tadler
One Pennsylvania Plaza, 19th Floor
New York, NY  10119
Telephone:  212/594-5300
212/868-1229 (fax)

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
Karen Hanson Riebel
100 Washington Ave. South, Suite 2200
Minneapolis, MN  55401
Telephone:  612/339-6900
612/339-0981 (fax)

*Attorneys for Plaintiffs and Proposed Class*
*Counsel*

1

## <u>CERTIFICATE OF SERVICE</u>

2

I hereby certify under penalty of perjury that on July 13, 2018, I authorized the electronic

3

filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send

4

notification of such filing to all ECF participants.

5

6

7

*s/Stuart A. Davidson*
STUART A. DAVIDSON

8

ROBBINS GELLER RUDMAN
 & DOWD LLP

9

120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432

10

Telephone:  561/750-3000
561/750-3364 (fax)

11

E-mail: sdavidson@rgrdlaw.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28