MORGAN & MORGAN
COMPLEX LITIGATION GROUP
John A. Yanchunis (Admitted *Pro Hac Vice*)
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Telephone: 813/223-5505
813/223-5402 (fax)
jyanchunis@ForThePeople.com

MILBERG TADLER PHILLIPS
GROSSMAN LLP
Ariana J. Tadler (Admitted *Pro Hac Vice*)
One Pennsylvania Plaza, 19th Floor
New York, NY 10119
Telephone: 212/594-5300
212/868-1229 (fax)
atadler@milberg.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
Stuart A. Davidson (Admitted *Pro Hac Vice*)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
sdavidson@rgrdlaw.com

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
Karen Hanson Riebel (Admitted *Pro Hac Vice*)
100 Washington Ave. South, Suite 2200
Minneapolis, MN 55401
Telephone: 612/339-6900
612/339-0981 (fax)
khriebel@locklaw.com

CASEY GERRY SCHENK FRANCAVILLA
   BLATT & PENFIELD LLP
Gayle M. Blatt (122048)
110 Laurel Street
San Diego, CA 92101
Telephone: 619/238-1811
619/544-9232 (fax)
gmb@cglaw.com

ROBINSON CALCAGNIE, INC.
Daniel S. Robinson (244245)
19 Corporate Plaza Dr.
Newport Beach, CA 92660
Telephone: 949/720-1288
949/720-1292
drobinson@robinsonfirm.com

*Attorneys for Plaintiffs and Proposed Class Counsel*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA - SAN JOSE DIVISION

| | |
|---|---|
| IN RE: YAHOO! INC. CUSTOMER DATA SECURITY BREACH LITIGATION | No. 16-md-02752-LHK |
| | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT** |
| | Date:      November 29, 2018 |
| | Time:      ____ p.m. |
| | Courtroom:  8, 4th Floor |
| | Judge:      Hon. Lucy H. Koh |

**Table of Contents**

I. Introduction ............................................................................................................1

II. Background ..........................................................................................................2

    A. Yahoo's Services and Representations Concerning Data Security...............2

    B. The 2013 Breach, 2014 Breach, And Forged Cookie Breach ......................3

    C. Coordination and Consolidation in Federal and State Courts ......................4

    D. Litigation History..........................................................................................4

    E. Plaintiffs' Claims and Relief Sought............................................................6

    F. Defendants' Class Certification Opposition and *Daubert* Challenges ...........7

    G. Settlement Negotiations ................................................................................8

III. The Settlement Terms .........................................................................................8

    A. Proposed Settlement Class ............................................................................8

    B. Business Practice Changes ............................................................................8

    C. Settlement Fund.............................................................................................9

        1. Out-Of-Pocket Costs...........................................................................10

        2. Paid User and Small Business User Costs ..........................................11

        3. Alternative Compensation ..................................................................11

    D. Credit Services.............................................................................................12

    E. Class Notice and Settlement Administration...............................................13

    F. Service Awards To Named Plaintiffs ..........................................................14

    G. Attorneys' Fees, Costs, and Expenses .......................................................14

    H. Reduction or Residual.................................................................................14

    I. Release .........................................................................................................15

IV. Argument ...........................................................................................................15

    A. The Settlement Class Should Be Preliminarily Certified............................15

        1. The Rule 23(A) Requirements Are Met.............................................15

        2. The Rule 23(B) Requirements Are Met..............................................16

    B. The Settlement Should Be Preliminarily Approved.....................................17

1. The Strength of Plaintiffs' Case.................................................................19

2. The Risk, Expense, Complexity, and Duration of Further Litigation...............20

3. The Risk of Maintaining Class Action Status Through Trial ..........................21

4. The Amount Offered In Settlement ...........................................................22

5. The Extent of Discovery Completed and the Stage of Proceedings .................22

6. The Experience and View of Counsel .........................................................23

7. The Presence of a Government Participant...................................................23

8. The Reaction of the Class Members to the Proposed Settlement .....................23

9. Lack of Collusion Among the Parties.........................................................23

C. The Proposed Notice Plan Should Be Approved ...........................................23

D. Appointment of the Settlement Administrator...............................................24

E. Appointment of Settlement Class Counsel....................................................25

F. Schedule For Final Approval....................................................................25

V. Conclusion .........................................................................................25

**CASES**

*Amchem Prods. v. Windsor*, 521 U.S. 591,620 (1997) ................................................................ 15

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979-80 (9th Cir. 2011) ..................................... 15

*G. F. v. Contra Costa Cty.*, 2015 WL 4606078, at *13 (N.D. Cal. July 30, 2015) ..................... 23

*Hammond v. The Bank of N.Y. Mellon Corp.*, 2010 WL 2643307, at *1 (S.D.N.Y. June 25, 2010) ............................................................................................................................ 21

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998). ............................................... 16

*In re Anthem, Inc. Data Breach Litig.*, 15-MD-02617-LHK, 2018 WL 3872788, at *11 (N.D. Cal. Aug. 15, 2018) ............................................................................................. 17

*In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011). .................... 19

*In re High-Tech Employee Antitrust Litig.*, 2014 WL 3917126, at *3 (N.D. Cal. Aug. 8, 2014) ................................................................................................................................ 17

*In re Linkedin User Privacy Litig.*, 309 F.R.D. 573, 585 (N.D. Cal. 2015) ............................... 17

*In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079-80 (N.D. Cal. 2007) ................... 17

*In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 266 F. Supp. 3d 1, 19 (D.D.C. 2017) .......................................................................................................................... 21

*In re: Yahoo! Inc. Customer Data Breach Security Litigation*, Case No. 16-md-02752-LHK (N.D. Cal.) .............................................................................................................. 4

*Just Film, Inc. v. Buono*, 847 F.3d 1108, 1118 (9th Cir. 2017) ................................................... 16

*Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998) .................................... 21

*O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1122 (N.D. Cal. 2016).......................... 17

*Smith v. Triad of Alabama, LLC*, 2017 WL 1044692, at *6 (M.D. Ala. Mar. 17, 2017) ............ 21

*Spann v. J.C. Penney Corp.*, 314 F.R.D. 312, 331 (C.D. Cal. 2016).......................................... 24

*Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) ............................................................ 16

*Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) .............................................. 16

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ....................................................... 15

**STATUTES**

Class Action Fairness Act, 28 U.S.C. § 1715 ............................................................................... 24

**OTHER AUTHORITIES**

2018 Amendment Advisory Committee Notes ........................................................................ 18

Manual for Complex Litigation, § 21.632 .......................................................................... 15

**RULES**

Fed. R. Civ. P. 23 .......................................................................................................... passim

Fed. R. Civ. P. 23(a) ............................................................................................................ 15

Fed. R. Civ. P. 23(b)(2) ......................................................................................................... 2

## I.      INTRODUCTION

In 2016 and 2017, Yahoo[1] acknowledged that it had been the target of multiple cyberattacks resulting in the exposure of Yahoo users' information – *i.e.*, the 2013 Breach, 2014 Breach, and Forged Cookie Breach (collectively, the "Data Breaches").  Names, email addresses, telephone numbers, dates of birth, hashed passwords, and, in some cases, security questions and answers (hereinafter "Personal Information") were among the disclosed data.

After two years of litigation, two rounds of motions to dismiss, the production and review of over 9 million pages of documents, seven percipient witness and Rule 30(b)(6) depositions, nine named Plaintiff depositions, producing Plaintiffs' four experts for deposition following submission of their reports, filing Plaintiffs' Motion for Class Certification and Defendants' response, and two day-long mediation sessions, the parties reached a resolution that—if accepted—will resolve all pending litigation both here and in the parallel state court proceedings, and provide, by far, the largest available cash fund for data breach class members in history. Specifically, Yahoo will establish a $50-million non-reversionary settlement fund for the benefit of the Class ("Settlement Fund"). In addition to the Settlement Fund, Yahoo will provide at least two years of three-credit-bureau credit monitoring and identity theft protection insurance for all Settlement Class Members, robust class notice and settlement administration, and service awards for the Settlement Class Representatives. Yahoo will also pay up to $35 million in attorneys' fees and $2.5 million in reimbursement of costs and expenses.  Hence, the full $50-million Settlement Fund will be available to compensate Settlement Class Members for out-of-pocket costs stemming from the Breaches, to reimburse Paid Users and Small Business Users up to 25% of the amounts they paid for Yahoo's email services, and to fund alternative compensation for Class Members that already have credit monitoring.

