MORGAN & MORGAN
COMPLEX LITIGATION GROUP
John A. Yanchunis (Admitted *Pro Hac Vice*)
201 N. Franklin Street, 7th Floor
Tampa, FL  33602
Telephone:  813/223-5505
jyanchunis@ForThePeople.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
Stuart A. Davidson (Admitted *Pro Hac Vice*)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
sdavidson@rgrdlaw.com

CASEY GERRY SCHENK FRANCAVILLA
  BLATT & PENFIELD LLP
Gayle M. Blatt (122048)
110 Laurel Street
San Diego, CA  92101
Telephone:  619/238-1811
gmb@cglaw.com

TADLER LAW LLP
Ariana J. Tadler (Admitted *Pro Hac Vice*)
One Pennsylvania Plaza, 36th Floor
New York, NY 10119
Telephone: 212/946-9300
atadler@tadlerlaw.com

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
Karen Hanson Riebel (Admitted *Pro Hac Vice*)
100 Washington Ave. South, Suite 2200
Minneapolis, MN  55401
Telephone: 612/339-6900
khriebel@locklaw.com

ROBINSON CALCAGNIE, INC.
Daniel S. Robinson (244245)
19 Corporate Plaza Dr.
Newport Beach, CA  92660
Telephone: 949/720-1288
949/720-1292
drobinson@robinsonfirm.com

*Attorneys for Plaintiffs and Proposed Settlement Class Counsel*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA - SAN JOSE DIVISION

| | |
|---|---|
| IN RE: YAHOO! INC. CUSTOMER DATA SECURITY BREACH LITIGATION | No. 16-md-02752-LHK |
| | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, COSTS, AND EXPENSES AND SERVICE AWARDS** |
| | Date:        April 2, 2020 |
| | Time:        1:30 p.m. |
| | Courtroom: 8, 4th Floor |
| | Judge:       Hon. Lucy H. Koh |

1

**Table of Contents**

2

3

4   I.       INTRODUCTION...................................................................................1

5   II.      ARGUMENT .......................................................................................2

6           A.      Percentage-of-the-Fund Analysis ....................................3

7                   1.      The Benefits Achieved are Exceptional.....................5

8                   i)      The $117.5 Million Cash Fund Benefit ....................6

9                   ii)     The Nonmonetary Benefits.........................................7

10                  2.      The Risk and Contingent Nature of the Case...........8

11                  3.      The Skill Required to Prosecute this Action Effectively ....9

12                  4.      Awards in Similar Cases ..........................................10

13          B.      The Request is Reasonable Under the Lodestar Cross-Check ....11

14                  1.      Settlement Class Counsel Vigorously Prosecuted This Case ...13

15                  2.      Document Review......................................................14

16                  3.      Depositions...............................................................15

17                  4.      Written Discovery and Plaintiff Discovery............18

18                  5.      Work in This Matter by Non-Appointed Firms.....19

19                  6.      JCCP Counsel: Coordination and Efficiency.........21

20                  7.      Lodestar Crosscheck Analysis .................................23

21          C.      The Requested Expenses are Reasonable ......................24

22          D.      Service Award Request Is Reasonable...........................25

23   CERTIFICATE OF SERVICE ...............................................................27

24

25

26

27

28

1

**Table of Authorities**

2

3  **CASES**

4  *Acosta v. Frito-Lay, Inc.*, No. 15-CV-02128-JSC, 2018 WL 646691, at *11 (N.D. Cal. Jan. 31, 2018) ................................................................................................................. 24

5

6  *Adkins v. Facebook*, No. C 18-05982 WHA, 2019 WL 7212315 ................................................. 9

7  *Bebchick v. Wash. Metro. Area Transit Comm'n*, 805 F.2d 396, 408 (D.C. Cir. 1986................. 5

8  *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) ....................................................................... 5

9  *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2018 WL 3960068..... 4, 7, 8, 12

10  *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011)................... 2, 3

11  *In re Cendant Corp. Litig.*, 264 F.3d 201, 284 n.55 (3d Cir. 2001)). ......................................... 5

12  *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 1:17-MD-2800-TWT, 2020 WL 256132................................................................................................................... 4, 5, 9

13  *In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 293 F.R.D. 21 (D. Me. 2013) ..................................................................................................................................... 9

14

15  *In re Heartland Payments Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1080-1081 (S.D. Tex. 2012) ............................................................................... 10

16  *In re Nat'l Collegiate Athletic Assoc. Athletic Grant-in-Aid Cap Antitrust Litig.*, 768 F. App'x 651, 653-54 (9th Cir. 2019);................................................................................. 2

17

18  *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2008)............................. 5

19  *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 947 (9th Cir. 2015) ........................... 25

20  *In re Quantum Health Res.*, 962 F. Supp. 1254, 1257-58 (C.D. Cal. 1997)................................. 3

21  *In re Target Corp. Customer Data Sec. Breach Litig.*, 2017 WL 2178306............................... 6, 8

22  *In re The Home Depot, Inc., Customer Data Sec. Breach Litig.*, 2016 WL 6902351 (N.D. Ga. Aug. 23, 2016)........................................................................................................ 6

23  *In re TJX Companies Retail Sec. Breach Litig.*, 246 F.R.D. 389 (D. Mass. 2007) ..................... 9

24  *In re Yahoo Mail Litig.*, 2016 WL 4474612, at *11 (N.D. Cal. Aug. 25, 2016)......................... 25

25  *Mills v. Elec. Auto–Lite Co.*, 396 U.S. 375, 395 (1970); ........................................................... 5

26  *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989) ............................ 2

27  *Rodman v. Safeway, Inc.*, No. 11-CV-03003-JST, 2018 WL 4030558 ...................................... 10

28  *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990)............... 2, 3

*Smith v. Triad of Alabama, LLC*, 2017 WL 1044692 ..................................................... 8

*So. Indep. Bank v Fred's Inc.*, No. 2:15-cv-00799 (M.D. Ala. Mar. 13, 2019) ............................. 9

*Staton v. Boeing Co.*, 327 F.3d 938, 965 (9th Cir. 2003) ................................. 3

*Vincent v. Hughes Air W., Inc.*, 557 F.2d 759, 769 (9th Cir. 1977) ............................ 24

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) .................................. 2, 3, 4, 5

*Wininger v. SI Mgmt. L.P.*, 301 F.3d 1115, 1121 (9th Cir. 2002). ................................ 24

**STATUTES**

Consumer Legal Remedies Act, Cal. Civ. Code §1750 ................................................. 21

**OTHER AUTHORITIES**

*An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 Journal of Empirical Legal Studies ................................................................ 11

*Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. Law Review ..................................... 10

**RULES**

Manual for Complex Litigation (4th ed. 2004) ........................................................ 12

Model Rules of Prof'l Conduct R. 4.2 ................................................................ 20

## I.      INTRODUCTION

Settlement Class Counsel[1] have worked diligently in prosecuting this matter on behalf of the Settlement Class and have achieved a successful result. The Amended Settlement Agreement provides the second largest common fund recovery ever obtained in a data breach case ($117,500,000.00), which is wholly non-reversionary. As part of the Settlement Fund, two years of comprehensive Credit Monitoring will be made available to the entire Class. Likewise, as a result of this case, Yahoo has made significant information security investments of $206 million in 2018 and 2019, and, as part of the Settlement's Business Practice Changes, has agreed to a spend of $198 million for 2020 through 2022, in addition to firm information security staffing commitments of 200 full-time employees through 2022, and third-party cybersecurity assessments, amongst other things.  (ECF No. 369-4); (ECF No. 369-28).

To reach this result, Settlement Class Counsel litigated for two years, defended against two rounds of motions to dismiss, reviewed over 9 million pages of documents, deposed seven percipient and Rule 30(b)(6) witnesses, defended nine named Plaintiff depositions, produced four experts for deposition following submission of their reports, filed a Motion for Class Certification, engaged in two day-long mediation sessions, drafted and submitted the First Preliminary Approval Motion and its concomitant notices, engaged in additional negotiations following the Court's denial of the First Motion for Preliminary Approval, prepared the Second Motion for Approval, which was granted, and took three confirmatory discovery depositions supporting the Second Motion for Approval.

In compensation for their efforts, Settlement Class Counsel seek 25.5% of the $117.5 million cash fund they achieved, namely $30,000,000. This request is only slightly above the Ninth Circuit's 25% "benchmark," and reflects a 1.49 multiplier based on Settlement Class Counsel's lodestar of $20,178,653—consisting of MDL Counsel's lodestar of $16,518,130, plus JCCP Counsel lodestar of $2,906,661, and anticipated future lodestar of $753,862, as described below and in the Declaration of Prof. Geoffrey Miller, attached as <u>Exhibit 1</u>, hereinafter "Miller Decl."

---

[1] Unless otherwise noted, all capitalized terms are defined in the Amended Settlement Agreement and Release, previously filed at ECF No. 369-2, and referred to hereafter as "SA" or "Settlement."