As a result of the litigation, Oath Holdings as successor to Yahoo's operating business

---

[1] Unless otherwise noted, all capitalized terms are defined in the Settlement Agreement and Release, which is being filed concurrently herewith. As noted in the Settlement Agreement, in June 2017, Yahoo! Inc. and Verizon Communications Inc. completed an asset sale transaction, pursuant to which Yahoo! Inc. became Altaba Inc. ("Altaba"), and Yahoo! Inc.'s previously operating business became Oath Holdings Inc. ("Oath Holdings"). Settlement Agreement §§ 1.54, 1.55.  Accordingly, herein, Yahoo refers to both Oath Holdings and Altaba.

also made, and continues to make, significant and substantive changes to its information security environment, including encryption of the User Data Base ("UDB"), backup files, enhanced intrusion detection tools, increased information security team headcount and budget, and implementation of the NIST Framework for Improving Critical Infrastructure Cybersecurity ("NIST Cybersecurity Framework"), amongst others.

Plaintiffs strongly believe the Settlement is a favorable one for the Settlement Class.[2]  It provides quick relief for Settlement Class Members with out-of-pocket damages and enhances protection of Settlement Class Members' Personal Information via credit monitoring and Yahoo's strengthened security program.  Credit monitoring in particular will be most effective the sooner it is implemented, and, once implemented, help preserve the confidentiality of Settlement Class Members' information in ways that a later monetary judgment could not. Accordingly, Plaintiffs respectfully request that the Court preliminarily approve the parties' Settlement Agreement[3] and enter an order that:

(1)   Certifies the Settlement Class under Fed. R. Civ. P. 23(b)(2) and (b)(3);

(2)   Preliminarily approves the Settlement as fair, reasonable, and adequate;

(3)   Directs Notice to be disseminated to the Settlement Class in the form and manner proposed by the parties as set forth in the Settlement and Exhibit 5 thereto;

(4)   Appoints Heffler Claims Group ("Heffler") to serve as the Settlement Administrator;

(5)   Appoints Class Counsel; and

(6)   Sets a hearing date and schedule for final approval of the settlement and consideration of Class Counsel's motion for award of fees, costs, expenses, and service awards.

## II.    BACKGROUND

### A.    Yahoo's Services and Representations Concerning Data Security

Yahoo provides comprehensive internet services. Yahoo's core service is Yahoo Mail, a free email service. Since 2011, Yahoo also provided a premium email service ("Paid Mail"), costing between $19.99 and $49.99 per year for features such as ad-free mail and priority

---

[2] Declaration of John Yanchunis ("Yanchunis. Dec."), ¶ 24.
[3] Attached as Exhibit 1 to the accompanying Declaration of John Yanchunis and cited hereafter as "SA" or "Settlement."

1    customer support.[4] Yahoo also provides paid business services. Cert. Memo, Ex. 3 at 941.

2    Anyone creating a Yahoo account in the United States or Israel agrees to Yahoo's Terms of

3    Service ("Yahoo TOS"). *Id.*, Ex. 4. The Yahoo TOS incorporated a "Privacy Policy," which

4    stated: "We have physical, electronic, and procedural safeguards that comply with federal

5    regulations to protect personal information about you." *Id.*, Ex. 6. On the "Security at Yahoo"

6    web page linked to the Privacy Policy, Yahoo represented: "We deploy industry standard

7    physical, technical, and procedural safeguards that comply with relevant regulations to protect

8    your personal information." *Id.*, Ex. 7. Similar, uniform representations were made in the Small

9    Business Terms of Service (*id.*, Ex. 8), and incorporated Privacy Policy (*id.*, Ex. 9).

10        **B.    The 2013 Breach, 2014 Breach, and Forged Cookie Breach**

11        In September 2016, Yahoo revealed that Personal Information "associated with at least

12    500 million user accounts was stolen" from Yahoo's UDB in late 2014 (the "2014 Breach").

13    Cert. Memo, Ex. 10. A few months later, Yahoo revealed that "an unauthorized third party, in

14    August 2013, stole [Personal Information] associated with more than one billion user accounts"

15    (the "2013 Breach"). *Id.*, Ex. 14. Ten months later, it was announced that the 2013 Breach

16    affected all three billion existing accounts. *Id.*, Ex. 13. Around the same time the 2013 Breach

17    was first announced, Yahoo confirmed that "an unauthorized third party accessed the company's

18    proprietary code to learn how to forge cookies," and that the "cookie forging activity" had

19    continued for more than one and a half years, from early 2015 through September 2016 (the

20    "Forged Cookie Breach"). *See Id.*, Ex. 14; Ex. 11 at 918.[5]  Collectively, the Data Breaches

21    impacted approximately one billion U.S. and Israeli accounts.[6] Cert. Memo at 2-3, Ex. 11 & 12.

22

---

23    [4] *See* Memorandum of Points and Authorities In Support of Plaintiffs' Motion for Class
      Certification ("Cert. Memo") at 1, (ECF No. 248-5 at 9), and its Exhibit 3 at 939-941.  To avoid

24    further burdening the record, Plaintiffs will cite to the Cert. Memo and its exhibits rather than re-
      attaching those exhibits.

25    [5] The 2013, 2014, and Forged Cookie breaches are referred to jointly as the "Data Breaches."
      [6] The MDL included claims on behalf of users residing in Israel with Yahoo accounts between

26    2012 and 2016, and Israeli users specifically agreed in the TOS to be bound by California law,
      and to litigate any disputes relating to their use of Yahoo in the United States.  Notwithstanding

27    the provisions of the TOS, two parallel class actions alleging claims related to the Data Breaches
      were filed in Israel, and styled Class Action 7406-08-17 *Raynzilber v. Yahoo! Inc.* and Class

28    Action 61020-09-16 *Lahav v. Yahoo! Inc.*, respectively.  Persons residing in Israel who used
      Yahoo services between 2012-2016 are eligible for benefits under the Settlement in this action.

## C.   Coordination and Consolidation in Federal and State Courts

Beginning in September 2016, multiple class action lawsuits were filed against Yahoo and other Defendants in federal courts across the country and in California state courts, alleging that Defendants failed to properly protect personal information in accordance with their duties, had inadequate data security, and delayed notifying potentially impacted individuals of the Data Breaches. On December 7, 2016, the Judicial Panel on Multidistrict Litigation transferred several federal putative class action lawsuits to this Court (the "MDL Court") for coordinated pretrial proceedings in *In re: Yahoo! Inc. Customer Data Breach Security Litigation*, Case No. 16-md-02752-LHK (N.D. Cal.) ("MDL Case"). ECF No. 1. Meanwhile, multiple parallel actions were also coordinated in California state court, which, on February 28, 2017, were assigned by the Judicial Council to a coordination trial judge for coordinated pretrial proceedings, in *Yahoo! Inc. Private Information Disclosure Cases*, JCCP No. 4895 (Orange County Superior Court) (the "JCCP Case"). Declaration of Daniel S. Robinson ("Robinson Dec."), Ex. 3. On March 14, 2017, the Orange County Superior Court Presiding Judge assigned the Honorable Thierry P. Colaw (Ret.) ("JCCP Court") to be the coordination trial judge. *Id.*, Ex. 4. Leadership was appointed in both the MDL Case and JCCP Case.[7] Throughout discovery, MDL Class Counsel and JCCP Class Counsel worked cooperatively in the scheduling and taking of offensive depositions.