1    Plaintiffs also seek $1,497,609.54 ($1,341,230.41 for MDL Counsel and $156,379.13 for

2    JCCP Counsel) in litigation costs reasonably expended, plus a $60,000 reserve for expert costs to

3    monitor compliance with the settlement.[2] Finally, Plaintiffs seek modest Service Awards of

4    $7,500, $5,000, and $2,500 per Settlement Class Representative, as determined by their

5    involvement.[3]

6    The fees, costs, and expenses sought here are factually well-supported by the declarations

7    of all counsel, including biographic backgrounds, lodestar totals, expense breakdowns, and

8    detailed time records filed at ECF No. 412.

9    **II.    ARGUMENT**

10    "Under Ninth Circuit law, the district court has discretion in common fund cases to choose

11    either the percentage-of-the-fund or the lodestar method." *Vizcaino v. Microsoft Corp.*, 290 F.3d

12    1043, 1047 (9th Cir. 2002); *In re Bluetooth Headset Products Liab. Litig*., 654 F.3d 935, 942 (9th

13    Cir. 2011) (same). "[T]he choice between lodestar and percentage calculation depends on the

14    circumstances, but [ ] 'either method may ... have its place in determining what would be

15    reasonable compensation for creating a common fund.'" *Six Mexican Workers v. Ariz. Citrus*

16    *Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) (ellipsis in original) (quoting *Paul, Johnson, Alston*

17    *& Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989)). The Ninth Circuit also "encourage[s] courts

18    to guard against an unreasonable result by cross-checking their calculations against a second

19    method." *In re Bluetooth*, 654 F.3d at 944-45. And, while perhaps a relevant overall consideration,

20    the size of the fund—including so-called "megafunds"—dictates neither the principal

21    methodology (*i.e.*, percentage versus lodestar) nor the specific values (*i.e.*, percentage value or

22    lodestar multiplier) applied in considering reasonableness of the requested fee.[4]

23    _____

24    [2] Because the Settlement permits recovery of up to $2.5 million for costs and expenses, S.A. § 12.1, the remaining approximately $1 million is available to pay Settlement Class Member claims.

25    [3] Plaintiffs incorporate by reference the factual and procedural background recited in the concurrently filed Plaintiffs' Memorandum of Points and Authorities in Support of Plaintiffs'

26    Motion for Final Approval, as directed by Northern District of California's Procedural Guidance for Class Action Settlements, Final Approval § 2, which directs that a separately filed "motion for

27    attorneys' fees should refer to the history and facts set out in the motion for final approval."

[4] *See In re Nat'l Collegiate Athletic Assoc. Athletic Grant-in-Aid Cap Antitrust Litig.*, 768 F. App'x

28    651, 653-54 (9th Cir. 2019); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002)

1    Where the percentage-of-recovery method is employed, it is well established that 25% of

2  the common fund is the benchmark award of attorney's fees. *See, e.g.*, *In re Bluetooth*, 654 F.3d

3  at 942 ("[C]ourts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee

4  award, providing adequate explanation in the record of any 'special circumstances' justifying a

5  departure."); *Six Mexican Workers*, 904 F.2d at 1311 (same). "The 25% benchmark rate, although

6  a starting point for analysis, may be inappropriate in some cases." *Vizcaino*, 290 F.3d at 1048.

7  Upward departures may be warranted in particular circumstances, while downward departures may

8  be warranted, for instance, where there is no "realistic risk of nonrecovery." *In re Quantum Health

9  Res.*, 962 F. Supp. 1254, 1257-58 (C.D. Cal. 1997). Whether upward or downward, departures

10  from the 25% "starting point" require consideration of the relevant factors at play in each instance.

11  *In re Bluetooth*, 654 F.3d at 942.

12    Under the lodestar method, a "lodestar figure is calculated by multiplying the number of

13  hours the prevailing party reasonably expended on the litigation (as supported by adequate

14  documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *In

15  re Bluetooth*, 654 F.3d at 941 (citing *Staton v. Boeing Co.*, 327 F.3d 938, 965 (9th Cir. 2003)). The

16  Court may adjust this lodestar figure "upward or downward by an appropriate positive or negative

17  multiplier reflecting a host of 'reasonableness' factors." *Id.* at 941-42.

18    Whether the Court utilizes the 25% benchmark amount or some other rate, the award must

19  be supported "by findings that take into account all of the circumstances of the case." *Vizcaino*,

20  290 F.3d at 1048. The Ninth Circuit has identified five factors that may inform this inquiry: (1)

21  the results achieved; (2) the risk of litigation; (3) the skill required and the quality of work; (4) the

22  contingent nature of the fee and the financial burden carried by the plaintiffs; and (5) awards made

23  in similar cases. *Id.* at 1048-50.

24    **A.    Percentage-of-the-Fund Analysis**

25    To compensate their time and effort in prosecuting this action and negotiating the

26  Settlement for the benefit of the class, Settlement Class Counsel seek a fee award of $30,000,000,

27  _____

28  (expressly declining to adopt so-called "increase-decrease" rule in which percentage of award
generally decreases as amount of fund increases).

1    comprising 25.5% of the $117.5 million cash fund yielded by the settlement.

2           As a preliminary matter, the nature of this action warrants application of percentage-of-

3    the-fund approach as the principal method determining the reasonableness of Settlement Class

4    Counsel's fee request. As this and other courts recognize, this method "is commonly used in the

5    legal marketplace to determine attorneys' fees in contingency fee cases." *In re Anthem, Inc. Data*

6    *Breach Litig.*, No. 15-MD-02617-LHK, 2018 WL 3960068, at *5 (N.D. Cal. Aug. 17, 2018).

7    Further, the novel and complex nature of this data breach action affords a dearth of established

8    precedent and other guidance by which to employ the lodestar method. *See id.* ("[T]he combination

9    of novel legal issues and technical subject matter present in the instant [data breach] case counsels

10   against the lodestar method because there is no set baseline against which to compare whether

11   hours were reasonably expended."). Other considerations also command using the percentage

12   approach here, including (1) replicating more accurately the manner that plaintiffs' lawyers

13   practice outside of the class action context, (2) ensuring that class counsel's interests are more

14   directly aligned with the interests of the class, (3) rewarding counsel for assuming the risks of

15   litigating a matter, and (4) avoiding the trappings often associated with the lodestar method, such

16   as encouraging counsel to bill time and to find reasons to do so. *See* 5 Newberg on Class Actions

17   §§ 15:62, 15:65 (5th ed. 2018); *see also In re Anthem*, 2018 WL 3960068, at *5-6; *In re Equifax*

18   *Inc. Customer Data Sec. Breach Litig.*, 1:17-MD-2800-TWT, 2020 WL 256132, at *36 (N.D. Ga.

19   Jan. 13, 2020).

20          Settlement Class Counsel seeks an award of 25.5%, a percentage value only slightly above

21   the Ninth Circuit's well-established benchmark of 25%. *Vizcaino*, 290 F.3d at 1048. The requested

22   percentage accords with the vast majority of so-called "megafund" settlements. *See Vizcaino*, 290

23   F.3d at 1047 (affirming fee award based on 28% of $95 million cash settlement fund, and analyzing

24   percentage-based fee awards between 1996-2001 in cases with common fund between $50-200

25   million); *In re Anthem*, 2018 WL 3960068, at *15 (adopting 27% percentage of $115 million

26   common fund); Miller Decl. ¶¶ 35-37 (reporting on fee awards between 2009 and 2013 in the

27   Ninth Circuit, Northern District of California, and across the country, each at or above 25%). The

28   percentage also falls in line with percentage fee awards in data breach cases of similar magnitude.

Miller Decl. ¶ 27, Table 1.

The large size of the fund here—the fund's likely classification as a "megafund" classification—warrants no downward departure from the Ninth Circuit's established 25% benchmark. As mentioned above, the Ninth Circuit expressly considered and rejected adopting the so-called "increase-decrease" rule in which the percentage of the award generally decreases as amount of the fund increases. *Vizcaino*, 290 F.3d at 1047; *see also In re Anthem*, 2018 WL 3960068, at *9-10 (awarding fee comprising 27% of the $115 million common fund).  As Judge Thrash stated in *Equifax*:

> The Court is unaware of any *per se* rule that a reduced percentage must be used in a "megafund" case and declines to create one now. Additionally, other courts have criticized the use of a reduced percentage in such a case because, among other things, the practice undercuts a major purpose of the percentage approach in aligning the interests of the class and its lawyers in maximizing the recovery. Such a rule might also discourage early settlements, and it fails to appreciate the immense risk presented by large, complex cases.

2020 WL 256132, at *36 (citing *In re Cendant Corp. Litig.*, 264 F.3d 201, 284 n.55 (3d Cir. 2001)). Moreover, consideration of the factors articulated in *Vizcaino* counsels strongly in favor of an award at or above the Circuit's 25% benchmark.  *Vizcaino*, 290 F.3d at 1048-50.