## D.   Litigation History

Following centralization, MDL Class Counsel filed a Consolidated Class Action Complaint ("CAC") (ECF No. 80), Defendants moved to dismiss the CAC, (ECF No. 94), and

---

[7] On February 9, 2017, this Court appointed John Yanchunis of Morgan & Morgan Complex Litigation Group as Lead Counsel, and Ariana Tadler of Milberg Tadler Phillips Grossman LLP, Stuart Davidson of Robins Geller Rudman & Dowd LLP, Gayle Blatt of Casey Gerry Schenk Francavilla Blatt & Penfield LLP, and Karen Hanson Riebel of Lockridge Grindal Nauen PLLP, to the Plaintiffs' Executive Committee representing Plaintiffs and putative class members in the MDL Case ("MDL Class Counsel"). On May 26, 2017, the JCCP Court approved and entered JCCP Case Management Order No. 1 appointing Daniel S. Robinson of Robinson Calcagnie, Inc. and Brian Chase of Bisnar | Chase LLP as Co-Lead Counsel, Eric A. Grover of Keller Grover LLP as Liaison Counsel, and Jeremiah Frei-Pearson of Finkelstein, Blankinship, Frei-Pearson & Garber LLP, Neil Fineman of Fineman Poliner LLP, Robert Samini of Samini Scheinberg PC, Nathan Smith of Brown Neri Smith & Khan LLP, and Brian Kabateck of Kabateck Brown Kellner LLP to the Plaintiffs' Steering Committee, to represent Plaintiffs and putative class Members in the JCCP Case ("JCCP Class Counsel"). Robinson Dec., Ex. 5.

1   this Court granted in part and denied in part the motion by Order dated August 30, 2017 (ECF

2   No. 132).  On December 19, 2017, MDL Class Counsel filed a First Amended Consolidated

3   Class Action Complaint ("FAC") (ECF No. 179), Defendants moved to dismiss (ECF No. 205),

4   and this Court granted in part and denied in part the motion on March 9, 2018 (ECF No. 215).

5        Moreover, as to the JCCP action, on May 25, 2017, Yahoo moved to stay the JCCP

6   proceeding.  After briefing and oral argument on the issue, JCCP Class Counsel filed a

7   Consolidated Complaint alleging state law causes of action. Robinson Dec., Ex. 6.  The JCCP

8   Court ultimately denied Yahoo's motion to stay on June 23, 2017.  *Id.*, ¶ 16.  On July 27, 2017,

9   Yahoo demurred, which, after briefing and oral argument, the JCCP Court sustained in part and

10   overruled in part, with claims for violation of California's Unfair Competition Law, violation of

11   California's Customer Records Act, negligence, breach of contract, and invasion of privacy

12   under the California Constitution proceeding. *See id.*, ¶¶ 16-18 Ex. 7.

13        Throughout this time, discovery was ongoing.  Initially, the parties negotiated for Yahoo

14   to begin producing certain documents prior to the start of formal discovery. The parties then

15   engaged in extensive discussions to reach a series of stipulated discovery orders (including

16   Protective Order (ECF No. 73), ESI protocol (ECF No. 74), Rule 502 Order (ECF No. 76), ESI

17   Search Protocol (ECF No. 104)), and multiple rounds of negotiations to reach agreement on

18   hundreds of search terms.[8] Yahoo then produced, and Plaintiffs reviewed, over 9 million pages

19   of documents.  Plaintiffs deposed critical information security personnel who worked at Yahoo

20   during the relevant time periods, including former Chief Information Security Officers ("CISO")

21   Justin Somaini, Alex Stamos, and Bob Lord; former incident response team leader and interim

22   CISO Ramses Martinez; former penetration testing team leader Christopher Rohlf; former Chief

23   Information Officer ("CIO") Jay Rossiter; and multiple days of testimony from Yahoo's

24   corporate representative Sean Zadig. Yanchunis Dec., ¶ 9; Robinson Dec. ¶¶ 22-25. Further, at

25   the time the Agreement was reached, Plaintiffs had set deposition dates for former Yahoo Chief

26

27   [8] During this period, JCCP Class Counsel also entered into a Protective Order, ESI Order, and

28   ESI search protocol, and engaged in numerous negotiations with Yahoo regarding the search
    terms that would be used in both the JCCP and the MDL action. Robinson Dec., ¶¶ 20-22.

1   Executive Officer Marisa Mayer and former General Counsel Ronald Bell, and were seeking

2   dates for Yahoo co-founder and former Board of Directors member David Filo. Plaintiffs also

3   propounded interrogatories, to which Defendants responded.  *Id.*, ¶ 10.

4        Plaintiffs' efforts provided them with a thorough understanding of Yahoo's complex IT

5   systems, and the alleged deficiencies within them and its information security department, that

6   Plaintiffs allege contributed to the Data Breaches and must be remedied. *Id.*, ¶ 15.

7        Eight of the nine named MDL Case Plaintiffs had their devices forensically imaged, they

8   all responded to document requests and interrogatories, and they were each deposed. *Id.*, ¶¶ 16,

9   28. Plaintiffs also produced for deposition four expert witnesses—James Van Dyke, Mary

10  Frantz, Ian Ratner, and Gary Parilis, each of whom previously produced reports. *Id.*, ¶ 17.

11       On July 13, 2018, MDL Class Counsel filed a motion for class certification (ECF No.

12  248), and Defendants filed an opposition and three *Daubert* motions (ECF Nos. 295, 301–303).

13  JCCP Counsel filed a motion for class certification on August 27, 2018. Robinson Dec., ¶ 30.

14       **E.    Plaintiffs' Claims and Relief Sought**

15       Plaintiffs sought several types of equitable and monetary relief in this matter, premised

16  on claims arising out of two fundamental allegations: Yahoo's information security was

17  inadequate and that it waited too long to inform users of the Data Breaches.  Fundamentally,

18  Plaintiffs' asserted that, despite holding Yahoo's most valuable information, the UDB was

19  improperly protected.

20       Accordingly, Plaintiffs sought equitable relief aimed at remediating the information

21  security deficits they uncovered. In support of their class certification motion, Plaintiffs

22  submitted an expert report setting forth several security controls needed to protect the

23  information Yahoo stored, including increased funding and staffing for information security,

24  adoption and implementation of the NIST Cybersecurity Framework, as well as increased and

25  enhanced executive oversight. Cert. Memo, Exh. 93 at 10–14. Had the case not settled, Plaintiffs

26  anticipated seeking an injunction requiring Yahoo to implement these measures, amongst others,

27  and/or maintain the security reforms it had already undertaken in response to this litigation.

28

1    Plaintiffs also sought damages under three complex and novel theories: benefit of the

2 bargain and restitution, lost value of Personally Identifiable Information ("PII"), and identity

3 theft losses. Cert. Memo at 26-31. As to benefit of the bargain, Plaintiffs' expert, Gary Parilis,

4 supported a conjoint analysis to determine the amount Paid Users and Small Business Users

5 overpaid for Yahoo's services because of the concealed security inadequacies. *Id.* at 27.

6    Plaintiffs proposed two methods of identifying lost value of PII. In the first, statistical

7 sampling would determine the PII in an average users' account and its value in order to calculate

8 aggregate damages. In the second, a market-based approach—analyzing the value of PII in

9 comparable transactions—would be utilized to determine damages resulting from the diminution

10 in value of class members' PII as a result of the Data Breaches. *Id*. at 27-30.

11    Finally, identity theft losses were proposed to be established through a claims process,

12 where: (1) temporally, the identity theft followed the Breach(es) in which the PII was taken, and

13 (2) the PII taken must have been the same kind needed to commit the identity theft suffered.

14 Cert. Memo at 30–31. Identity theft losses would include, among other things, money spent to

15 rectify identity fraud, delayed tax refunds, and fees for fraud-prevention and detection services.

### F.    Defendants' Class Certification Opposition and *Daubert* Challenges

17    Defendants opposed Plaintiffs' class certification motion and filed three *Daubert*

18 motions. ECF Nos. 295, 301–303. Defendants challenged Plaintiffs' ability to prove they were

19 harmed by the cyberattacks on Yahoo, and that Yahoo's actions caused that harm.  Defendants

20 asserted that Plaintiffs had no class-wide proof of those elements and that proving each would

21 require potentially millions of mini-trials. Because the compromised UDB did not contain the

22 type of information that would directly lead to the harms alleged, Defendants pointed out that

23 Plaintiffs must rely on the information accessible in email content, which would necessarily vary

24 from person to person. Defendants additionally challenged the methodologies set forth in

25 Plaintiffs' expert reports, asserting that: Plaintiffs' Lost Value of PII damages model was

26 unreliable because fictitious information was sometimes provided in connection with Yahoo

27 accounts and it is impossible to diminish the value of fake information, amongst other reasons;

28 and the benefit of the bargain hypothesis failed because Defendants maintained identical security

measures for paid and free users, therefore Paid and Small Business Users lost no benefit of their bargain.  Defendants also proffered their own experts relating to damages and the non-existent, or extremely brief, period of vulnerability for any named Plaintiffs' information on the dark web.