### 1.    The Benefits Achieved are Exceptional

"The overall result and benefit to the class from the litigation is the most critical factor in granting a fee award." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2008); *see also Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) ("most critical factor" in considering the reasonableness of fee request is "degree of success obtained").  The overall result achieved by counsel comprises both monetary and nonmonetary benefits to the class. *See, e.g.*, *Vizcaino*, 290 F.3d at 1049 ("Incidental or nonmonetary benefits conferred by the litigation are a relevant circumstance.") (citing *Mills v. Elec. Auto–Lite Co.*, 396 U.S. 375, 395 (1970); *In re Pac. Enter. Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995); *Bebchick v. Wash. Metro. Area Transit Comm'n*, 805 F.2d 396, 408 (D.C. Cir. 1986)); *see also In re Equifax*, No. 1-17-md-02800-TWT (Doc. 956 at p. 83-84) (N.D. Ga. Jan. 13, 2020). Here, the Settlement affords the class exceptional relief—

monetary and nonmonetary benefits carefully negotiated by Settlement Class Counsel to definitively right the wrongs underlying this action.

First, in terms of monetary relief, the Settlement yields a $117.5 million Settlement Fund that, at the time of preliminary approval, was the largest common fund created in a data breach case, and that, consequent upon *Equifax*, is the second largest common fund created in a data breach case. Second, in terms of non-monetary relief, the Settlement commits Yahoo to extensive and detailed Business Practice Changes, including (1) $234.7 million in 2017 to 2019 spending, (2) future spending of $66 million per year through 2022 (more than four times Yahoo's yearly spend from 2013-2016), and (3) deploying 200 information security employees through 2022, more than four times the Yahoo Paranoid headcount in 2013 and 2016. The agreed annual security program maturity assessments with the participation of a third-party security consultant, furthers the Class's interests by ensuring Defendants' information security program remains fully updated. *See* Miller Decl. ¶ 38 (explaining that the significant business practice changes can be taken into account when determining a reasonable fee).

### i)      The $117.5 Million Cash Fund Benefit

The $117.5 million Settlement Fund is the second largest such fund in data breach history. The following chart compares the benefits achieved in five of the largest recent data breach cases:

Table 1: Comparative Analysis of Large Data Breach Cases

|  | Home Depot[5] | Target[6] | Equifax[7] | Anthem[8] | Yahoo! |
|---|---|---|---|---|---|
| Total Cash Value | $28.4 million | $23.3 million | $380.5 million | $115 million | $117.5 million |
| Credit protection | 18 months of identity protection services | None | 10 years of credit monitoring 7 years of identity | 2 additional years of credit monitoring | 2 years of credit monitoring, paid out of settlement fund |

---

[5] *In re The Home Depot, Inc., Customer Data Sec. Breach Litig.*, 2016 WL 6902351 (N.D. Ga. Aug. 23, 2016); *see also* (ECF No. 369-31).

[6] *In re Target Corp. Customer Data Sec. Breach Litig.*, 2017 WL 2178306 (D. Minn. May 17, 2017); *see also* (ECF No. 369-31).

[7] *In re Equifax*, 2020 WL 256132.

[8] *In re Anthem*, 2018 WL 3960068.

| | | | protection service | | |
|---|---|---|---|---|---|
| Business practice changes | Yes | Yes | Yes | Yes | Yes |
| Class size | ~ 52 million | ~ 110 million | ~ 147 million | ~ 79 million | ~ 194 million |
| Total fee award | $8.03 million | $6.75 million | $77.5 million | $31.05 million | $30 million (requested) |
| Percentage fee award | 28.2% | 28.9% | 25% | 27% | 25.5% (requested) |

Among the analogous comparators, the cash component of the settlement measures favorably.

Moreover, the credit monitoring offered here is certainly worth more to the Settlement Class than the discounted and fixed wholesale cost of $24 million to be paid from the Settlement Fund. *See In re Equifax*, 2020 WL 256132, at *38 n.55 (citing *In re Anthem*, 2018 WL 3960068, at *7). The actual value to class members is significant. The AllClear Services have a monthly retail value of $14.95. Thus, once more than approximately 67,000 Settlement Class Members enroll in the Credit Services, additional value is being provided by this negotiated bulk rate, further lowering the percentage of the value of the cash fund Settlement Class Counsel are seeking.

### ii)    The Nonmonetary Benefits

The requested fee is a reasonable percentage of the minimum $117.5 million cash fund alone.  But this non-reversionary cash component is clearly not alone the true measure of the benefits achieved by Settlement Class Counsel for the benefit of the Settlement Class. *See, e.g.*, *Vizcaino*, 290 F.3d at 1049 (citing cases); *see also In re Equifax*, 2020 WL 256132, at *31. The Settlement commits Yahoo to extensive and detailed Business Practice Changes discussed above. The Settlement expressly categorizes and monetizes these business practice changes—requiring spending of $108 million in 2019, and $66 million per year in 2020 through 2022—to comprise an aggregate added value of $306 million. *See In re Equifax*, 2020 WL 256132, at *31.  Adding this quantifiable non-monetary relief to the $117.5 million cash fund, results in an aggregate common fund of $423.5 million—the requested fee comprising only 7% of that amount.

Moreover, the various renumeration levels set within the Settlement Fund substantively raised the bar—not only in this case, but in many (if not all major) data breach cases that have

followed.  Specifically, the initial Settlement Agreement (ECF No. 330-3) filed on October 22, 2018, like the Amended Settlement Agreement now before the Court, contained an individual claim amount of $25,000; Alternative Compensation of $100; and reimbursement of time at $25.00 per hour or unpaid time off work at the actual hourly rate of that Settlement Class Member, for up to fifteen hours of time with documented Out-of-Pocket Costs, and up to five hours at that same $25.00 rate for undocumented costs.  S.A. § 1.29.  As represented below, data breach settlements prior to this case set the amounts much lower, and those settlements following in its wake have benchmarked their compensation levels to those achieved here:

|  | Target[9] | Home Depot[10] | Anthem[11] | Yahoo! | Equifax[12] |
|---|---|---|---|---|---|
| Individual Cap | $10,000 | $10,000 | $10,000 | $25,000 | $20,000 |
| Alternative Compensation | N/A | N/A | $36, up to $50 | $100 | $125 |
| Reimbursed Hours | 2 hours, documented | 5 hours, undocumented 2 hours, undocumented | 10 hours, above which required "a detailed showing" | 15 hours, documented 5 hours, undocumented | 20 hours – documented 10 hours, undocumented |
| Reimbursed Time Rate | $10/hour | $15/hour | $15/hour | $25/hour | $25/hour |

### 2.    The Risk and Contingent Nature of the Case

"The law in data breach litigation remains uncertain and the applicable legal principles have continued to evolve . . . ."  *In re Equifax*, 2020 WL 256132, at *32. In this case, Plaintiffs' claims partially survived Defendants' motion to dismiss.  But outside of the pleadings stage, these claims and issues remained untested.  The action settled before the Court ruled on Plaintiffs' motion for class certification, a high-stakes endeavor, inherently fraught with risks and bearing enormous consequences, especially in the nascent legal landscape of data breach litigation. Certification of consumer data breach cases is rare—first occurring in *Smith v. Triad of Alabama, LLC*, 2017 WL 1044692, at *6 (M.D. Ala. Mar. 17, 2017). Success at class certification has been

---

[9] *In re Target*, 2017 WL 2178306.
[10] *In re The Home Depot*, 2016 WL 6902351.
[11] *In re Anthem, Inc.*, 327 F.R.D. at 318-19.
[12] *In re Equifax*, 2020 WL 256132.

1    mostly nonexistent in these cases, recently resulting, in this District, in success for only an

2    injunctive class.[13] As in *Anthem*, "class certification was not guaranteed, in part because Plaintiffs

3    had a scarcity of precedent to draw on." 2018 WL 3960068, at *12. That said, even if this Court

4    had granted in full Plaintiffs' motion for class certification, the inherent risks attendant to trying a

5    data breach class action of this magnitude would have only magnified the difficult legal questions

6    at issue here. *See, e.g.*, *In re Anthem*, 2018 WL 3960068, at *12; *In re Equifax*, 2020 WL 256132,

7    at *32-33.

8                    **3.    The Skill Required to Prosecute this Action Effectively**

9            This case required the highest level of experience and skill. Settlement Class Counsel

10   include attorneys recognized by bench and bar nationally for their extensive experience in class

11   actions and in data breach cases. Non-appointed counsel were also well credentialed, as established

12   in their declarations. These attorneys were equal to the difficult and novel tasks at hand.  They

13   were also equal to the experience and skill of the lawyers representing Yahoo.

14           Fundamentally, the issues here were unique in data breach cases in light of the variability

15   of the information at issue. Generally, data breach cases involve the pilfering of known, uniform

16   types of data—often set fields of payment card related data, or personal and health information.

17   Here, such uniformity is not present. The types of especially sensitive information at issue for any

18   particular Class Member varied based on the contents of their email account. And the need to

19   access email (or other account) content also adds an additional link in the causal chain.