## G.   Settlement Negotiations

On August 14 and September 7, 2018, MDL Class Counsel, JCCP Class Counsel, and Defendants engaged in arm's-length, in-person, day-long mediation sessions under the direction of the Honorable Daniel Weinstein (Ret.), Jed Melnick, and Simone Lelchuk of JAMS ("Mediators").  In addition, between August 15 and September 7, 2018, counsel for Defendants and Plaintiffs engaged in multiple arms-length ongoing settlement negotiations.   During the second formal mediation session, the parties agreed to terms forming the substance of the Settlement. Negotiations of attorneys' fees, costs, and expenses did not begin until agreement on behalf of the Settlement Class had been reached. S.A. § 12.1; Yanchunis Dec., ¶ 20.

## III.   THE SETTLEMENT TERMS

### A.   Proposed Settlement Class

The Settlement Agreement will provide relief for the following class:

> All U.S. and Israel residents and small businesses with Yahoo accounts at any time during the period of January 1, 2012 through December 31, 2016, inclusive; provided, however, that the following are excluded from the Settlement Class: (i) Defendants, (ii) any entity in which Defendants have a controlling interest, (iii) Defendants' officers, directors, legal representatives, successors, subsidiaries, and assigns; (iv) any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff; and (v) any individual who timely and validly opts-out from the Settlement Class.

S.A. § 1.43. This proposed class encompasses approximately a billion accounts, and upwards of 200 million individuals. Cert. Memo, Ex. 12 at 7. Notably, this definition includes users specifically impacted by the 2013, 2014, and Forged Cookie Data Breaches and also extends to all Yahoo users from 2012 to 2016, to provide robust protection taking into account the analysis in the  the expert report of Mary Frantz, that beginning in at least 2012, Yahoo suffered from multiple intrusions, from multiple bad actors, which may have resulted in loss of user data or misuse of user accounts.  Cert. Memo, Ex. 93 at 14–15, 36, 38-39, 44-54.

### B.   Business Practice Changes

Enhanced and improved data security is a critical aspect of the Settlement. Specifically, Yahoo, and later Oath,[9] have made, and continue to make, substantial enhancements, expenditures and improvements to its security environment in response to the litigation, including significantly increasing information security expenditures; substantially increasing the number of information security team members to multiple times the 2016 level; limiting access to the UDB and encrypting UDB backup copies; obtaining enhanced intrusion and anomaly detection tools; implementing an annual maturity assessment benchmarked against the NIST Cybersecurity Framework; buttressing oversight through an external Board of Advisors to the Oath CISO through at least 2019 to assist in maintaining best practices; and retaining pertinent security related logs for multiple years. S.A. § 2, Ex. 2. Oath has committed to provide an attestation of compliance, and to validate the enhanced security measures for three years.

These measures directly relate to the inadequacies in Yahoo's information security environment Plaintiffs alleged to have identified during discovery. For example, Plaintiffs explained in their class certification motion that Yahoo's information security team (the "Paranoids") was significantly understaffed and underfunded, Yahoo lacked intrusion detection systems and had inadequate logging, access to the UDB was liberally granted and backup copies of the UDB were regularly created without encryption or auditing.  Cert. Memo at 11-17.

The business practice changes initiated as a result of the litigation and as part of the Settlement address these shortcomings. Paranoids headcount and funding is increased, intrusion detection systems are augmented, logging is enhanced, access to the UDB is reduced and UDB back copies are encrypted, while vulnerability management and patching is increased.

## C.    Settlement Fund

In addition to addressing alleged security deficiencies, the Settlement requires Yahoo to pay $50 million into a Settlement Fund. S.A. § 3.1. This fund will be used (a) to reimburse Settlement Class Members who have out-of-pocket losses, (b) to compensate Paid and Small Business Users up to 25% of the amounts they paid for Yahoo's email services, and (c) to pay

---

[9] As noted above and in the Agreement, Oath now runs what was Yahoo's operating business.

1  for those who already have credit monitoring and choose the alternative cash payment rather than

2  Credit Monitoring Services. S.A. §§ 3.2, 5.3, 6.4, 6.5, 6.7.[10] Plaintiffs believe the $50 million

3  fund will be more than ample to accommodate the amounts drawn from it, Yanchunis Dec., ¶ 25,

4  but, in the event it is not, all claims drawn from it will be reduced pro rata. S.A. § 6.9.

5  **1.    Out-of-Pocket Costs**

6  One element available from the Settlement Fund is Settlement Class Members' Out-of-

7  Pocket Costs, meaning "costs or expenditures that a Settlement Class Member actually incurred

8  that are fairly traceable to one or more of the Data Breaches," and

> may include, without limitation: unreimbursed fraud losses or charges;
> professional fees incurred in connection with identity theft or falsified tax returns;
> fees or expenses incurred for, or as a result of, credit freezes; credit monitoring
> that was ordered after January 1, 2012 through the date on which the Credit
> Services become available through this Settlement Agreement; [and]
> miscellaneous expenses such as notary, fax, postage, copying, mileage, and long-
> distance telephone charges . . . .

S.A. § 1.29.  For Small Business Users, Out-of-Pocket Costs may also include "wages or fees

paid for the performance of tasks fairly traceable to mitigating the impact of one or more of the

Data Breaches."  S.A. § 1.29.

Time spent remedying issues related to one or more of the Data Breaches is likewise

compensable at the rate of "$25.00 per hour or unpaid time off work at the actual hourly rate of

that Settlement Class Member, whichever is greater," and can include up to fifteen hours of time

for Settlement Class Members with documented Out-of-Pocket Costs, and up to five hours at that

same rate for Settlement Class Members with undocumented costs.  S.A. § 1.29.

Claims for up to $25,000.00 can be submitted via a single claim form, accompanied by an

attestation regarding the expenditures incurred and basic documentation (*i.e.* letter from IRS if

claiming IRS tax fraud expenses).  S.A. §§ 6.1, 6.4; S.A. Ex. 6. Proof of causation is limited to

establishing the costs are "fairly traceable" to the Data Breaches, meaning:

---

[10] The costs of class notice and settlement administration; at least two years of Credit Monitoring Services; all attorneys' fees, costs, and expenses; and Service Awards are all being paid for separately by Yahoo, apart from the Settlement Fund.  S.A. §§ 4.8, 10.3, 11.2, 12.2.

(i) the Misconduct occurred in January 2012 or thereafter; (ii) the Settlement Class Member states that he, she, or it believes the Misconduct is connected to one or more of the Data Breaches; and (iii) the Misconduct involved possible mis-use of the type of Personal Information accessed in one or more of the Data Breaches (*i.e.*, names, email addresses, telephone numbers, birth dates, passwords, and security questions of Yahoo account holders, or from contents of the Class Member's email account, such as financial communications and records containing credit cards, retail accounts, banking, account passwords, IRS documents, and social security numbers from transactions conducted by email).

S.A. § 6.3. Preventative measures, "such as obtaining credit monitoring services or credit freezes, shall be deemed fairly traceable to one or more of the Data Breaches if they were incurred in January 2012 or thereafter and the Settlement Class Member states that they believe the costs were incurred as a result of one or more of the Data Breaches." S.A. § 6.3.

Out-of-Pocket Costs Claims can be submitted for 270 days after the Preliminary Approval Order. S.A. § 6.1. The Settlement Administrator will review claims as they are submitted, and if a claim is deemed deficient, will notify the Settlement Class Member within fifteen days of that determination, and the Class Member then has 30 days to rectify. S.A. § 6.2.

### 2.   Paid User and Small Business User Costs

Paid Users are Settlement Class Members that paid for ad-free or premium email services during the Class Period. S.A. § 1.31. Small Business Users are Settlement Class Members that paid for Small Business services during the Class Period. S.A. § 1.48. Paid and Small Business Users can receive up to 25% of the total amounts paid per year by those users between January 1, 2012 and December 31, 2016. S.A. §§ 6.5, 6.7. Small Business Users are subject to a cap of $500 per year. S.A. § 6.7.[11] Paid and Small Business Users need only submit a Claim Form identifying the paid account(s) utilized, and the number of years during the Class Period it was used within 270 days of the Preliminary Approval Order. S.A. §§ 6.6, 6.8, Ex's 8-9. Paid and Small Business Users remain eligible to submit claims for Out-of-Pocket Costs and for Credit Services or Alternative Compensation. S.A. §§ 6.5, 6.7.