20           The subject matter is highly technical, including facts about Yahoo's cybersecurity and

21   industry best practices, requiring use of multiple experts.  As detailed further below, Settlement

22   Class Counsel undertook immense efforts in document review, discovery, motions practice, and

23   negotiations, doing so with an ever-diligent eye towards efficiency. Declaration of John Yanchunis

24   ¶ 20, attached as Exhibit 2 (hereinafter "Yanchunis Decl.").

25

26   [13] *See Adkins v. Facebook*, No. C 18-05982 WHA, 2019 WL 7212315, *9 (N.D. Cal. Nov. 26,
     2019) (granting motion to certify injunctive-only class, but denying motion to certify damages and
27   issues classes in data breach class action); *So. Indep. Bank v Fred's Inc.*, No. 2:15-cv-00799 (M.D.
     Ala. Mar. 13, 2019) (denying data breach case motion for class certification); *In re Hannaford*
28   *Bros. Co. Customer Data Sec. Breach Litig.*, 293 F.R.D. 21 (D. Me. 2013) (same); *In re TJX*
     *Companies Retail Sec. Breach Litig.*, 246 F.R.D. 389 (D. Mass. 2007) (same).

1

### 4.   Awards in Similar Cases

2   In context, the requested fee here is clearly reasonable when compared to fee awards in

3   other actions. First, among the five of the largest data breach actions in Table 1, above, Counsel's

4   fee request of 25.5% is not only clearly within the range of these comparators but would line up

5   as the second lowest fee award among the group on a percentage basis.

6

7   Second, the requested fee percentage of 25.5% is reasonable when compared to reported

8   data breach class action fee orders in the Northern District of California in the last 10 years, set

9   forth in Exhibit 3, attached.

10   Third, the requested fee percentage of 25.5% (and attendant lodestar multiplier of 1.49) is

11   reasonable when compared to reported class action fee orders with common funds of $5 million

12   or more in the Northern District of California in the last 10 years, which includes the data breach

13   fee orders, Exhibit 4, attached.

14   Finally, Settlement Class Counsel's 25.5% percentage (and attendant lodestar multiplier of

15   1.49) fee request is also supported by the opinion of Plaintiffs' fee expert, Professor Miller, and

16   the extensive body of research on class actions attorney fees he discusses.[14]   As noted by Professor

17   Miller in his Declaration:

18

19   Empirical evidence shows that courts in the Ninth Circuit adhere closely to the 25%
   benchmark, although with a slight tendency to adjust the fee upward in particular
   cases. A recent study of 458 reported class action settlements from state and federal

20   courts around the country during the five years from 2009 to 2013 examined 144
   cases from the Ninth Circuit and found that mean fees were 26% of the class

21   recovery and median fees were 25%, almost precisely tracking the benchmark
   guidance. Theodore Eisenberg, Geoffrey Miller and Roy Germano, *Attorneys' Fees*

22   *in Class Actions: 2009-2013*, 92 N.Y.U. Law Review 937, 951 & Table 3 (2017).
   Of 53 cases from the Northern District of California, mean fees were 26% and

23   median fees were 25%, again tracking the benchmark. *Id.* at 950 & Table 2.

24

_____

25   [14] *See also*, *In re Anthem*, 2018 WL 3960068, at **15-16; *In re Equifax*, 2020 WL 256132, at *34;
   *In re Heartland Payments Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040,

26   1080-1081 (S.D. Tex. 2012) ("[Judges] increasingly consider empirical studies analyzing class-
   action-settlement fee awards to set the appropriate percentage benchmark or to test the

27   reasonableness of a given benchmark. . . . Using these studies alleviates the concern that the
   number selected is arbitrary."); *Rodman v. Safeway, Inc.*, No. 11-CV-03003-JST, 2018 WL

28   4030558, at *5 (N.D. Cal. 2018) (empirical studies are an "important additional data point in the
   determination of an appropriate award").

1
2

> Counsel's 25.5% fee request in the present case is clearly reasonable when judged against these data.

3

Miller Decl. ¶ 35.  As further explained by Professor Miller:

4
5
6
7
8

> Comparable percentage fees are observed in cases around the country. The Eisenberg-Miller-Germano study found that for all reported class action fee awards between 2009 and 2013, the mean fee percentage award was 27% and the median was 29%. Professor Fitzpatrick's study of every federal class action settlement from 2006 and 2007 reports similar results. For all 444 cases in his data set, mean fees were 25.7% of the class recovery and median fees were 25.0%. For 39 consumer cases, mean fees were 23.5% and median fees were 24.6%. Brian Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 Journal of Empirical Legal Studies 811, 835 & Table 8. The 25.5% fee requested in this case is in line with the mean and median figures reported in these statistical studies.

9
10
11
12
13
14
15
16
17

> …
> Like other researchers, Eisenberg, Miller, and Germano report that average percentage fees tend to decline with class recovery. In a prior study, Eisenberg and Miller analyzed fee awards in 69 settlements ranging from $69.6 to $175.5 million and found that the median percentage was 19.9% and the mean percentage was 19.4%, with a standard deviation of 8.4%. Theodore Eisenberg & Geoffrey P. Miller, Attorney Fees and Expenses in Class Action Settlements: 1993–2008, 7 J. Empirical Legal Stud. 248, 265 tbl.7 (2010). More recent data finds that average fees are higher in cases of this dimension. For cases in the highest decile of class recovery (>$67.5 million), Eisenberg, Miller, and Germano find that the mean percentage fee was 22.3%. *Id.* at 948 & Figure 5. In preparing this report, I used the Eisenberg-Miller-Germano data to more specifically examine fees in the range between $75 million and $150 million. For 19 cases in the nation as a whole, the mean fee in this range was 24.9% of the recovery and the median fee was 25%. For cases in the Ninth Circuit, the mean fee in this range was 24.3% and the median was 24.6%. This study indicates that the requested 25.5% fee is comparable to awards in cases of similar dimension.

18

Miller Decl. ¶¶ 36-37.

19

**B.     The Request is Reasonable Under the Lodestar Cross-Check**

20
21
22
23
24
25
26
27
28

As required by this Court's February 9, 2017, Order Selecting Lead Plaintiffs' Counsel and Plaintiffs' Executive Committee (ECF No. 58), MDL Class Counsel successfully managed this litigation to ensure efficiency. Yanchunis Decl. ¶ 47. As an initial matter, on February 24, 2017, a Billing Protocol was established and provided to all firms (appointed and non-appointed) billing in this matter, which directed, *inter alia*, the requirement to avoid block billing, guidelines for the content of detailed time entries, the requirement to record time contemporaneously and submit all time to Lead Counsel monthly, travel and expense limitations, and standardized capped rates based on years of experience and status (Partner v. Associate). *See* Exhibit A to the Declaration of Karen Riebel ("Riebel Decl."), attached as <u>Exhibit 5</u>. Moreover, throughout the case Lead MDL Counsel

1   ensured that MDL Class Counsel were assigned defined roles and that they maintained focus on

2   those roles to efficiently and effectively prosecute the case. Yanchunis Decl. ¶ 47.

3          Further, following Preliminary Approval (ECF No. 390), and to ensure another layer of

4   review of the time records of counsel, MDL Class Counsel Karen Riebel and Gayle Blatt were

5   tasked with engaging in a line-by-line, and expense-by-expense review of all time and expenses

6   submitted in this matter.  Riebel Decl. ¶¶ 4–8. As part of that process, Ms. Riebel and Ms. Blatt

7   sent extensive edits, showing disallowed time entries and expenses as well as asking for clearer

8   and more detailed descriptions of time entries and expenses, to every firm that submitted time for

9   consideration in this matter, including the lawyers appointed by this Court to serve in leadership.

10  They had extensive, time-consuming communications with all firms regarding these disallowed

11  time entries and expenses and requests for clarification of the same. Riebel Decl. ¶ 8. Likewise, in

12  keeping with this Court's Order in *Anthem*,[15] the document review rates, previously capped by

13  Lead Counsel in this case at $350 per hour, were later reduced to $240 per hour, a drop of over

14  30%, for all counsel performing document review tasks, whether full-time, contract, or staff

15  attorney. Yanchunis Decl. ¶ 48. The time MDL Counsel spent on this process has not been included

16  in the reported lodestar here. Riebel Decl. ¶ 4.

17         Prior to this exercise, and as of approximately April 8, 2019, MDL Counsel's total lodestar

18  consisted of $18,304,817.30. (ECF No. 369-30). After the review and reduction of document

19  review rates, that was reduced to the $16,518,130 sought here.[16]

20         Time prior to appointment of MDL Class Counsel  has been included in this total to reflect

21  the collective efforts of all firms involved. This included a self-organization meeting in Atlanta on

22  December 14, 2016, attended by several firms at the behest of Mr. Yanchunis in order to facilitate

23  coordination and consensus,[17] as recommended by Manual for Complex Litigation (4th ed. 2004)

24

---

25  [15] *See In re Anthem*, 2018 WL 3960068, at *20 (applying rate of $240 per hour for all contract and staff attorneys).