### 3.   Alternative Compensation

---

[11] This cap exceeds the amount any Small Business User paid for email services and impacts, if any, only those receiving the highest level merchant solutions. Yanchunis Dec., ¶ 48.

Settlement Class Members with no need for Credit Monitoring Services because they already have similar protections are eligible for Alternative Compensation in the amount of $100. S.A. §§ 5.1-5.3. Depending on participation, the amount could rise to as much as $358.80: the full, two-year retail value of the Credit Monitoring Services being offered. Yanchunis Dec., ¶ 26. To obtain Alternative Compensation, Settlement Class Members need only timely confirm the timing and type of credit monitoring services they already have, that they wish to receive the Alternative Compensation instead of the Credit Services, and that they will keep their current services active for at least one year.  S.A. §§ 5.1, 5.2, Ex. 7.

### D.  Credit Services

Separate and apart from the Settlement Fund, Yahoo will also separately pay for two years of credit monitoring and identity theft protection services from AllClear ID. S.A. § 4.1, 4.7. AllClear is an industry leader with more than 10 years of specialized experience in data breach response. It has successfully managed some of the largest data breaches in history and has been utilized to notify more than two hundred million people in other breaches. AllClear is the same vendor and service that this Court recently approved in the *Anthem* data breach resolution. The Credit Services to be provided by AllClear ID will consist of:

- Credit monitoring of the Settlement Class Members' credit file for U.S. residents at all three (3) major credit reporting agencies (Experian, Equifax & TransUnion) (Single bureau monitoring with TransUnion is activated at the time of enrollment. Members will have to login to their online customer portal  or call the support center to accept the filtering policy to activate triple bureau credit monitoring) ) during the duration of the Credit Services Period;

- VantageScore® 3.0 Credit Score and Credit Report from TransUnion® for U.S. residents.

- Fraud Alerts for U.S. residents, which Settlement Class Members can set, renew, and remove in their online customer portal, for additional protection against identity theft;

- ID Theft Insurance for U.S. residents, which covers certain identity theft related expenses incurred by Settlement Class Members up to a limit of $1 million.

- Identity Theft Monitoring for U.S. residents to notify Settlement Class Members when stolen identity information has been detected and reported through the Internet Fraud Alert system (Dark Web monitoring).

- Identity Restoration Services that provide professional fraud resolution assistance to Settlement Class Members who experience identity theft or fraud, helping them with identity recovery and restoration.
- Identity theft scan of Settlement Class Members' minor children identities, up to the age of 18 for U.S. residents;
- Assistance with canceling and replacing credit and debit cards if a wallet is lost or stolen;

S.A. § 4.1.  This fulsome credit monitoring product is especially important here, where Yahoo has not previously made credit monitoring available. Settlement Class Members will be encouraged to timely sign up for credit monitoring, and educated about the benefits of doing so. S.A. § 4.5. Credit Services can be claimed via a straightforward claim form.  S.A. § 4.3, Ex. 7.

The Credit Services to be provided to the Settlement Class have a retail value of $14.95/month.[12] Given a class size consisting of nearly a billion U.S. and Israeli accounts and approximately 200 million individuals, this is an enormous benefit; potentially amounting to billions of dollars of savings to Settlement Class Members were they to obtain similar, or even inferior, credit monitoring products on their own. Defendants have committed to providing these services for the agreed term to *all* Settlement Class Members claiming them for the agreed term, regardless of the number. These services, offered broadly to claimants, are important to the Settlement Class in order to protect them from further identity fraud and losses.

Because AllClear Credit Services are unavailable in Israel, such Israeli Settlement Class Members are eligible for Alternative Compensation without a showing of current credit monitoring services. S.A. §§ 4.9, 5.4. The underlying U.S. resident, individual owner(s) of Small Business Users are also eligible to claim Credit Services or Alternative Compensation.  These U.S. resident individuals can obtain all Credit Services in their individual capacity. S.A. § 4.10.

**E.    Class Notice and Settlement Administration**

Notice to the Settlement Class and the costs of administration will also be separately funded by Yahoo. S.A. § 10.3. Heffler, a nationally recognized class action settlement administrator has been retained here, subject to the Court's approval.  Due to the large size of the

---

[12] Declaration of AllClear ID at ¶ 5, filed concurrently herewith (hereinafter "AllClear Dec.").

Class—hundreds of millions of accounts—and reflective of the nature of the Settlement Class and the Data Breaches, email addresses are available for most of the Class Members, and individual notice will be achieved primarily via email. S.A. Ex. 4 ¶ 15. Notice will also be posted in *People Magazine* and *National Geographic*, as well Israeli publications, and made via an innovative and far reaching digital media notice plan, further explained below. *Id.* ¶¶ 36-53.

### F.    Service Awards to Named Plaintiffs

Because the Settlement resolves both the MDL and JCCP Cases, named plaintiffs in both cases have been named as Settlement Class Representatives in the Settlement. S.A. § 1.45. These consumers have been integral in litigating this matter. All sixteen representatives have been personally involved in the cases and support the Settlement. Yanchunis Dec., ¶¶ 28-29; Robinson Dec., ¶ 36. Plaintiffs will separately petition the Court to award each Representative up to $7,500 (for those whose computers were forensically imaged and who were deposed); $5,000 (for those whose computer was forensically imaged but were not deposed); and $2,500 (for those whose computers were not forensically imaged and who were not deposed); in recognition of the time, effort, and expense they incurred pursuing claims that benefited the entire class.  This payment will also be made separately by Yahoo, and not reduce the Settlement Fund.  S.A. §§ 11.1-11.2.

### G.    Attorneys' Fees, Costs, and Expenses

Plaintiffs will also separately seek an award of attorneys' fees and reimbursement of litigation costs and expenses.  This payment too will come from Yahoo outside of the Settlement Fund. S.A. § 12.2. The request for an award of attorneys' fees will not exceed $35 million and the request for costs and expenses shall not exceed $2.5 million. S.A. § 12.1. The request for fees, costs, and expenses will encompass all effort and expenditures incurred by counsel in both the MDL and JCCP Cases. S.A. § 12.1. The motion will be supported with detailed lodestar information and an accounting of expenses.  Yanchunis Dec., ¶ 41.

### H.    Reduction or Residual

If the Settlement Fund is insufficient to cover all Out-of-Pocket Costs, Paid User Costs, Small Business User Costs, and Alterative Compensation payments, all such claims will be reduced on a *pro rata* basis.  S.A. § 6.9. Conversely, should there be a residue, surplus funds will

1  first be used to increase the Alternative Compensation payments up to the $358.80 individual

2  claim cap, (S.A. § 7.1(a))—the full retail value of two years of the Credit Services. AllClear

3  Dec., ¶ 5. Next, residual funds will be used to purchase up to five years of additional Credit

4  Monitoring Services. S.A. § 7.1(b). If additional funds remain following those two steps, then the

5  parties will motion the Court for direction regarding any remainder.  S.A. § 7.1(c).

6          **I.      Release**

7          In exchange for the benefits provided under the Settlement Agreement, Settlement Class

8  Members will release any and all claims against Defendants related to or arising from any of the

9  facts alleged in the complaints filed in this litigation. S.A. §§ 1.39, 13.1-13.4.[13]

10  **IV.    ARGUMENT**

11          **A.      The Settlement Class Should Be Preliminarily Certified**

12          Before assessing the parties' settlement, the Court should first confirm that the

13  underlying settlement class meets the requirements of Rule 23.  *See Amchem Prods. v. Windsor*,

14  521 U.S. 591,620 (1997); Manual for Complex Litigation, § 21.632. The requirements are well

15  known: numerosity, commonality, typicality, and adequacy—each of which is met here.  Fed. R.

16  Civ. P. 23(a); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979-80 (9th Cir. 2011).

17          **1.      The Rule 23(a) Requirements Are Met**

18          The Settlement Class includes nearly a billion accounts, representing some approximately

19  200 million individuals, and so readily satisfies the numerosity requirement. *See* Fed. R. Civ. P.