26  [16] This review process was undertaken without regard to attempting to arrive at any particular

27  amount of lodestar reduction, or specific total lodestar number, or to reach any related, pre-ordained multiplier or percentage of the fund. Riebel Decl. ¶ 9.

28  [17] *See* (ECF No. 19 at 3-4) (discussing self-organization activities in this matter and broad support for MDL Class Counsel)

1  (the "*Manual*"). *See id.* § 21.272 (encouraging "private ordering"); *id.* § 10.22 (stating that where

2  "attorneys coordinate their activities without the court's assistance . . . such efforts should be

3  encouraged"); Yanchunis Decl. ¶ 50.

4            **1.**        **Settlement Class Counsel Vigorously Prosecuted This Case**

5        Starting with announcement of the 2014 Breach in September 2016, Settlement Class

6  Counsel have vigorously litigated this matter.   Lead Settlement Counsel John Yanchunis filed

7  likely the first case related to the Breaches and filed the Motion to Transfer before the JPML.  *See*

8  *In re: Yahoo! Inc. Customer Data Sec. Breach Litig.*, MDL No. 2752, ECF No. 1 (J.P.M.L.).

9  Following centralization, MDL Class Counsel sought leadership in this matter (ECF No. 19),

10  alongside three other competing applications, (ECF Nos. 21, 23, 24).

11        In their application, MDL Class Counsel touted not only their depth of experience in data

12  breach and other complex class litigation, but also their ability—and absolute need—to ensure

13  "inclusiveness, cooperation, and efficiency among all plaintiffs' counsel." (ECF No. 19 at 2).

14  Indeed, they noted that "the prosecution of this action cannot be effectively accomplished without

15  the utmost cooperation and inclusion among the Committee and non-Committee plaintiffs'

16  counsel." (*Id.* at 4); *see also* (*id.* at 7) ("Efficiency, cooperation, and inclusion will be the polestars

17  of the Committee's efforts.").   MDL Class Counsel were:

18          mindful that other experienced firms [sought] appointments to leadership positions
and recognize the wealth of knowledge and expertise they bring to the table.  To
19          that end, the Committee is committed to an inclusive management style that will
welcome and seek the participation of the other firms that have filed cases in this
20          litigation.  Drawing on their long history of directing litigation involving dozens of
firms and working cooperatively with multiple co-counsel, the Committee
21          members are confident that they can harness available efficiencies and
opportunities for coordination to benefit the class and avoid unnecessarily
22          burdening the Court.

23

24  (*Id.* at 9–10). On February 9, 2017, MDL Class Counsel were appointed. (ECF No. 58).

25        Shortly thereafter, months of negotiations commenced between Plaintiffs and Defendants

26  regarding a Protective Order (ECF No. 73), ESI protocol (ECF No. 74), Rule 502 Order (ECF No.

27  76), ESI Search Protocol (ECF No. 104), and multiple rounds of negotiations to reach agreement

28  on hundreds of ESI search terms, (ECF Nos. 151, 153, 163, 167, 170, 171). Initially, the parties

1    negotiated for Yahoo to produce certain documents prior to the start of formal discovery, including

2    certain investigative reports of malicious activity. Yahoo ultimately produced over 9 million pages

3    of documents.

4              **2.      Document Review**

5              Working with other firms that had filed cases centralized in this MDL—as further

6    examined below—MDL Class Counsel reviewed the massive production they obtained.  This

7    process involved a competitive bidding process for an ESI hosting vendor (CS Disco), establishing

8    customized workflows, led by well-experienced lawyers, with CS Disco to maximize efficiency

9    and accuracy in the review process, training of a review team, and authoring a detailed coding

10   manual, including summaries of the case issues and instructions to use the customized coding

11   panels set up in the CS Disco platform. *See* (ECF No. 369-32 ¶¶ 12-14).  Reviewers were trained

12   in a series of live group video sessions; training sessions continued for weeks as new reviewers

13   joined the team.

14             During this period, the Parties engaged in an early, voluntary exchange of information that

15   enabled Plaintiffs to refine their document requests and enabled Defendants to more efficiently

16   locate certain documents related specifically to Plaintiffs, ultimately arriving at a list of over 200

17   search terms, many of a highly technical nature, applied by Yahoo to identify potentially relevant

18   documents. (*Id.* ¶¶ 15, 17). Upon receiving Yahoo's document productions, Plaintiffs employed a

19   variety of technological tools to segregate documents needing review by experts and deprioritize

20   documents least likely to yield useful information.  Plaintiffs' review team peaked at 27 trained

21   reviewers in January 2018.  Review supervisors served as a "help desk" to address questions and

22   provide feedback to reviewers in real time. Quality control and second-level review of "hot"

23   documents were ongoing. The coding manual and coding panels in the CS Disco platform were

24   refined to improve the quality and consistency. Certain reviewers were later escalated to perform

25   higher level data analysis and assigned to deposition prep teams to identify documents and prepare

26   outlines.  A "Hot Document Spreadsheet" was maintained and regularly updated, and MDL Class

27   Counsel was provided regular status reports detailing various metrics of the ongoing review.

28   Document review supervising attorneys regularly communicated with MDL Class Counsel

1  regarding the status of document review and the best data in the document universe. (*Id*. ¶ 18).

2             **3.**     **Depositions**

3          Settlement Class Counsel also deposed Yahoo's corporate representative and the pertinent

4  information security related witnesses.

5          Specifically, on November 10 and November 20, 2017, and February 22, 2018,[18]

6  Settlement Class Counsel deposed Yahoo's Rule 30(b)(6) corporate representative, Sean Zadig,

7  Director of Threat Investigations.  This deposition included three days of testimony, creating more

8  than a thousand pages of testimony, and including 46 exhibits. The first two days of Mr. Zadig's

9  testimony were taken in advance of MDL Class Counsel's filing their First Amended Complaint

10  ("FAC") (ECF No. 179), with the questioning focused on eliciting facts needed to support the

11  FAC. Yanchunis Decl. ¶ 6. As the Court may recall, after its First Motion to Dismiss Order on

12  August 30, 2017, (ECF No. 132), Yahoo announced a far broader scope of the Breaches, *see, e.g.*

13  (ECF No. 142).  MDL Class Counsel proposed an expedited Rule 30(b)(6) deposition be taken in

14  advance of amending the pleading, (ECF No. 143); a proposal the Court accepted, (ECF No. 147).

15  Between October 28, 2017, and November 5, 2017, Yahoo produced approximately 345,000

16  documents, comprising approximately 1.4 million pages.  Thus, in the weeks leading up to the first

17  two days of this deposition, Plaintiffs were reviewing in excess of a million pages of production

18  while preparing for a deposition that would set the pleadings, likely, for the remainder of this

19  matter. Yanchunis Decl. ¶ 6. In light of the importance of this deposition, and the fluid nature of

20  the potentially relevant documents that were being discovered in real time immediately prior to,

21  and during the deposition days, three MDL Class Counsel were involved—John Yanchunis and

22  Ariana Tadler were present, and Patrick Barthle attended remotely in order to better interface with

23  the document database during the testimony. Yanchunis Decl. ¶ 7.

24          On April 13 and June 8, 2018,[19] Settlement Class Counsel deposed Robert Lord, former

25  Yahoo Chief Information Security Officer ("CISO") from November 2015 through June 2017.

26

27  ---

[18] MDL Class Counsel led the questioning on November 10 and November 20, 2017; JCCP Class Counsel led the questioning on February 22, 2018.

28  [19] MDL Class Counsel led the questioning on April 13th; JCCP Class Counsel led the questioning on June 8th.

1    This deposition included two days of testimony, creating nearly 700 pages of testimony, and

2    including 26 exhibits. Yanchunis Decl. ¶ 9. Mr. Lord was the CISO at the time the Breaches were

3    disclosed, and his emails and personal journal writings shed much light on the state of information

4    security during his tenure and the timing and sequence of the investigations into the Breaches in

5    2016. Two MDL Class Counsel attorneys were utilized for this deposition, considering its

6    importance and the volume of documentary evidence. *Id.*

7        On May 14 and 15, 2018, Settlement Class Counsel deposed Ramses Martinez,[20] former

8    Incident Response Team leader and Yahoo Interim CISO (from July to August 2015). This

9    deposition included two days of testimony, creating nearly 800 pages of testimony, and including

10   59 exhibits. Yanchunis Decl. ¶ 10. Mr. Martinez was an especially important witness given he was

11   one of the few Yahoo employees whose tenure spanned the entire period of the Breaches—having

12   worked at Yahoo from September 2011 through July 2015.   Moreover, Mr. Martinez's

13   responsibility was incident response—meaning he was tasked with responding to information

14   security events as they arose and had an intimate understanding of Yahoo's security shortcomings

15   throughout the relevant time period. In light of his importance, and the volume documents, MDL

16   Class Counsel utilized two attorneys for the deposition, and to juggle the numerous relevant

17   exhibits.  *Id.*

18       On May 29, 2018, Settlement Class Counsel deposed Justin Somaini, former Yahoo CISO

19   from April 2011 through January 2013.[21]  This deposition included nearly 500 pages of testimony,

20   and 33 exhibits. Mr. Somaini's testimony was particularly pertinent to establishing the inadequacy

21   of Yahoo's information security environment immediately prior to the 2013 Breach and during the

22   2012 incidents. In light of his importance, and the volume documents, MDL Class Counsel utilized

23   two attorneys for the deposition, and to juggle the numerous relevant exhibits. Yanchunis Decl.