20  23(a)(1). The commonality requirement, which requires that class members' claims "depend

21  upon a common contention," of such a nature that "determination of its truth or falsity will

22  resolve an issue that is central to the validity of each [claim] in one stroke," is also met. *Wal-*

23  *Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Here, Plaintiffs' claims turn on whether

24  Yahoo's security environment was adequate to protect Settlement Class members' Personal

25  Information. Cert. Memo at 22-23. The resolution of that inquiry revolves around evidence that

26  does not vary from class member to class member, and so can be fairly resolved—whether

---

27  [13] In MDL proceedings, it is proper to release claims based on facts alleged in the underlying
28  MDL complaints. *See, e.g., In re: Volkswagen "Clean Diesel"*, Case No. 3:15-md-02672-CRB,
    PACER Dkt. No. 3230 at 5-6 (N.D. Cal. May 17, 2017).

1   through litigation or settlement—for all class members at once.

2          Likewise, typicality and adequacy are satisfied.   Each proposed Settlement Class

3   Representative alleges he or she was a Yahoo user, with Personal Information stored on the

4   UDB, that was exfiltrated during the Data Breaches, and thus they were impacted by the same

5   inadequate data security that Plaintiffs allege harmed the rest of the Class. Cert. Memo at 23–25;

6   *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1118 (9th Cir. 2017) ("[I]t is sufficient for typicality if

7   the plaintiff endured a course of conduct directed against the class."). The Settlement Class

8   Representatives also have no conflicts with the Settlement class; have participated actively in the

9   case, including by sitting for depositions and allowing their devices to be examined; and are

10  represented by experienced attorneys who were previously appointed by this Court—or the JCCP

11  Court—to represent class members' interests.  *See* Cert. Memo at 26; *Staton v. Boeing Co*., 327

12  F.3d 938, 957 (9th Cir. 2003) (adequacy satisfied if plaintiffs and their counsel lack conflicts of

13  interest and are willing to prosecute the action vigorously on behalf of the class); Yanchunis

14  Dec., ¶¶ 16, 28, 30, 38-39; Robinson Dec., ¶¶ 2-5, 32.

15          **2.      The Requirements of Rule 23(b) Are Met**

16          "In addition to meeting the conditions imposed by Rule 23(a), the parties seeking class

17  certification must also show that the action is maintainable under Fed. R. Civ. P. 23(b)(1), (2) or

18  (3)." *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1022 (9th Cir. 1998).  Here, the Settlement Class

19  is maintainable under Rule 23(b)(3), as common questions predominate over any questions

20  affecting only individual members and class resolution is superior to other available methods for

21  a fair and efficient resolution of the controversy.   *Id*. Plaintiffs' claims depend, first and

22  foremost, on whether Yahoo used reasonable data security to protect their Personal Information.

23  Cert. Memo at 22, 31-33. That question can be resolved using the same evidence for all

24  Settlement Class Members, and thus is the precise type of predominant question that makes a

25  class-wide adjudication worthwhile. *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045

26  (2016) ("When 'one or more of the central issues in the action are common to the class and can

27  be said to predominate, the action may be considered proper under Rule 23(b)(3) …'").

28          Importantly, predominance analysis in the settlement context need not consider

manageability issues because "the proposal is that there be no trial," and hence manageability considerations are no hurdle to certification for purposes of settlement. *Amchem*, 521 U.S. at 620. There is only the predominant issue of whether Yahoo failed to properly secure the Personal Information taken from it in the Data Breaches and failed to provide timely notice, such that its users should now be provided a remedy. Resolution of that issue through individual actions is impracticable: the amount in dispute for individual class members is too small, the technical issues involved are too complex, and the required expert testimony and document review too costly. *See Just Film*, 847 F.3d 1108 at 1123. Rather, the class device is the superior method of adjudicating consumer claims arising from these Data Breaches—just as in other data breach cases where class-wide settlements have been approved. *See, e.g.*, *In re Anthem, Inc. Data Breach Litig.*, 15-MD-02617-LHK, 2018 WL 3872788, at *11 (N.D. Cal. Aug. 15, 2018); *In re Linkedin User Privacy Litig.*, 309 F.R.D. 573, 585 (N.D. Cal. 2015).

### B.    The Settlement Should be Preliminarily Approved

There is "relatively scant appellate authority regarding the standard that a district court must apply in reviewing a settlement at the preliminary approval stage." *In re High-Tech Employee Antitrust Litig.*, 2014 WL 3917126, at *3 (N.D. Cal. Aug. 8, 2014).  In the past, courts have focused only on whether the proposed agreement appears to be non-collusive, is free of "obvious deficiencies," and generally falls within the range of "possible" approval. *See, e.g.*, *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079-80 (N.D. Cal. 2007). Recently, however, several courts have criticized the notion that review at the preliminary approval stage need only involve a "quick look," or a watered-down version of final approval. *See, e.g.*, *O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1122 (N.D. Cal. 2016).

Proposed revisions to Rule 23—effective on December 1, 2018—further confirm the need for a more detailed analysis.  Proposed Amended Rule 23(e)(1) states:

> **(e) Settlement, Voluntary Dismissal, or Compromise.** The claims, issues, or defenses of a certified class--or a class proposed to be certified for purposes of settlement--may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:
>
> **(1)** *Notice to the Class.*

**(A)** Information That Parties Must Provide to the Court. The parties must provide the court with information sufficient to enable it to determine whether to give notice of the proposal to the class.

**(B)** Grounds for a Decision to Give Notice. The court must direct notice in a reasonable manner to all class members who would be bound by the proposal if giving notice is justified by the parties' showing that the court will likely be able to:

**(i)** approve the proposal under Rule 23(e)(2); and

**(ii)** certify the class for purposes of judgment on the proposal.

**(2)** *Approval of the Proposal.* If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:

**(A)** the class representatives and class counsel have adequately represented the class;

**(B)** the proposal was negotiated at arm's length;

**(C)** the relief provided for the class is adequate, taking into account:

**(i)** the costs, risks, and delay of trial and appeal;

**(ii)** the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

**(iii)** the terms of any proposed award of attorney's fees, including timing of payment; and

**(iv)** any agreement required to be identified under Rule 23(e)(3); and

**(D)** the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23 (proposed amended Rule 23(e)).  Thus, under the proposed rule, notice should be given to the class, and hence, preliminary approval should only be granted, where the Court "will likely be able to" finally approve the settlement under Proposed Rule 23(e)(2) and certify the class for settlement purposes. *Id.*; *see also id.* 2018 Amendment Advisory Committee Notes.

Thus, the proposed rule reflects the factors already used in this Circuit for final approval: (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; (8) the reaction of the class members to the proposed settlement; and (9) whether the

1    settlement is a product of collusion among the parties. *In re Bluetooth Headset Products Liab.*

2    *Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).

3       Accordingly, Plaintiffs will undertake here an analysis akin to that required at final

4    approval and by the proposed rule, save for recognizing that at least one of those factors—the

5    reaction of class members—is not yet known.  Each weighs in favor of approval.

6            **1.**      **The Strength of Plaintiffs' Case**

7       While Plaintiffs have built a very strong liability case, the viability of the their causation

8    and damages models on a class-wide basis remains subject to vigorous challenge from

9    Defendants, subject to *Daubert* challenges, and is untested on a class-wide basis beyond the

10    pleading stages and certainly at trial.

11       As to liability, Plaintiffs class certification motion detailed the numerous shortcomings in

12    Yahoo's information security environment, despite its contrary representations. Plaintiffs allege

13    Yahoo was well aware that its Paranoids team was understaffed, underfunded, and lacked the

14    industry standard tools necessary to protect the valuable information Yahoo held. Cert. Memo at

15    11–20. Plaintiffs also established that certain senior executives had contemporaneous knowledge

16    of the 2014 Breach, yet failed to provide notice to users until years later. *Id*. at 18–20. Finally,

17    Plaintiffs provided three potential damages models, supported by three well-regarded experts, to

18    establish the predominance and manageability of class treatment. *Id*. at 35–39.

19       Yet, Defendants raise substantial questions of causation and damages—both as to the

20    named plaintiffs individually and as to any ability to prove causation or damages class-wide.