24   ¶ 11.

25

26   [20] MDL Class Counsel led the questioning on May 14th, finishing their full 7 hours early in the
     morning on May 15th; JCCP Class Counsel led the questioning for the remainder of the day on
27   May 15th.
     [21] MDL Class Counsel led questioning to begin the day, utilizing their allotted seven hours, prior
28   to JCCP Counsel questioning for an additional approximately three hours.

1    On June 26, 2018, Settlement Class Counsel deposed Christopher P. Rohlf, former Yahoo

2  Director of Penetration Testing and Offensive Engineering Team.  This deposition included nearly

3  450 pages of testimony, and 58 exhibits.[22] Yanchunis Decl. ¶ 12. Mr. Rohlf's position essentially

4  entailed attempting to hack into Yahoo's network in order to demonstrate the systems' weaknesses.

5  Given that chief responsibility, he was especially familiar with Yahoo's insufficiencies and his

6  communications regarding these issues were particularly illuminating, further emphasizing the

7  significance of exhibits related to him and the need to authenticate and admit that evidence.  In

8  light of his importance, and the volume documents, MDL Class Counsel utilized two attorneys for

9  the deposition. *Id.*

10    On June 28, 2018, Settlement Class Counsel deposed Alexander C. Stamos, former Yahoo

11  CISO from March 2014 through June 2015.[23]  This deposition included nearly 450 pages of

12  testimony, and 28 exhibits. Yanchunis Decl. ¶ 13. Mr. Stamos was the CISO during the time of

13  2014 Breach, and testified regarding what happened in connection with that incident, and his

14  reporting of the issues to senior management, including CEO Marisa Mayer. In light of his

15  importance, and the volume documents, MDL Class Counsel utilized two attorneys for the

16  deposition. *Id.*

17    On August 16, 2018, Settlement Class Counsel deposed Jay Rossiter,[24] former Yahoo

18  Senior Vice President and Chief Information Officer ("CIO"). This deposition included nearly 300

19  pages of testimony, and 29 exhibits. During the 2014 Breach timeframe, Mr. Rossiter oversaw the

20  information security team, Mr. Stamos reported to him, and Mr. Rossiter was a party to numerous

21  conversations with Mr. Stamos, and with Ms. Mayer, regarding the events surrounding the 2014

22  Breach.  In light of his importance, and the volume documents, MDL Class Counsel utilized two

23

24

25  [22] Similar to Mr. Somaini, MDL Class Counsel led questioning of Mr. Rohlf to begin the day, utilizing their allotted seven hours, prior to JCCP Counsel questioning for an additional approximately three hours.

26  [23] MDL Class Counsel led the questioning for the full time of this deposition. JCCP Counsel were unable to commence their questioning that day but had subpoenaed Mr. Stamos for a second day

27  of questioning at a later date.

28  [24] MDL Class Counsel led the questioning for the full time of this deposition. JCCP Counsel were unable to commence their questioning that day, but had prepared to do so.

1   attorneys for the deposition. Yanchunis Decl. ¶ 14. [25]

2       In connection the Amended Settlement Agreement and the declarations they submitted

3   regarding it, depositions of Yahoo's Senior Principal Software Development Engineer, its Product

4   Manager of Audience Data Engineering, and Verizon's current CISO, were taken in April 2019.

5   (ECF No. 369-1 ¶ 50); Yanchunis Decl. ¶ 15. These depositions explored the analyses used in

6   computing class size and makeup, as well as the business practice changes Defendants committed

7   to as part of the Settlement. *Id.*

8                   **4.       Written Discovery and Plaintiff Discovery**

9       Settlement Class Counsel also propounded, and responded to, written discovery.

10  Specifically, MDL Plaintiffs propounded three sets of Requests for Production, one set of

11  interrogatories, sent or served more than 35 document preservation letters or subpoenas on non-

12  parties, produced more than 16,000 pages of documents in response to Defendants' 47 Document

13  Requests, and eight of the nine named MDL Case Plaintiffs had their devices forensically imaged.

14  (ECF No. 369-22 ¶¶ 16, 24, 25). MDL Plaintiffs also each responded to 25 interrogatories,[26] and

15  all nine were deposed. Riebel Decl. ¶¶ 2-3.

16      Between November 15, 2017 and July 27, 2018, Yahoo served five privilege logs and four

17  amended logs, with more than 77,000 entries. (ECF No. 369-22 ¶ 26). Disputes regarding the logs

18  entailed months of extensive written and telephonic communications concerning MDL Plaintiffs'

19  claims that numerous documents were improperly withheld because no privilege or protection

20  applied, it had been waived, or because the log entries were inadequate. (*Id.*). Ultimately, Yahoo

21  produced four amended privilege logs, revising the descriptions of approximately 3,300 entries,

22  and produced 276 challenged documents. The parties ultimately submitted a joint statement on the

23  remaining disputes to Magistrate Judge Cousins, who held an in-person hearing and ordered

24

---

25  [25] When the original Settlement was reached, Plaintiffs had also set depositions for former Yahoo
    Chief Executive Officer Marisa Mayer and former General Counsel Ronald Bell, and were seeking
26  dates for Yahoo co-founder and former Board of Directors member David Filo. Disputes over
    scheduling those depositions, and that of Plaintiffs' expert Mary Frantz, were brought before
    Magistrate Judge Cousins at an August 22, 2018, hearing. (ECF No. 369-32 ¶ 23).
27  [26] Except for MDL Plaintiff Mortensen who responded to 43 Requests for Production and 17
    Interrogatories. Riebel Decl. ¶ 2.
28

1   further briefing. Plaintiffs moved to compel and briefing was completed two weeks thereafter. The

2   motion was taken off calendar after the Notice of Settlement was filed on September 14, 2018.

3   (ECF No. 369-32 ¶ 26).

4               **5.      Work in This Matter by Non-Appointed Firms**

5               Consistent with the representations in their leadership application (ECF No. 19), MDL

6   Class Counsel—with careful consideration and assessment of direct client representation and

7   skillset—involved non-appointed attorneys in performing discrete tasks in the litigation of this

8   matter, prior to the Court's February 1, 2018, directing that all such work would require prior Court

9   approval, (ECF No. 208) ("Efficiency Order"). Immediately upon receiving this Court's Efficiency

10  Order, MDL Class Counsel instructed all non-appointed members assisting to cease performing

11  any work in this matter pending further order of the Court. (ECF No. 369-32 ¶ 19); Yanchunis

12  Decl. ¶ 52.

13              However, prior to the Efficiency Order, inclusion was always administered consistent with

14  the requirements identified by the Court when it appointed MDL Class Counsel, as addressed

15  above. As described by Prof. Miller, the *vast* majority of non-appointed attorney time was devoted

16  to document review, in order to digest and synthesize the immense document production in as

17  expeditious a timeline as possible, in light of pending depositions and class certification deadlines.

18  *See* Miller Decl. ¶¶ 73, 48 and Figures 2 & 8.

19              Specifically, Yahoo produced 648,891 documents totaling approximately 9.03 million

20  pages in this case. While production occurred on a rolling schedule,[27] notably, between October

21  28, 2017 and January 24, 2018, Defendants produced over 7.7 million of those pages.

22              As instructed by the Court at the January 4, 2018, hearing, MDL Class Counsel reviewed

23  these documents prior to depositions.[28] Thus prior to the Court's Efficiency Order, Plaintiffs were

24  reviewing approximately 7.7 million pages of documents, and trying to do so as expeditiously as

25

26  _____

    [27] *See* (ECF Nos. 160, 164, 166, 172, 187, 209, 218, 226, 238).

27  [28] *See* Jan. 4, 2018 CMC Hr'g Tr., ECF 199, at 15-17 ("I don't want to have to preside over motions
    to depose people twice or to go through class cert or something else twice.… You should only take

28  [the depositions] if you have the information you need to take them.").

1    possible in order to begin depositions so as to meet the July 13, 2018, class certification deadline.

2    (ECF No. 207).  Accordingly, immense labor was involved in that effort, including by non-

3    appointed attorneys.

4          Outside of document review, some limited time was devoted by non-appointed attorneys

5    to client contact, and to Plaintiffs' Response to Defendants' First Motion to Dismiss.