21    ECF No. 295 at 7–8, 13–15, 17–18. Defendants lodged multiple challenges to Plaintiffs' class

22    certification motion including attacking Plaintiffs' Lost Value of PII damages model on the basis

23    that fake information is not uncommonly provided in connection with Yahoo accounts and

24    "Yahoo cannot be held responsible for a diminution in value if the PII was fake to begin with."

25    *Id*. at 19.  As to benefit of the bargain, Defendants argued that enhanced security was not part of

26    any agreement because it "maintained identical security measures for paid users and free users,"

27    and hence Paid and Small Business Users lost no benefit of their bargain. *Id*. at 35. Proving

28    actual injury or loss would be difficult on an individual, much less class basis, and recovery (if

1    any) for identity theft losses, Defendants urged, would require unavoidable, and unmanageable,

2    individual inquiries or mini-trials. *Id*. at 27–32.

3            The range of potential outcomes was thus vast.  For instance, Plaintiffs' expert Ian Ratner

4    noted that email log-in information is sold on the Dark Web for approximately $1 per account,

5    providing a Lost Value of PII measure. ECF No. 254-9 at 15. But other potentially applicable

6    values of account information were much higher: the Ponemon Institute valued it at $8 per

7    account; survey respondents valued their passwords at $75.90; hackers charge up to $129 to

8    access a single individual account; and similar prior data breach settlements indicate a range of

9    $1.02 to $1.46 per user; amongst other approaches. *Id*. at 15-19. Given the near billion accounts

10   at issue here, even a $1 per account valuation could meet resistance from a jury; but these

11   estimates do so without accounting for the spectrum of veracity associated with the Personal

12   Information at issue. While the legal theory behind the larger numbers may be sound, it is

13   untested, and, as a practical matter, Plaintiffs' counsel recognize that taking such large numbers

14   to a jury presents substantial strategic risks. Yanchunis Dec., ¶ 37.

15           The Identity Theft/Out-of-Pocket Damages theory, while more tangible, applies to only a

16   subset of the Settlement Class, and would require them to come forward individually and

17   document their losses—whether through a claims process or otherwise—with respect to a breach

18   that happened years before trial. Cert. Memo at 38. Defendants contended that Plaintiffs would

19   not be able to prove out-of-pocket damages causally related to the Data Breaches, and not some

20   other source. The Settlement recompenses those costs without needing to overcome Defendants'

21   substantial arguments regarding causation.

22                  **2.      The Risk, Expense, Complexity, and Duration of Further Litigation**

23           While Plaintiffs believe their case is a strong one, all cases, including this one, are subject

24   to substantial risk.  This case involves hundreds of millions of individuals, and a complicated and

25   technical factual overlay lodged against well-funded and motivated Defendants. The damages

26   methodologies, theoretically sound in Plaintiffs' view, remain untested in a disputed class

27   certification setting and unproven in front of a jury.  And—as in any data breach, but especially

28   one of this scope and age—establishing causation and damages on a class-wide basis is an

MEMO ISO PLTFS' MOTION FOR PRELIMINARY APPROVAL - 16-md-02752-LHK          - 20 -

1    unexplored legal frontier rife with uncertainty.

2           Although nearly all class actions involve a high level of risk, expense, and complexity—

3    undergirding the strong judicial policy favoring amicable resolutions, *Linney v. Cellular Alaska*

4    *P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998)—this is an especially complex class in an especially

5    risky arcana. Historically, data breach cases faced substantial hurdles in surviving even past the

6    pleading stage. *See, e.g.*, *Hammond v. The Bank of N.Y. Mellon Corp*., 2010 WL 2643307, at *1

7    (S.D.N.Y. June 25, 2010) (collecting cases). Even cases of similar wide-spread notoriety and

8    implicating data far more sensitive than at issue here have been found wanting. *In re U.S. Office*

9    *of Pers. Mgmt. Data Sec. Breach Litig*., 266 F. Supp. 3d 1, 19 (D.D.C. 2017) ("The Court is not

10   persuaded that the factual allegations in the complaints are sufficient to establish . . . standing.").

11          To the extent the law has gradually accepted this relatively new type of litigation, the

12   path to a class-wide monetary judgment remains unforged; particularly in the area of damages.

13   For now, data breach cases are among the most risky and uncertain of all class action litigation,

14   making settlement the more prudent course when a reasonable deal is available.

15          By settling now, practical remedies that have been sorely absent become imminently

16   available. While the Data Breaches occurred some time ago, credit monitoring services have

17   never been offered; while Yahoo had contemporaneous knowledge of the 2014 Breach, data

18   security remained inadequate. The Settlement fills both those voids: providing credit monitoring

19   services to all Settlement Class Members who desire it and enhancing Yahoo's data security

20   practices. Even if Plaintiffs achieved a successful judgment, injunctive practice changes would

21   likely be years away following appeals, and credit monitoring would not have been provided.

22   Here then, delay only further injuries the class and increases each members' risk of harm.

23          **3.    The Risk of Maintaining Class Action Status Through Trial**

24          While Plaintiffs have moved for class certification and Defendants have responded, none

25   of Plaintiffs' claims had yet been certified. Hundreds of exhibits were submitted along with this

26   briefing. Certification of consumer data breach cases is rare—first occurring in *Smith v. Triad of*

27   *Alabama, LLC*, 2017 WL 1044692, at *6 (M.D. Ala. Mar. 17, 2017)—and unprecedented in a

28   case of this size. While certification of additional consumer data breach classes should follow,

the dearth of direct precedent adds to the risks posed by continued litigation.

### 4.   The Amount Offered in Settlement

The $50 million Settlement Fund, coupled with the separate payment for at least two years of credit monitoring, service awards, class notice and administration, and attorneys' fees, costs, and expenses is a remarkable outcome. The cash fund available for Settlement Class Member claims far out paces such funds in similar cases, as does the individual claim cap.[14]

The quality of the credit monitoring product is directly on par with that offered in similar data breach settlements, many of which had information that is designated more sensitive under the law, and the business practice changes safeguard Settlement Class Members' information by filling the voids identified during discovery in Yahoo's information security apparatus.

### 5.   The Extent of Discovery Completed and the Stage of Proceedings

This agreement was not reached until over two years after the first of the Data Breaches was announced. In the interim, significant steps in this litigation were taken. Two motions to dismiss were briefed and ruled upon in the MDL Case; one demurrer was briefed and ruled upon in the JCCP Case; Plaintiffs reviewed over 9 million pages of documents; they took seven depositions, including all three of Yahoo's relevant CISOs, the head of the Incident Response Team at the time of the 2014 Breach, and the CIO; all named plaintiffs from the MDL Case were deposed; Plaintiffs produced four expert reports, and all four experts were deposed; Plaintiffs filed their motions for class certification and Defendants responded thereto and filed multiple *Daubert* motions.     Yanchunis Dec., ¶¶ 8-10, 16-17, 28; Robinson Dec., ¶¶ 24-29, 32. Accordingly, Plaintiffs are well informed about their case, its assets and pitfalls, and have had the benefit of their experts' opinions in understanding the business practice changes needed here.

---

[14] *See, e.g., In re Anthem, Inc. Data Breach Litig.*, 15-MD-02617-LHK, 2018 WL 3872788, at *6, *18 (N.D. Cal. Aug. 15, 2018) (noting a $15 million fund for out-of-pocket costs with $10,000 individual cap, and $13 million allocation for alternative cash payments); *In re Home Depot, Inc., Customer Data Sec. Breach Litig.*, No. 1:14-MD-02583-TWT, 2016 WL 6902351, at *6 (N.D. Ga. Aug. 23, 2016) ($13 million fund for consumer claims with $10,000 individual cap); *In re Target Corp. Customer Data Sec. Breach Litig.*, No. MDL 14-2522-PAM, 2017 WL 2178306, at *2 (D. Minn. May 17, 2017) ($10 million settlement fund with $10,000 individual cap).

1      **6.**  **The Experience and View of Counsel**

2     MDL Class Counsel was appointed over a year-and-a-half ago. ECF No. 58. This group

3  has substantial experience litigating complex class cases of various natures, and extensive

4  exposure to the highest profile data breach cases in the country.   Yanchunis Dec., ¶ 38. Mr.