6          Specifically, in drafting the Consolidated Amended Complaint and First Amended

7    Complaint, MDL Class Counsel vetted, and included as named plaintiffs certain individuals who

8    had retained non-appointed attorneys.  Specifically, plaintiff Andrew Mortensen is represented by

9    Glancy, Prongay & Murray;[29] plaintiff Brian Neff is represented by Roger L. Mandel;[30] Plaintiffs

10   Deana and Matthew Ridolfo are represented by Capstone Law APC;[31] plaintiffs Mali Granot, Paul

11   Dugas, Rajesh Garg, and Yaniv Rivlin are represented by Zaveri Tabb;[32] and plaintiff Jose Abitbol

12   is represented by Bronstein Gewirtz & Grossman, LLC.[33]  Recognizing that many of these named

13   plaintiffs were represented by non-PEC counsel, respecting that representation, and in conformity

14   with uniform ethical guidelines,[34] MDL Class Counsel engaged these plaintiffs through, and in

15   consultation with, their chosen counsel.  That consultation continued for purposes of framing

16   written discovery responses and each Plaintiff's document production, and, as the Court is aware,

17   for purposes of Plaintiffs' depositions as permitted by the Court, (ECF Nos. 233, 241).

18         Defendants' first Motion to Dismiss (ECF No. 94), spanned thirty-five pages and raised

19   numerous complex legal issues.  While MDL Class Counsel Stuart Davidson and his firm, Robbins

20   Geller, took primary responsibility for the research and drafting of the response, several non-

21

---

22   [29] Acting on behalf of Glancy, Prongay & Murray were attorneys Brian Murray, Max Phyo, Olga
     Fort, Gary Johnston, and Paramita Ghosh.
23   [30] Roger Mandel, formerly of Lackey Hershman, L.L.P., and currently of Roger L. Mandel, P.C. .
     [31] Acting on behalf of Capstone Law APC were attorneys Bevin Allen Pike, Trisha K. Monesi,
24   and Lee A. Cirsch.
     [32] Acting on behalf of Zaveri Tabb were attorneys Deval "Dev" R. Zaveri and James A. Tabb. Ms.
25   Gayle Blatt was co-counsel in the underlying Zavari Tabb complaints.
     [33] Acting on behalf of Bronstein Gewirtz & Grossman, LLC were attorneys Peretz Bronstein and
26   Shimon Yifach.
     [34] *See, e,g*, MODEL RULES OF PROF'L CONDUCT R. 4.2 ("In representing a client, a lawyer shall not
27   communicate about the subject of the representation with a person the lawyer knows to be
     represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer
28   or is authorized to do so by law or a court order.").

appointed firms sought to contribute to the briefing and those requests were accommodated, consistent with the MDL Class Counsel's commitment to inclusiveness.  Specifically, attorneys Francis Bottini, Albert Chang, and Yury Kolesnikov of Bottini & Bottini, Inc., assisted with research and drafting regarding the Consumer Legal Remedies Act, Cal. Civ. Code §1750, *et seq.* ("CLRA") claim; attorneys Corban Rhodes, Ross Kamhi, and Joel Bernstein of Labaton Sucharow LLP, assisted with research and drafting regarding the Online Privacy Protection Act ("OPPA") and Stored Communications Act ("SCA") claims; attorneys Michael Ram and Susan Brown of Robins Kaplan LLP assisted with research and drafting regarding the contract claims; and attorneys Howard Longman and Patrice Bishop of Stull, Stull & Brody, assisted with research and drafting regarding the fraudulent inducement claim. Importantly, with respect to Defendants' Second Motion to Dismiss, and even before the Court's February 1, 2018 Order, Mr. Davidson and his firm performed all of the work necessary to prepare the initial draft of Plaintiffs' opposition brief (ECF No. 211), which was reviewed and edited only by other MDL Class Counsel prior to filing.

### 6.    JCCP Counsel: Coordination and Efficiency

Throughout the litigation, JCCP Counsel have worked cooperatively with MDL Counsel in their respective cases against Yahoo. Declaration of Daniel Robinson ¶ 23, filed at (ECF No. 412-13) ("Robinson Decl."). For instance, between October 2017 and January 2018, JCCP Plaintiffs and MDL Plaintiffs jointly negotiated the search terms Yahoo would use for the production of documents in both the JCCP Litigation and this case (*id.* ¶ 25), coordinated topics and documents to be used in the 30(b)(6) deposition and the other Yahoo witness depositions, and cooperated on other discovery aimed at establishing liability and damages. *Id.* ¶ 28.  Before each deposition, JCCP Plaintiffs spent significant time and effort reviewing custodial files for potential exhibits, preparing memoranda on key documents and events in the data breach chronology, creating drafts of deposition outlines, coordinating documents and deposition strategy with MDL Counsel, and attending and/or conducting examination of the witnesses. *Id.* ¶ 29. JCCP Counsel and MDL Counsel were mindful of avoiding duplication to the extent possible when deposing witnesses.  *Id.*

JCCP Counsel, MDL Counsel, and Yahoo jointly selected the Honorable Daniel Weinstein (Ret.) and his colleagues at JAMS to serve as the mediator for both proceedings. *Id.* ¶ 32. Prior to the first mediation session in August 14, 2018, JCCP Counsel coordinated settlement strategy with the MDL Counsel. *Id.* After JCCP Counsel filed their motion for class certification on August 27, 2018, the parties met for a second session before Judge Weinstein on September 7, 2018, where they reached an agreement in principle to settle the claims against Yahoo brought in both the JCCP Litigation and the MDL Litigation. *Id.* ¶¶ 31-32. As part of the settlement, the parties agreed to seek approval of the class action settlement before this Court. *Id.* ¶ 33. By agreement, the MDL Counsel drafted, and JCCP Counsel reviewed and refined, as appropriate, all settlement documents, and JCCP Counsel prepared a declaration in support of preliminary approval. *Id.*

Mindful of the Court's concern that additional time and expenses billed by JCCP Counsel could potentially impact benefits for the Class, JCCP Counsel committed to this Court that they would not submit any time spent or expenses incurred following the first preliminary approval hearing for reimbursement. *Id.* ¶ 38. In fact, no time or expenses incurred after November 6, 2018, are being submitted to the Court by the JCCP Plaintiffs for compensation or reimbursement. *Id.* ¶ 49. Despite not billing for such time or expenses, JCCP Plaintiffs have continued to devote substantial time and financial resources for the benefit of the Class, having continued to revise settlement documents, attended two confirmatory depositions in Chicago and San Francisco, as well as all settlement hearings before the Court. *Id.* ¶¶ 30, 41, 49.

JCCP Plaintiffs also retained Judge Colaw—the previously presiding judge over the JCCP case, who is now a retired neutral with Judicate West—to perform a review and evaluation of the timesheets and expense reports which will be submitted to this Court for review, and to identify potential issues or concerns with respect to the attorneys' fees and costs JCCP Counsel seek. *Id.* at 48; *see also* Declaration of Hon. Thierry Patrick Colaw (Ret.) ¶ 1 ("Colaw Decl."), attached as Exhibit 6. As a result of the review and implementation of the guidelines discussed with Judge Colaw and Settlement Class Counsel, JCCP Counsel have reduced their lodestar by approximately 23%, or from $3,768,273 to $2,906,661. Robinson Decl. ¶ 65; Colaw Decl. ¶ 55. JCCP Counsel also seek reimbursement of $156,379.13 for the litigation expenses incurred prior to November 6,

2018. Robinson Decl. ¶ 65; Colaw Decl. ¶ 56. JCCP Counsel respectfully submit that the number of hours expended and the expenses incurred in the JCCP Litigation are reasonable and commensurate given the duration, complexity, and intensity of this case and the tasks that were performed, and were reasonably necessary for the continued prosecution and resolution of the entire litigation. Robinson Decl. ¶ 67-68; Colaw Decl. ¶ 37, 42, 49, 56-57. This is especially true considering the substantial work and expenses incurred by JCCP Counsel since the first preliminary approval hearing, which are not included in JCCP Counsel's fee and expense reimbursement request. Robinson Decl. ¶ 49, 51; Colaw Decl. ¶ 39, 47 49.

### 7.    Lodestar Crosscheck Analysis

MDL Class Counsel seeks fees for 32,867 hours, for a lodestar of $16,518,130; as well as 1,500 anticipated future hours yielding additional lodestar of $753,862; JCCP Counsel seeks fees for 7,180.4 hours, for a lodestar total of $2,906,661; for a total of $20,178,653. Miller Decl. ¶¶ 20, 42, 63; Yanchunis Decl. ¶ 45.