5  Robinson was appointed by the JCCP Court and has similar credentials. Robinson Dec., ¶¶ 2-5.

6  Having worked on behalf of the putative class since the Data Breaches were first announced, and

7  having dedicated thousands of hours to the case, proposed Settlement Class Counsel endorse the

8  Settlement without reservation. Yanchunis Dec., ¶¶ 24, 42; Robinson Dec., ¶¶ 5, 34-35.

9      **7.**  **The Presence of a Government Participant**

10     Plaintiffs here pursued their claims independently. Should preliminary approval be

11  granted, the United States Attorney General and Attorneys General of each of the States will be

12  notified pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715, and given an opportunity to

13  raise any objections or concerns they may have.

14      **8.**  **The Reaction of the Class Members to the Proposed Settlement**

15     Because notice has not yet been given, this factor is not yet implicated.   However,

16  Settlement Class Representatives all strongly support the Settlement.  Yanchunis Dec., ¶ 29.

17      **9.**  **Lack of Collusion Among the Parties**

18     Here, the parties negotiated a substantial Settlement Fund, making available $50 million

19  to the Class along with a minimum of two years of robust credit monitoring services. The parties

20  did not commence discussion of fees until agreement on all substantive portions of the class

21  resolution had been reached, and both the class portion of the resolution and the fees were

22  negotiated at arms-length under the direction of the Honorable Daniel Weinstein (Ret.), Jed

23  Melnick, and Simone Lelchuk of JAMS.  *See G. F. v. Contra Costa Cty*., 2015 WL 4606078, at

24  *13 (N.D. Cal. July 30, 2015) ("[T]he assistance of an experienced mediator in the settlement

25  process confirms that the settlement is non-collusive." (internal quotation marks omitted)).

26    **C.**  **The Proposed Notice Plan Should Be Approved**

27     Rule 23 requires that prior to final approval, the "court must direct notice in a reasonable

28  manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). For

1    classes certified under Rule 23(b)(3), "the court must direct to class members the best notice that

2    is practicable under the circumstances, including individual notice to all members who can be

3    identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Under proposed amended Rule

4    23(c)(2)(B), "[t]he notice may be by one or more of the following: United States mail, electronic

5    means, or other appropriate means." Fed. R. Civ. P. 23(c)(2)(B) (effective Dec. 1, 2018).

6           Here, because email addresses are available for the vast majority of Class Members, the

7    chief vector of direct, individual notice will be via email. S.A. Ex. 4 ¶ 15. Even prior to the

8    above noted proposed change in Rule 23 expressly electronic notice, email notice in similar

9    circumstances has been found appropriate. *See, e.g.*, *Spann v. J.C. Penney Corp*., 314 F.R.D.

10   312, 331 (C.D. Cal. 2016).   Substitute notice will also be provided by publication *People*

11   magazine and *National Geographic*, with a combined circulation of 6,361,756, and online via

12   display adds, and through social media, resulting in a reach rate of 80%. S.A. Ex. 4 ¶¶ 4, 36-56.

13   Copies of all the notice documents are attached to this preliminary approval motion; they are

14   clear and concise, and directly apprise Settlement Class Members of all the information they

15   need to know to make a claim.  Fed. R. Civ. P. 23(c)(2)(B).

16          Moreover, on the dedicated Settlement website, Class Members are able to review the

17   detailed Long Form Notice, which provides clear and concise information with respect to all the

18   relevant aspects of the litigation in English, Spanish and Hebrew. Thus, the Notice provides all

19   the information necessary for Settlement Class Members to make informed decisions with

20   respect to whether they remain in or opt out of the Settlement Class, or object to the proposed

21   Settlement. Yanchunis Dec., ¶¶ 45.  The Notice Plan has been developed by a provider with

22   significant experience in designing notice plans in large and national class actions similar to this

23   one.  Yanchunis Dec., ¶ 46-47. Accordingly, the content and method of dissemination of the

24   proposed Notice fully comports with the requirements of due process and applicable case law.

25          **D.**      **Appointment of the Settlement Administrator**

26          In connection with implementation of the notice plan and administration of the settlement

27   benefits, the parties seek the Court to appoint Heffler to serve as the Settlement Administrator.

28   Heffler has vast experience in many complex class action lawsuits.  The cost of administration is

1    being paid by Yahoo outside of the Settlement Fund, and hence will not reduce the amounts

2    available for Class Members.

3         **E.**     **Appointment of Settlement Class Counsel**

4         Under Rule 23, "a court that certifies a class must appoint class counsel . . . [who] must

5    fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). In making

6    this determination, courts generally consider the following: (1) the proposed class counsel's work

7    in identifying or investigating potential claims, (2) the proposed class counsel's experience in

8    handling class actions or other complex litigation, and the types of claims asserted in the case,

9    (3) the proposed class counsel's knowledge of the applicable law, and (4) the proposed class

10    counsel's resources committed to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i-iv).

11         Here, proposed Settlement Class Counsel have extensive experience prosecuting class

12    action cases, and specifically data breach cases, and were previously appointment by this Court,

13    or by the JCCP Court. *See* Yanchunis Dec., ¶ 38-39; Robinson Dec., ¶¶ 2-5 & Ex 1. Mr.

14    Robinson was appointed as co-lead counsel in the JCCP Case and his inclusion here as Class

15    Counsel acknowledges the coordination of the MDL and JCCP Cases throughout discovery, and

16    the joint resolution of the matters here through the settlement of the claims in both consolidated

17    actions in this case. Accordingly, the Court should appoint John Yanchunis, Gayle Blatt, Stuart

18    Davidson, Karen Hanson Riebel, Ariana Tadler, and Daniel S. Robinson as Class Counsel.

19         **F.**     **Schedule for Final Approval**

20         Once the Court has ruled on the motion for preliminary approval, the timeline for

21    providing notice, opting out of the Settlement Class, and submitting claims will begin to run.

22    Plaintiffs provided an agreed-up schedule in their Motion for Preliminary Approval.

23   **V.**     **CONCLUSION**

24         In light of the significant benefits provided by the Settlement, Plaintiffs respectfully

25    request that the Court grant Plaintiffs' Motion for Preliminary Approval.

26

27

28

DATED:  October 22, 2018

Respectfully submitted,

MORGAN & MORGAN
COMPLEX LITIGATION GROUP
John A. Yanchunis

_s/_
John A. Yanchunis

201 N. Franklin Street, 7th Floor
Tampa, FL  33602
Telephone:  813/223-5505
813/223-5402 (fax)

ROBBINS GELLER RUDMAN
   & DOWD LLP
Stuart A. Davidson (Admitted _Pro Hac Vice_)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
sdavidson@rgrdlaw.com

CASEY GERRY SCHENK FRANCAVILLA
   BLATT & PENFIELD LLP
Gayle M. Blatt
110 Laurel Street
San Diego, CA  92101
Telephone:  619/238-1811
619/544-9232 (fax)

MILBERG TADLER PHILLIPS
GROSSMAN LLP
Ariana J. Tadler
One Pennsylvania Plaza, 19th Floor
New York, NY  10119
Telephone:  212/594-5300
212/868-1229 (fax)

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
Karen Hanson Riebel
100 Washington Ave. South, Suite 2200
Minneapolis, MN  55401
Telephone:  612/339-6900
612/339-0981 (fax)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ROBINSON CALCAGNIE, INC.
Daniel S. Robinson (244245)
19 Corporate Plaza Dr.
Newport Beach, CA  92660
Telephone: 949/720-1288
949/720-1292
drobinson@robinsonfirm.com

*Attorneys for Plaintiffs and Proposed Class
Counsel*

1

2

<u>CERTIFICATE OF SERVICE</u>

3

     I hereby certify that October 22, 2018, I authorized the electronic filing of the foregoing

4

with the Clerk of the Court using the CM/ECF system which will send notification of such filing

5

to the e-mail addresses denoted on the attached Electronic Mail Notice List.

6

     I certify under penalty of perjury under the laws of the United States of America that the

7

foregoing is true and correct. Executed October 22, 2018.

8

9

/s/ *John A. Yanchunis*_____

John A. Yanchunis

10

MORGAN   &   MORGAN   COMPLEX
LITIGATION GROUP

11

201 N. Franklin Street,

12

7th Floor Tampa, FL 33602
Telephone:  813/223-5505
813/223-5402 (fax)

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28