As demonstrated by Prof. Miller, time spent in this case was done so prudently, and distributed sensibly across types of tasks and attorney experience level (with its related billing rates). Miller Decl. ¶¶ 41-49, Figures 1-8, and Tables 2a and 2b. For instance, document review was originally capped at $350 and later reduced to $240 per hour (including retroactively), regardless of years of experience, resulting in by far the highest number of hours deriving from the $200-$299 rate tranche. Miller Decl. ¶ 45, Figure 5; ¶ 46, n.6. Likewise, the rates sought were standardized via years of experience, and are below that seen in comparable complex litigation, Miller Decl. ¶¶ 56-59, and all billers have submitted biographical information justifying their rates, as well as references to other matters in which those rates have been found reasonable. *See* (ECF Nos. 412-3–412-60)]; Yanchunis Decl. ¶ 53. A detailed review of, for instance, deposition practice demonstrated it was executed efficiently in terms of number of hours and billing rates. Miller Decl. ¶¶ 50-53. A reasonable additional 1,500 hours was added to the total to account for future work, Yanchunis Decl. ¶ 45, including preparing and filing this motion, the Final Approval Motion, responding to objections, litigating any appeals arising from such objections, and handling claim disputes and Class member inquiries. This is a reasonable estimate and including it is well-

1  supported, and far below that seen in similar cases. Miller Decl. ¶ 61.[35] The resultant multiplier of

2  1.49 is well within the averages seen in the empirical data, and well below cases with recoveries

3  in excess of $67.5 million, where average multiplier was 2.72; or for cases with recoveries between

4  $75 million and $150 million, where the mean multiplier was 2.62 and the median was 1.70. Miller

5  Decl. ¶ 60.

6        **C.**    **The Requested Expenses are Reasonable**

7        In common-fund cases, the Ninth Circuit has stated that the reasonable expenses of

8  acquiring the fund can be reimbursed to counsel who has incurred the expense. *See Vincent v.*

9  *Hughes Air W., Inc.*, 557 F.2d 759, 769 (9th Cir. 1977); *Acosta v. Frito-Lay, Inc.*, No. 15-CV-

10  02128-JSC, 2018 WL 646691, at *11 (N.D. Cal. Jan. 31, 2018) ("There is no doubt that an attorney

11  who has created a common fund for the benefit of the class is entitled to reimbursement of

12  reasonable litigation expenses from that fund.") (citation omitted). Such expense awards comport

13  with the notion that the district court may "spread the costs of the litigation among the recipients

14  of the common benefit." *Wininger v. SI Mgmt. L.P.*, 301 F.3d 1115, 1121 (9th Cir. 2002).

15        Here, Settlement Class Counsel request $1,497,609.54 in litigation costs and expenses

16  reasonably incurred ($1,341,230.41 for MDL Counsel and $156,379.13 for JCCP Counsel), plus

17  a $60,000 reserve for expert costs to monitor compliance with the settlement,[36] for a total of

18  $1,557,609.54. Attached to the declarations of Plaintiff's counsel (ECF Nos. 412-3–412-60) are

19  detailed breakdowns of the unreimbursed expenses necessarily incurred by counsel in this case.

20  As with the lodestar, all expenses were carefully scrutinized. These expenses are in line with those

21

---

22  [35] *See, e.g.*, *Nitsch v. Dreamwork Animation SKG Inc.*, No. 14-cv-04062, 2017 WL 2423161, at
23  *10 (N.D. Cal. June 5, 2017) ("Thus these hours do include hours billed in preparing the motion
   for final approval, responding to objectors, arguing at the final approval hearing, working with the
   settlement administrator to distribute the settlement fund, and litigating any appeals."); *In re*
24  *Equifax*, (Docs. 956 at pp. 95 and 106 and 858-1 at p. 30, ¶48) (N.D. Ga. Jan. 13, 2020) (deeming
   "reasonable and justified" class counsel's estimate that counsel will spend at least 10,000 hours
25  over the next seven years "in connection with final approval, managing the claims process, and
   administering the settlement," 2,500 hours of which class counsel expected to reasonably spend
26  specifically "in connection with matters relating to final approval of the settlement, dealing with
   objectors, and handling the inevitable appeals").
27  [36]  As part of the Settlement, Yahoo's is required to undergo annual security program maturity
   assessments, subject to subject to review by a third party appointed by Class Counsel. (ECF No.
28  369-4 § 7). The reserve is to permit payment of a cybersecurity expert for this review.  Yanchunis
   Decl. ¶ 55.

1    previously permitted by the Court. *In re Anthem*, 2018 WL 3960068, at *28; *In re High-Tech*

2    *Employee Antitrust Litig.*, 2015 WL 5158730, at *16 (N.D. Cal. Sept. 2, 2015).

3          **D.**    **Service Award Request Is Reasonable**

4          Finally, Plaintiffs' seek modest Service Awards of $7,500 for eight Plaintiffs, all from the

5    MDL Case, as each had their computers forensically imaged and each was deposed: Andrew

6    Mortensen, Mali Granot, Paul Dugas, Yaniv Rivlin, Matthew Ridolfo, Deana Ridolfo, Kimberly

7    Heines, and Hashmatullah Essar. Counsel seeks Service Awards of $5,000 for three Plaintiffs, as

8    they were either deposed or had their computers forensically imaged: Brian Neff (MDL Case),

9    John Bell (JCCP Case), and Michelle Bouras (JCCP Case). And Counsel seeks Service Awards of

10   $2,500 for five Plaintiffs, all from the JCCP Case, who were not deposed and did not have their

11   computers forensically imaged: Jana Brabcova, Reid Bracken, Hilary Gamache, Jared Pastor, and

12   Brendan Quinn. Combined, the Service Award request totals $87,500.00.

13         The Settlement Class Representatives devoted substantial time and effort to this matter,

14   responding to interrogatories and document requests, gathering and producing documents, being

15   deposed about searching and invasively private topics, and, for many, having their devices

16   forensically examined. Yanchunis Decl. ¶ 59; Riebel Decl. ¶¶ 2-3. The amounts requested here

17   comport with the Ninth Circuit's benchmark and this Court's prior rulings.[37]

18

19     DATED:  January 31, 2020          Respectfully submitted,

20                                          MORGAN & MORGAN

21                                          COMPLEX LITIGATION GROUP
                                          John A. Yanchunis

22                                  *s/ John A. Yanchunis*

23                                     John A. Yanchunis

24

25

26   [37] *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 947 (9th Cir. 2015) (finding $5,000 reasonable); *In re Anthem*, 2018 WL 3960068, at *31 (awarding $5,000 for Plaintiffs who, among

27   other things, responded to discovery requests and were deposed, and awarding $7,500 for Plaintiffs who, in addition, had their devices imaged); *In re Yahoo Mail Litig.*, 2016 WL 4474612,

28   at *11 (N.D. Cal. Aug. 25, 2016) (awarding $5,000.00 where the representative plaintiffs produced personal and work emails, responded to interrogatories, and testified at depositions).

1

2   201 N. Franklin Street, 7th Floor
    Tampa, FL  33602
3   Telephone:  813/223-5505
    813/223-5402 (fax)

4   ROBBINS GELLER RUDMAN
5       & DOWD LLP
    Stuart A. Davidson (Admitted *Pro Hac Vice*)
6   120 East Palmetto Park Road, Suite 500
    Boca Raton, FL  33432
7   Telephone:  561/750-3000
    561/750-3364 (fax)
8   sdavidson@rgrdlaw.com

9   CASEY GERRY SCHENK FRANCAVILLA
        BLATT & PENFIELD LLP
10  Gayle M. Blatt
11  110 Laurel Street
    San Diego, CA  92101
12  Telephone:  619/238-1811
    619/544-9232 (fax)
13
    TADLER LAW LLP
14  Ariana J. Tadler
15  One Pennsylvania Plaza, 36th Floor
    New York, NY  10119
16  Telephone:  212/946-9300

17

18  LOCKRIDGE GRINDAL NAUEN P.L.L.P.
    Karen Hanson Riebel
19  100 Washington Ave. South, Suite 2200
    Minneapolis, MN  55401
20  Telephone:  612/339-6900
    612/339-0981 (fax)
21

22  ROBINSON CALCAGNIE, INC.
    Daniel S. Robinson (244245)
23  19 Corporate Plaza Dr.
24  Newport Beach, CA  92660
    Telephone: 949/720-1288
25  949/720-1292
    drobinson@robinsonfirm.com
26

27  *Attorneys for Plaintiffs and Settlement Class*
    *Counsel*

28

1

2                                 CERTIFICATE OF SERVICE

3          I hereby certify that January 31, 2020, I authorized the electronic filing of the foregoing

4   with the Clerk of the Court using the CM/ECF system which will send notification of such filing

5   to the e-mail addresses denoted on the attached Electronic Mail Notice List.

6          I certify under penalty of perjury under the laws of the United States of America that the

7   foregoing is true and correct. Executed January 31, 2020.

8

9                                                  /s/ *John A. Yanchunis*___ ___

10                                                 John A. Yanchunis
                                                   MORGAN   &   MORGAN   COMPLEX
11                                                 LITIGATION GROUP
                                                   201 N. Franklin Street,
12                                                 7th Floor Tampa, FL 33602
                                                   Telephone:  813/223-5505
13                                                 813/223-5402 (fax)

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28